FILED

2018 JUN 22   AM II: 44

CLERK US DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. [UNDER SEAL], *et al*<br><br>Plaintiff[s],<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendant[s]. | No. CV 17-08726-DSF (AFMx)<br><br>**[FILED UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3730(b)(2) AND (3)]**<br><br>**FIRST AMENDED COMPLAINT**<br>**JUDGE:  Hon. Dale S. Fischer** |

BY FAX



FILED

2018 JUN 22  AM 11: 44

CLERK U.S. DIST. COURT
CENTRAL DIST. OF CALIF.
OS ANGELES
BY:_____

Gloria Juarez, Esq. SBN 109115
LAW OFFICES OF GLORIA JUAREZ
P.O. Box 4591
Montebello, California 90640-9997
Telephone (213)598-4439
Attorneys for Relator, Emily Roe

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA; and THE STATE OF CALIFORNIA; *ex. Relator* Emily Roe., an individual; Plaintiffs, vs. STANFORD HEALTHCARE BILLING DEPARTMENT, STANFORD HEALTH CARE (FORMERLY KNOWN AS STANFORD HOSPITALS AND CLINICS), DR. FREDERICK DIRBAS, DEBRA ZUMWALT, THE BOARD OF DIRECTORS OF THE STANFORD HEALTH CARE, THE BOARD OF DIRECTORS OF THE LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, THE LELAND JUNIOR UNIVERSITY, THE BOARD OF TRUSTEES OF STANFORD UNIVERSITY, STANFORD HEALTH CARE ADVANTAGE, and DOES 1-10, inclusive, Defendants. | **CASE NO. : CV17-08726-DSF**<br><br>**JUDGE:  Hon. Dale S. Fischer**<br>[FILED UNDER SEAL PURSUANT TO FALSE CLAIMS ACT, 31 U.S.C. §§ 3730(b)(2) AND (3)]<br><br>JURY TRIAL DEMANDED<br><br>**FIRST AMENDED COMPLAINT FOR CIVIL DAMAGES**<br><br>**1. VIOLATION OF 31 U.S.C. §§ 3729-33 FALSE CLAIMS ACT "QUI TAM ACTION"**<br><br>**2. VIOLATION OF CAL. INSURANCE CODE §1871 et.seq.**<br><br>**3. VIOLATION OF CAL. GOV'T CODE §§ 12650-12656 FOR MEDI-CAL FALSE CLAIMS**<br><br>Complaint Filed:          Dec. 4, 2017<br>First Amended Complaint:<br>                                      June 20, 2018 |

## STATEMENT OF COMPLAINT

1. This is a False Claims Action (herein "FCA"), brought on behalf of Plaintiffs, the United States of America and the State of California, (herein "Plaintiffs") against defendants Stanford *et al*. for false surgical billing. This case is filed under seal on behalf of Plaintiffs, *ex relatione* Relator Emily Roe pursuant to the *qui tam* provisions of the Civil False Claims Act including 31 U.S.C.§§ 3729-33, Cal. Gov't Code §§ 12650-12656, and the California Insurance Frauds Prevention Act (herein "IFPA") pursuant to Insurance Code § 1871 *et. seq.*

2. Evidence incorporated *infra* was uncovered through proprietary data mining of thousands of adjudicated Medicare claims. Claims analysis showed that defendants Stanford *et. al* and its surgeons freely took advantage of a flawed medical payment system by habitually upcoding and unbundling major surgical codes for breast cancer surgery as well as unbundling and charging exorbitant fees for otherwise "free" services, considered part of the global surgery fees. Additionally, Stanford customarily released "ever-changing" medical records which were not only variable depending on the requestor, but also indecipherable and purposely ambiguous records. For example, a single 23hour mastectomy hospitalization at Stanford resulted in 500 pages of medical records which were at best, unintelligible and internally contradictory as to the services performed.

3. The herewith FCA is based on Stanford's identified billing schemes and habitual submission of false, fraudulent and/or misleading healthcare bills to the government and private insurers, whereas Stanford:

(1) *Unbundled* and billed pre- and post-operative visits *and* facility fees in violation of global surgery fee rules;

(2) *Upcoded* units of exorbitant surgical supplies and medical goods like breast implants or artificial skin substitute- i.e. whereby Stanford billed *double* or more number of *units* than the actual units used, and units recorded in the surgeon's reports;

(3) *Unbundled* and *upcoded* tissue pathology exam codes in violation of the "one tissue, one code" rule- i.e. a single surgical pathology specimen was charged as two or three pathology codes and multiple facility or technical charges;

(4) Habitually *upcoded* physician office visits and time codes to the highest paying level codes (CPT 99205 and 99215) without documentary support;

(5) Freely *upcoded* mid-level providers (physician assistants and nurse practitioners) visits to the highest paying physician codes in violation of "incident to" guidelines- thereby also fraudulently misreporting the actual provider of services;

(6) Unlawfully billed for unsupervised and *unlicensed practice of medicine*, and diagnostic testing and procedures by unlicensed personnel; and

(7) Egregiously instructed and *required* that its medical billers and coders *always bill at the maximum level and fees,* regardless of the lack of medical necessity, lack of substantiating medical records, and failure to adhere to national Correct Coding Initiatives.

## SUMMARY

4. Stanford Healthcare is very *expensive*, particularly for women's health and mastectomy surgery. For example, when national benchmarks for a "one-and-

done" single stage mastectomy cost an average of $34,839-$78,000, Stanford bills a staggering $153,488.68 for the same surgery. ( Exh. E,  p. 95) [1]

| Total Charges | | 153488.68 |
|---|---|---|
| ACCOUNT NUMBER **IMPORTANT – READ REVERSE SIDE** 53448100 | FED. I.D. 77-0488765 | 0.00 PAY THIS AMOUNT |

x assistance, please contact our Customer Service Center in Palo Alto at (650) 498-7200. If you are calling from outside the 650 area code, ease call us at 1-800-353-7491. Our business hours are Monday – Friday 8:00 am – 5:00 pm Pacific time.

5. Stanford's fraudulent billing regularly targeted women's health. Defendants' upcoding and unbundling affected particularly women who underwent cancer treatment at the Stanford Cancer Center located on Blake Wilbur Drive in Palo Alto. This facility is also known as the Wilbur Drive Cancer Center or "Blake Wilbur".

6. Of interest in this action, are Stanford's upcoding schemes in breast surgery, mastectomy, surgical departments, hospital surgical supplies, and countless procedures including pelvic floor testing at the "Stanford Cancer Center".

| |
|---|
| Breast surgery |
| Mastectomy Reconstruction |
| Surgical Departments |
| Pelvic Floor Testing |
| Stanford Women's Cancer Center |
| Stanford Cancer Center on Blake Wilbur Drive |
| Stanford Hospital |
| Stanford Pathology Department and Laboratory |

[1] Explanation of Benefits attached for a 23-hour hospitalization for a single stage "one-and-done" mastectomy at Stanford totaling approximately $150,000 billed.

7. Stanford institutionally bills much higher and quantities of <u>codes</u> for the same or similar procedures. Industry standards show that Stanford deliberately lacks transparency in its healthcare billings, and its billing ledgers are indecipherable.

8. Stanford habitually takes advantage of a flawed medical payment system and capitalizes by upcoding and unbundling surgeries, medical services, and upcoding *units* of surgical supply codes.

9. For example, Stanford typically bills 2 or 3 *units* when in fact one unit is used. Stanford exercises its billing schemes regularly in the expanding field of breast cancer surgery and mastectomy, where one implant costs several thousand dollars, and one artificial surgical tissue used is billed at $17,300 *per unit*. Several hundred million dollars of Stanford's annual revenues are a result of upcoding and unbundling, and estimated to be recoverable pursuant to FCA.

10. Herein Stanford's key six (6) categoric billing schemes have been elucidated and are demonstrated *prima facie* within the attached Complaint and exhibits. (¶3) However, the extent of Stanford's capacious upcoding remains to be fully fleshed out.

11. Stanford's ongoing schemes to defraud the government and private payers is motivated by Stanford's ability to "game the system" by unbundling global surgical fees, churning the abundantly high volume of breast cancer and surgical patients into a larger number of procedures, and using multiplicitous misappropriation of CPT codes for unearned enrichment and big profits.

12. In 2016 alone, Stanford *collected* $3.9 billion dollars in total healthcare revenues. Stanford's billed amount was in excess of Stanford's

collections.   Of the nearly $4 billion dollars collected, $755.7 million was from Medicare.

13.     In the first quarter of 2018, Stanford reported collections of $1.16 billion dollars, up from $1.09 billion dollars in 2017. In 2016 and 2017, while other California providers experienced decreased revenues because of the implementation of the Affordable Care Act, Stanford reported a sizeable income increase and only single digit increase in expenses.

14.     Of Stanford's total annual healthcare billings, it is demonstrated herein that 11-15% of all its billed CPT codes are habitually and fraudulently manufactured through institution wide schemes including pattern upcoding and unbundling.

15.     Stanford Health Care – which includes Stanford Hospital, Lucile Packard Children's Hospital, and three affiliated medical groups – is among the most *expensive* providers in California, making affordable care access increasingly difficult to provide to commercial carriers.

16.     On point, Blue Shield recently unilaterally terminated its contract with Stanford citing: "Stanford Health Care's rates are among the *most expensive* in California and its high costs are *not* consistent with our mission." (Accessed at https://calhealthnews.com/blue-shield-to-drop-stanford-health-care-from-ifp-network/)."As part of our continuing efforts to help make access to health care more affordable for our members, Blue Shield of California is *removing Stanford Health Care* from our Individual and Family Plan (IFP) Exclusive PPO Network, effective January 1, 2016." ( https://www.blueshieldca.com)

17.     In relevant background, Medicare sets and publicly publishes national fee schedules for all medical, surgical, and laboratory services based on standard CPT codes. Hence, Medicare's fees and allowed CPT reimbursements

vary only slightly based on geographic factors. Thus, other than to employ creative billing schemes, it is not possible to justify how Stanford routinely churns a one (1) day mastectomy hospitalization into a $150,000 bill when the benchmark for similar services is far, far under $100,000. (https://www.cms.gov/apps/physician-fee-schedule/license-agreement)

18.      Stanford receives the lion's share of its profits and operating revenues from *healthcare* Federal funds. Stanford's willful implementation of these unlawful billing schemes is intended to override lower health care reimbursements, and to circumvent reduced Medicare fee schedules.

19.      Commercial carriers, Medi-Cal, and healthcare providers typically all use the Medicare fee schedule as a benchmark for their reimbursement schedules. It is industry standard that carriers state their fee schedule globally as "80% of the Medicare fee schedule" or some percentage of the Medicare fee schedule.  Over the past decade, Medicare has gradually reduced its fee schedule particularly for high ticket items like radiology, surgeries, labs, and pathology. Accordingly, there has been  a general reduction in health care revenues  for the same level of services CPT code.

20.      For example, notwithstanding annual inflation and similar adjustments in medical supplies and costs, over the past 10 years Medicare began slashing health care reimbursements and targeting high dollar CPT codes like surgeries. Hence, the same surgery that reimbursed $3000 in 2008 may now be only paying $1200. Therefore, surgeons or pathologists would have to produce far greater work product to just *maintain* their earnings at prior year's levels.

21.      However, Stanford nearly <u>doubled</u> its Medicare revenues in just four years from 2012 ($460.4 million) to 2016 ($755.7 million) *without* an explainable, reasonable, or proportionate increase in expenses or overhead. In fact,

Stanford reported exceedingly low overhead expenses averaging 14% in the pathology clinical laboratory. Through various artifices and schemes, Stanford freely billed and collected unjust enrichment from Medicare, Medicaid, commercial insurance carriers, *and* individual payers through deductibles and co-pays.

| 2012 | 2016 |
|---|---|
| Stanford collected | Stanford collected |
| **$460.4 million** | **$755.7 million** |
| Medicare funds | Medicare funds |

22.    Stanford reported doubled healthcare revenues amidst a nominal expense ratio. While profits are not improper and typically could signal a healthy and thriving organization, Stanford's unconscionable profits signal a willful course of conduct through unbundling and upcoding.

23.    Stanford's disparity in massive healthcare production and doubled earnings and purported extremely low annual expenses simply defies belief, especially in an era when comparable hospitals are struggling, very few post any profit, and many have been forced to restructure or close.

24.    Stanford's hospital expansion plans broke ground around 2011 and expanded facilities are expected  operational in mid to late 2018. However, between 2012 and 2016 Stanford had not undergone expansion. In fact its' hospital campus was under heavy construction resulting in lost space and work delays. Hence, Stanford was expanding when the healthcare dollar was being deeply cut by Medicare, commercial carriers, and Obamacare plans. Stanford was motivated and required large amount of funds to expand, remodel, add beds, establish dominance in the elite healthcare space, and pay salaries of high price tag faculty.

25.     An example on point for reduction is Medicare reimbursement per CPT is code "88307" for tissue pathology.  In 2018 Medicare reimburses this at an average of $240.71, in 2016 paid $288.50, and paid even more at $292.61 in 2013.[2] Medicare's gradual decline in CPT 88307 reimbursement would in effect deduce lower earnings and *higher overhead* since there is an expected reciprocal increase in costs of supplies, staffing, facilities, and the like.

| 2018 | 2013 |
|---|---|
| Medicare pays  $240.71 | Medicare  paid  $292.61 |
| CPT 88307 Pathology | CPT 88307 Pathology |

26.     As previously shown by Stanford's FCA settlement and the multi- million-dollar 2015 Stanford Lucille Packard's Children's Hospital payment to California State for upcoded anesthesia block billing practices, Stanford harbors a deep proclivity toward aggressive billing and maximizing profits.

27.     Stanford has an established penchant toward upcoding and pushing the envelope, and has already been heavily sanctioned for false claims pursuant to Cal. Insurance Code § 1871. Stanford has also been hit with additional Medicare cuts as penalties for substandard patient care and above average healthcare acquired infections (herein "HAI"). (Exh. T, p. 188)

28.     Moreover, during the same time Stanford's own surgeon testified under oath that he would not refer patients to Stanford because "Stanford was without good plastic surgery, without a good plastic surgeon" (Depo. Dr. Dirbas p. 207, 2-8).

---

[2] Referenced Medicare fee lookup  at https://www.cms.gov/apps/physician-fee-schedule/search/search-results.aspx?Y=0&T=0&HT=0&CT=1&H1=88307&C=2&M=4

29.     In unrelated but concurrent Stanford matters, Stanford's employees testified under oath that Stanford was improperly staffed, lacked proper supervision for female procedures, maximized healthcare codes and billing despite contrary medical records, failed to maintain required emergency crash carts and instructed staff to call 911 instead, and for example  caused contaminated anal probes to be erroneously inserted into women's vaginas with false readings, but still billed carriers and Medicare as the intended procedure. (Exh. T)

30.     Despite being under construction, Stanford ended the first quarter of fiscal year 2018 with a remarkable  operating income of $74.3 million, more than double the operating income of $28 million it reported in the first quarter of        fiscal        year        2017.        (Reference https://www.beckershospitalreview.com/finance/stanford-health-care-s-operating-income-more-than-doubles-in-q1.html)

| 2016 | 2017 |
|---|---|
| Stanford 1st quarter income **$28 million** | Stanford 1st quarter income **$74.3 million** |

31.     As a U.S. non-profit entity, Stanford ironically  enjoys rank as one of the top five *most* profitable healthcare entities in the U.S. Stanford is required to publicly disclose its income statements and does so at https://stanfordhealthcare.org/about-us/bondholder-general-financial-information/audited-financial-statements.html. Stanford issues bonds and hence has complete disclosures of Stanford Healthcare's census, assets, earnings, salaries, and expenses. Moreover, Stanford posts its healthcare utilization reports detailing the number of annual surgeries, discharges, and patient days.  Thomas E. Malm,

Treasurer of Stanford Healthcare is listed for contact and report access at tmalm@stanfordhealthcare.org.

32.     Based on evidence herein, it is *estimated* that in 2016 *alone*, ($468 million) a rather conservative estimated *11-15% of Stanford's annual revenues* were statutorily upcoded, unbundled, or fraudulent, and hence recoverable pursuant to FCA.

33.     At a glance, Stanford reported to the State that it performed 34,046 surgeries in 2016, which was up from 32,956 surgeries in 2015, and up from 30,751 surgeries in 2014.   At a very conservative estimate that 13% of the total in 2016 surgeries were preceded by an unbundled pre- or post-op visit, that totals 4426 surgeries where typically a high complexity office visit code (CPT 99214 to 99215) was wrongly billed, and hence subject to FCA.

34.     Moreover, in addition to the upcoding of professional fees, Stanford's facility fees were similarly affected as well as were upcharges for the quantity billed of durable surgical supplies, such as breast implants, artificial tissue (Alloderm), and tissue expanders (herein "TE"). Implants and TE, which are billed at thousands of dollars per breast, carry a great billable and profit margin, especially when they are double billed to multiple patients for the same product. For example, Stanford fully admitted that it upcoded and billed double units of high dollar artificial tissue ($17,300 per unit for Alloderm) used in surgery, when the surgeon's report and deposition under oath showed that only one unit was used. (Exh. D,E,K)

35.     In simple calculation, extrapolating Stanford's conservative number of unbundled pre-operative visits in 2016 multiplied by $341.97 per captured pre-operative visit results in unjust enrichment to Stanford of $1,513,559.22 in professional fees *plus* facility fees, in 2016 alone.

36.     This action alleges that Stanford's violation of FCA likely began prior to 2010 and are continuing. Hence the base damages for Stanford's unbundling of professional fees for pre-operative visits, extrapolated by the number of years, is easily *$15 million dollars*. That figure can double once the technical or facility fees are added. Stanford captured improper facility fees for unbundled pre-operative visits which are also subject to FCA. Hence, FCA entitles Plaintiffs to *penalties* in addition to the base earnings recovery.

37.     Stanford was put on formal notice and has been aware of its unbundling billing compliance since at least November 2016 and again on March 2017. Stanford and their executive Vice President and Chief Compliance Officer Ms. Zumwalt's response was not to respond or to investigate, but rather to do what Stanford does well when caught red handed- *suppress and conceal*.  In response to notice of noncompliant surgical billing practices, Stanford cause to be filed a *motion in limine* to suppress their joint billing frauds.

38.     In March 2018, Stanford billing compliance officers, including Ms. Debra Zumwalt as General Counsel,  and their outside counsel have been aware of their billing non-compliance for more than a year.  The same parties have since independently and consistently conceded in writing to Stanford's unbundled pre-operative visits and up coded units of surgical products. (Exh.  J).  If fact, Stanford sent relator a check 2 months ago refunding the  $341.97 from the unbundled    2012       pre-operative       visit.      (Exh.     K,     L)



FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

39.     Stanford also wrote to relator in June 2018 that Stanford was in process of sending *another* check to relator for upcoded and unbundled services. (Exh. J). In June 2018, Stanford Counsel also conceded that Stanford General Counsel was aware of the pathology  tissue fraud allegations.

40.     For example, Stanford's Medicare payment ledgers for thousands of surgeries show that upcoding and unbundling was routine. A typical Stanford surgeon Dr. Amanda Wheeler billed Medicare $1,494,584.50 or approximately $1.5 million over a four-year period from 2013 to 2017. $778103.5 50% of that amount was breast surgery. Of that subtotal, 11-20% of claims were upcoded and/ or unbundled.

41.     As another example, Dr. Nguyen billed Medicare $2,695,000.65 is a five-year span from 2012 to 2017. Dr. Dung H. Nguyen, M.D. PharmD is the Director of  Breast Reconstruction at Stanford Women's Cancer Center and she billed CPT 15777 (biologic or artificial tissue  implant procedure) 23 times from 2013 to 2017; the majority of those were billed as bilateral procedures and at least 2 units of the artificial tissue were billed by Stanford , regardless of how many units were used.

42.     Pursuant to Internal Revenue Code, Defendants' tax returns are of public record. This FCA has examined Stanford's disclosed tax records and public  filings  with  the  State. **Defendants' self-reported disparity of unconscionable double digit increases in health care revenues and very low expense increases is often reflective of the fact that *creative coding schemes* are at play.** Operating expenses required for more production and services reasonably necessities more supplies, gauze, needles, paper towels, syringes, table paper, utilities, staffing, and the like. Hence expenses  would be expected to also climb proportionately. For example, Stanford's doubling of Medicare revenues without

explicable increases in expenses simply defies belief. Stanford's purported public "successes" in healthcare of a $1.1 billion dollar profit the first quarter of 2018 amidst decreasing Medicare nationally set fee schedules also defy belief.

43. Stanford's schemes are to routinely upcode to the highest level paying code for a given *class* or *time* of service, regardless of the true service provided. Stanford also upcodes the number of units for supplies and services, as well as improperly unbundles surgical services for unconscionable healthcare profits.

44. Stanford has only approximately 613 licensed beds in its main hospital and 311 licensed beds in the Children's Hospital. At a glance, Stanford's combined 924 patient inpatient beds purportedly generate 40-50% of the healthcare giant's annual healthcare revenues. (Ref. Dr. Brent Tan , MD, PhD Director of Laboratory Informatics, Stanford Department of Pathology- accessed at http://www.executivewarcollege.com/wp-content/                 uploads/TAN.tue_ .7am.Final_.pdf ). As a simple ballpark calculation, Stanford reports a striking revenue of $2,110,389 per patient bed per year.  Of Stanford's annual healthcare *revenues*, it is therefore estimated that $468 million dollars is recoverable through this false claims action.

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

**:s** 

**Summary**

- Licensed Beds – 613 Beds
- Adult Acute Care – 466 Active Beds
    - 59   Intensive Care
    - 8   Coronary Care
    - 369   General Medical/Surgery
    - 30   Acute Psychiatric
- Surgical Services
    - 33   Operating Suites
        - 21 Main OR
        - 12 Ambulatory Surgery
    - 14   Cath-Angio Suites
    - 6   Outpatient Surgery Units at Redwood City
- Transplant Center, Level 1 Trauma Center, Comprehensive Cancer Center
- EMR: EPIC since 2008

**s Hospital**

**Summary**

- 311 Total Licensed Beds
    - 111   Pediatric Services
    - 89   Intensive Care Newborn Nursery
    - 44   Intensive Care
    - 32   Perinatal Services
    - 35   Unspecified General Acute Care
- Surgical Services
    - 7   Operating Suites
    - 3   Cesarean Section OR Suites
    - 3   Ambulatory Procedure Rooms
- EMR:
    - EPIC 2013 (CERNER prior)

45.     Stanford began an extensive hospital expansion project on May 1, 2013 which is anticipated to be completed in 2018 and lead to an additional 144 patient beds at Stanford. However, it is notable that when Stanford posted these remarkable doubling of Medicare revenues between 2012 to 2016, the hospital had the same or decreased access,  and expansion was not actualized. The Hospital expansion project broke ground in mid-2013, hence that date does not support Stanford's basis for a near doubling of profits.  Creative billing schemes would however,  substantiate the types of increases in healthcare revenues reported at Stanford from 2012 to 2016. Inset below are schematics of Stanford's new "Arcade"..





**View of the New Stanford Hospital
from Welch Road**



**Arcade at New Stanford Hospital**

46.     Of note are that Stanford's healthcare billings are habitually contradictory to the actual healthcare services provided for patients, and the medical records are contradictory to the CPT codes billed. Stanford generates volumes of paper for a simple hospitalization, for example in a 1 day mastectomy hospitalization, Stanford's medical records were 500 pages. In many instances the doctor's surgical notes are contradictory to the nursing records for surgical supplies used, and the billing for units of surgical supplies are habitually at the maximum possible codes.  The doctor's surgical records contradict the doctor's testimony under oath, and there are different version of surgical reports depending on who requests the records. Stanford billers are routinely  instructed to unbundle and upcode services for maximal reimbursement despite that Stanford knows that the

billed codes are also contradictory to national Correct Coding Initiatives (herein "CCI").

47.     Hence Stanford's habitual false coding led to false billing, which in turn led to unjust and exorbitant healthcare revenues for Stanford. Itemized Medicare billing ledgers for tens of Stanford surgeons, and accordingly thousands of Medicare beneficiaries demonstrate that Stanford habitually violated national CCI. Stanford's exorbitant healthcare billings  were *not* only unsupported by Stanford's own surgical and medical records, but the coding which led to the collected revenues was also knowingly in direct violation of CCI's.

48.     In FY 2016, Stanford (also Stanford HealthCare or "SHC") treated approximately 71,500 patients in its emergency room, admitted more than 25,700 inpatients and recorded nearly 697,000 outpatient transactions. [3] Stanford reported to the State that it performed 34,046 surgeries in 2016, which was up from 32,956 surgeries in 2015, and up from 30,751 surgeries in 2014.

49.     In 2016 California commercial carriers like Blue Shield unilaterally terminated their contracts with Stanford based on recognizance of Stanford's disproportionate and *"expensive"* billings. Many carriers including Medicare and Anthem Blue Cross have *not* yet terminated Stanford contracts.

50.     Stanford freely promotes and incentivizes institution wide upcoding and unbundling to achieve maximal healthcare profits. Stanford fraudulently upcodes claims to maximize profits particularly in high ticket women's health services including mastectomy and breast cancer.

51.     Defendants collectively herein "Stanford" devised billing schemes to artificially inflate medical and surgical revenues over at least an eight

---

[3] https://www.treasurer.ca.gov/chffa/meeting/2017/20171207/staff/430.pdf

(8) year period from 2010-2018, resulting in hundreds of millions of dollars of recoverable overpayments.

52.     This action makes prima facie showing that Stanford knowingly used artifices to violate correct coding initiatives and upcode standardized healthcare fee schedules for a profit motive. (Exhibits- excel spreadsheets of Stanford billing codes per surgeon)

53.     For example, on 12/12/12 Stanford billed a *commercial carrier* $153,488.68 for a 23-hour mastectomy surgery hospitalization (facility fee and professional fees). $153,488.68 is *expensive* by local hospital standards for a less than 1-day hospitalization.

54.     On 3/23/18 (five years later) Stanford <u>conceded</u> in writing that $17,758 (approximately 13%) of that total bill was *upcoded and unbundled*, hence rendering the service fraudulent pursuant to Cal. Ins. Code § 1871 *et. seq*. (Exh. MM).  Stanford habitually upcoded number of units of surgical supplies, including CPT code 15121 As detailed herein, Stanford received and retained *at least 13%* unjust enrichment from Anthem Blue Cross.

| STANFORD'S CODING | | *CORRECT* CODING | |
|---|---|---|---|
| CPT 15171 (2 units) | $34,600 | CPT 15171 (1 units) | $17,300 |
| CPT 99215 (pre-op visit) | $458 | CPT   No Charge Pre-op | $0 |
| | | | |
| Stanford Fee | $35,058 | Correct Fee | $17,300 |

55.     On June 20, 2018 Anthem Blue Cross (herein ABC) telephonically confirmed that Stanford's Dec 12, 2012 claim had been adjudicated and paid for 2 units of Alloderm, and that Stanford had submitted *no* refunds of any type since claim processing in Jan. 2013 by ABC.

56.     As another example, on 06/29/16 Stanford billed Medicare $3729 in total professional fees for two office visits and a mastectomy. Stanford violated global surgical fees because the pre-operative visits the day before surgery was unbundled.  Hence, pursuant to 31 §§U.S.C. 3279-3733, $263 (7%) of just the professional fees was fraudulently billed on 6/28/16 for a pre-operative visit. Incorporating the related fraudulent facility and operating room fees, Stanford received and retained at least 13-17% in unjust total enrichment from Medicare. (Billing National Provider Identification (herein "NPI")  1437292927, Rendering NPI 1154457091).

| STANFORD'S CODING | | *CORRECT* CODING | |
|---|---|---|---|
| CPT 99215  (pre-op visit) | $263 | CPT    No Charge Pre-op | $0 |
| Stanford Fee | $263 | Correct Fee | $0 |

57.     In many cases, Stanford surgeons' operative reports don't support the number of surgical durable good billed, and the nursing records don't support the surgeon's operative report.  In other words, the evidence contradicts the billings, and the billings are contradictory to the medical records. In other cases, Stanford mid-level providers'  medical records don't support Stanford's *physician* service codes billed, and the billed high fees aren't supported by standard 15-20% reduced fee schedules for mid-level providers.

58.     The full extent of Stanford's billing schemes has not been elucidated. Stanford has paid out on prior FCA suits.  However due to Stanford's influence and power and under their direction, those  FCA have largely been either

kept under seal or concealed[4] from public court files. Stanford Children's Hospital anesthesia time block upcoding settled for monetary payment to the State Insurance Commissioner by Stanford on or about mid-2013. However, Stanford negotiated to suppress the FCA files from public access.

## STANFORD'S SIX (6) BILLING SCHEMES

## FIRST

59.    **First scheme, Stanford freely and habitually unbundled pre-operative visits** in violation of simple global surgical fee rules. A "pre-surgery" visit is not separately chargeable.  Once the decision for surgery is made, another visit cannot be stacked on top of the global surgery fee. Stanford unbundled pre-op visits and collected Medicare and non-Medicare money. Stanford did this through two separate unlawful charges, neither of which  were allowed.

(1) Stanford billed a professional fee for the surgeon's  pre-op visit.

(2 Stanford billed additionally a facility fee for the institution.

60.    For  example,  a  correctly  coded  mastectomy  professional component pays approximately $1000.  The global surgery fee includes pre-op and post-op visits.

61.    After  the  decision  for  surgery  was  made,  Defendants  required most patients to return a day or two before surgery.  Defendants then separately tacked on a "comprehensive return visit" before surgery at $268-$491.  Stanford's

---

[4] Although Stanford paid money to settle the case, Stanford negotiated to conceal from public court access the False Claim Action case filed  pursuant to Calif Insur. Code § 1871.4 ex Relator Rockville Recovery Associates for fraudulent anesthesia timeblock billing by Stanford Children's Hospital.

*unbundling* scheme resulted in the mastectomy professional fee of roughly $1268-1491, a 26%-49% increase per claim.

62.     Facility fees pay richly thousands of dollars for global surgery codes. Stanford's pre-operative visit unbundling scheme added hundreds and thousands of dollars in facility fees per claim.

**SECOND**

63.     **Second scheme,** Stanford upcoded a majority of midlevel provider office visits. Care was provided by mid-level providers like physician assistants (herein "PA") without the supervising doctor but Stanford billed under the physician (National Provider Identification herein "NPI")

64.     A PA office visit pays approximately $80, but Stanford's scheme resulted in pay out of $100-$110 because Stanford falsely coded that doctors provided the service. But for Stanford upcoding services with a false NPI, CMS would have paid 80-85% of fees if a midlevel provider rendered professional service.

65.     Stanford uses many mid-level providers throughout its surgical departments but billed exclusively under the surgeons' NPI even when the surgeon was on vacation. Defendants' PA's total billings show less than 20 visits per annum in cases reviewed, whereas all other visits were *improperly* billed under the doctor. Stanford also violated "incident-to" rules by freely billing new patient visits provided entirely by the PA, under the doctor's NPI. The doctor would sign off a note that he reviewed the chart without ever being involved in the direct care of the patient. *"I have reviewed the Physician Assistant's note and agree with..."* This is incorrect use of the non-physician practitioner and incorrect billing under the "incident to" guidelines.

**THIRD**

66.      **Third scheme,** Stanford freely and fraudulently upcoded billed quantities and <u>units</u> of exorbitant medical and surgical supplies. For example, throughout its hospitals and operating rooms, if one breast implant was used, Stanford billed 2 units resulting in thousands of dollars of unjust enrichment. The surgeon's notes and operating room nurse notes showed one unit, but upcoding regularly resulted in billing more units than used. (Exh. MM- Stanford admission)

67.      Stanford fraudulently billed another patient for the unused second implant or surgical tissue that was already billed to another patient's carrier.

68.      This case demonstrates a congregation of Defendant's billing, medical records, and nursing records which when examined together show the fraud.

69.      For example, this case shows that Defendant surgeon only used 1 sheet (1 unit) of artificial tissue and Stanford freely billed 2 units. In the case of Alloderm, *each unit* costs $17, 300 (CPT 15171). Stanford performed some 220 mastectomies and hundreds more surgeries involving artificial tissue in one year, at an estimate that 100 of those cases had upcoded Alloderm units, that estimates to **$1,700,000 per annum of false** and fraudulent charges in just one medical supply code for mastectomy. Alloderm is also used in other surgeries and flaps and grafts, hence fraudulent billing for units of Alloderm is estimated at $2.5 million dollars a year. Stanford's true usage of durable goods can be *reconciled* with the number of units purchased from the manufacturer annually.

**FOURTH**

70.    **Fourth Scheme, Stanford upcoded and improperly billed related testing, procedures, and ancillary services** including:

- Codified disproportionate percentage of visits as CPT 99215, consecutive high-level visits amounting to 40 minutes of face-to-face physician time, when the documentation did not support the coding: a correctly coded level visit pays $80 whereas Stanford's upcoding pays $120 or $150;

  - Billed for the *unlicensed practice of medicine* by interns and students when no attending signed the notes (Dirbas deposition);

  - Billed for medical services and office visits by students and unlicensed interns but no- attending or licensed physicians on premises or co-signed the intern and student notes (See Dirbas Deposition- Exh. JJ);

  - Billed for diagnostic testing and medical procedures when no attending physician was on premises (*See* Dirbas Deposition, and Exh. KK Quiqia Young Complaint ¶175- on pelvic floor testing and billing without required physician on site).

- Billed the maximum level and highest code possible per encounter.

- Instructed its coders to always code the highest level of service and time per procedure regardless of controverting and unsupported medical records.

## FIFTH

71.    **Fifth Scheme, Stanford upcoded and improperly billed anesthesia time block billing, and postoperative time billing** including:

- Codified disproportionate time block billing for anesthesia services and "post anesthesia care";

- Charged more than $1000 per 15 minutes of post anesthesia care and upcoded the units of time billed which were not supported by the medical records (for example in relator's claim  Defendant reported an unsubstantiated 13 units of post anesthesia care on 12/12/12 which would translate to 195 minutes or 3 ¼ hours spent in the recovery room);

- Unbundled and charged tens of thousands of dollars for "anesthesia time";

- Unbundled and charged nearly one hundred thousand dollars per 8 hours for "OR time" (or roughly $10,000 per hour of operating room time);

- Failed to show supporting documentation to support the coding;

- Billed the maximum level and highest codes possible per encounter.

- Instructed its coders to always code the highest level of service and time per procedure regardless of controverting and unsupported medical  records.

- For example, unbundling of the "OR room" resulted in charges of $69,685 plus $16,848.00 plus $14,870 totaling $101,403.00

**SIXTH**

72.     **Sixth Scheme, ("Tissue Fraud") Stanford upcoded units and improperly billed pathology laboratory tests** including:

- Upcoded and unbundled  a single mastectomy surgery breast specimen as three separate pathology services;

- Failed to correctly bill the number of specimens per the surgeon's operative report;

- Habitually billed the maximum level and highest codes possible per encounter;

- Freely violated the "one specimen, one code pathology" rule; and

- Received unjust enrichment of 45-76% by the described tissue fraud schemes.

73.  Stanford's Anatomical Pathology and Clinical Laboratories is *very* profitable. Stanford bills both a technical( tissue requisition and preparation) and professional (physician interpretation service) component for anatomical pathology. Through an imperfect payment system, the reimbursable technical component is often 3 to 4 times the professional component. For example, in 2016, according to CMS the technical component ( or facility fee) for mastectomy tissue was a whopping $288.50 and the professional component was $98.27.

74.  According to Stanford,  "At the Stanford University Medical Center, approximately *31,000 surgical specimens* originating from the Stanford Health Services Operating Rooms, Stanford University Clinics, other area clinics, or from the private and independent Palo Alto Surgicenter are accessioned yearly." "Another *13,000 cases* are reviewed either when patients, whose pathology specimens were originally examined elsewhere, are referred to Stanford for treatment or when other pathologists refer difficult cases for second opinions." (Accessed at http://surgicalpathology.stanford.edu/  (Exh. CC))

75.  Case in point is CPT 88307 for tissue pathology which reimburses $240.71 in 2018, but paid $288.50 in 2016, and paid even more at $292.61 in 2013.[5] The demonstrated  declines in the reimbursement for pathology codes would infer *higher overhead* calculations and lower profits. While  there is an expected reciprocal increase in costs of supplies, staffing, facilities,  and the like, Stanford posts astonishing profits that are neither  in line with community standards nor with revenues.

---

[5] Referenced Medicare fee lookup  at https://www.cms.gov/apps/physician-fee-schedule/search/search-results.aspx?Y=0&T=0&HT=0&CT=1&H1=88307&C=2&M=4

76.     In 2012 alone, Stanford labs billed out charges of $1.0 billion gross billings for over 5.3 million billable tests. [6]Of the 1 billion dollars, 41% of the fees were generated from SHC inpatient fees, such as the pathology schemes described here. Remarkably, Stanford reported that expenses were a fraction of the billables at $142 million dollars. Simply calculating Stanford's percent overhead in billings versus expenses, that places Stanford's lab overhead at astonishingly low 14% overhead. Such fantastic billing is virtually unheard of in the medical space where overheads typically range from 35% to 75% of billings. Stanford's "superhero" low overhead supports *creative billing schemes*.

## Anatomic Pathology and Clinical Laboratories Statistics

 Stanford HEALTH CARE

- Shared service: Stanford Health Care, Stanford Children's Health, Clinics, and Referred Clients
- Over 5.3 Million Billable Tests in FY2012
- Locations
  - Core Laboratory (SHC)
  - Transfusion Service (SHC)
  - Anatomic Pathology (SHC & Hillview)
  - Specialty Laboratories (Hillview)
  - 12 Patient Service Centers
- Over $1.0 Billion Gross Charges in FY2012
  - 41% SHC Inpatient
  - 59% LPCH, SHC Outpatient & Referral Testing
- $142 Million Expenses
- 22 sections
- 544 Paid FTE's
- 53 Faculty, 17 Clinical Fellows, 36 Residents




---

[6] (Ref. Dr. Brent Tan , MD, PhD Director of Laboratory Informatics, Stanford Department of Pathology 2015- accessed at http://www.executivewarcollege.com/wp-content/ uploads/TAN.tue_ .7am.Final_.pdf )

77.     For example, of one of the upcoding schemes, Stanford's surgical records for relator demonstrate that on 12/12/12 a <u>single</u> right breast tissue was sent to the Stanford lab for pathology examination.  Hence a <u>single</u> pathology code should have been billed. However, Stanford manufactured unsupported charges of $3342.00 and *unbundled* and *upcoded* the <u>one tissue into three separate</u> <u>pathology codes.</u>

78.     For instance, as exemplified here Stanford's schemes involved upcoding a single (1)  mastectomy  specimen as three (3) pathology codes.



79.     The surgeon's operative report [inset below] stated only one (1) specimen was sent to the lab for each breast.

Official Copy

 STANFORD

STANFORD HOSPITAL
450 BROADWAY STREET
REDWOOD CITY, CA 94063

Sex: F

Adm:12/12/2012

**SURGERY REPORTS (continued)**

OPERATIVE REPORT (continued)
DATE OF OPERATION: 12/12/2012

PREOPERATIVE DIAGNOSES:
1. Fibrocystic changes, right and left breast

POSTOPERATIVE DIAGNOSES:
1. Fibrocystic changes, right and left breast

OPERATION PERFORMED:
1.    Prophylactic nipple-sparing right total mastectomy.
2.    Prophylactic nipple-sparing left total mastectomy.

SURGEON: Frederick M Dirbas, MD

ASSISTANT: Jon Gerry, MD

ESTIMATED BLOOD LOSS: 50 mL.

IV FLUIDS: 2 L crystalloid.

SPECIMEN:
1.    Right breast with double stitch at the ductal tissue underneath the nipple and single stitch at the axillary tail.
2.    Left breast with double stitch at the ductal tissue underneath the nipple and single stitch at the axillary tail.

DRAINS:

80.    Nothing in the Stanford surgeon's reporter his testimony under oath supported the total number of pathology specimens billed. ( Depo Dr. Dirbas p.154-159). Stanford billed for 6 pathology codes for a total of $6600. Four of the codes in the pathology billing were not supported by the operative reports, and two of the codes were unsupported by any record or nursing notes.

81.    Even the Stanford pathologist's report reflects a total of four (4) specimens, but Stanford billed for (6) specimens. It is illegitimate for Stanford to have billed for purported "surgical specimens" which have no accounting in the surgeon's operative reports or surgical nursing records.

82.    In many cases, Stanford unbundled and upcoded billed out three levels of pathology including 88305, 88307, and a "breast biopsy code" for one *contiguous* mastectomy surgical tissue removed together which when billed

1   correctly results in mandatory *bundling* into one code. The signed surgical report

2   showed only two specimens were removed. ( Inset below- Exh. 12/12/12 Op.

3   report)

4   Official Copy

5   🛡 STANFORD          STANFORD HOSPITAL
                        450 BROADWAY STREET
                        REDWOOD CITY, CA 94063                           Sex: F

6                                                       Adm:12/12/2012

7                                   **SURGERY REPORTS (continued)**
    OPERATIVE REPORT (continued)

8   DATE OF OPERATION: 12/12/2012

9   PREOPERATIVE DIAGNOSES:
    1. Fibrocystic changes, right and left breast

10  POSTOPERATIVE DIAGNOSES:
    1. Fibrocystic changes, right and left breast

11

12  OPERATION PERFORMED:
    1.      Prophylactic nipple-sparing right total mastectomy.
    2       Prophylactic nipple-sparing left total mastectomy.

13  SURGEON: Frederick M Dirbas, MD

14  ASSISTANT: Jon Gerry, MD

15  ESTIMATED BLOOD LOSS: 50 mL.

16  IV FLUIDS: 2 L crystalloid.

17  SPECIMEN:
    1.      Right breast with double stitch at the ductal tissue underneath the nipple and single stitch at the axillary tail.
    2       Left breast with double stitch at the ductal tissue underneath the nipple and single stitch at the axillary tail.

18  DRAINS:

19  CULTURES: None

20

21

22          83.     However, for this operative date showing only two (2) pathology

23  specimens generated Stanford Hospital charged (herein "HC")  and upcoded a

24  staggering $6600 for six (6) units of high level pathology codes.

25

26

27                                      - 30 -

28

| DATE OF BILL 09/29/1? | ![STANFORD] STANFORD HOSPITAL & CLINICS Stanford University Medical Center | PATIENT FINANCIAL SERVICES P.O. Box 742195 Los Angeles, CA 90074-2195 HOSPITAL STATEMENT | ITEMIZED STATEMENT OF ACCOUNT | PAGE NO. 1 |

| PATIENT NAME A | HOSP ACT# 5346 | ACNT NUMBER 0 | INITIAL SERVICE DATE 12/12/2012 | DISCHARGE DATE 12/13/2012 | MEDICAL # 1? | MRN NUMBER |

| GUARANTOR NAME AND ADDRESS | ? 9-3360 | INSURANCE COMPANY NAME )SS PPO | GROUP NUMBER 212900 | POLICY NUMBER XDL |

Make Check Payable To: Stanford Medical Center.
If you wish to pay by credit card, please complete reverse side.
Please write the ACCOUNT NUMBER on your check and return with the top portion of this statement.

| AMOUNT OF PAYMENT | $ |

| DATE OF SERVICE | SERVICE CODE | DESCRIPTION OF HOSPITAL SERVICES | QUANTITY | TOTAL CHARGES |
|---|---|---|---|---|
| 121212 | 25391137 | HC DGR MED/SURG PRIV | 1 | 8897.00 |
| 121212 | 30007447 | HC BREAST IMPLANT LVL 13 | 2 | 2203.92 |
| 121212 | 30201354 | HC OR MAJOR 7HR15 | 1 | 69685.00 |
| 121212 | 30240444 | HC INTENSE POST ANES CARE 15 MIN | 13 | 14846.00 |
| 121212 | 30290806 | IMPL DERMAMATRIX 8X16 | 2 | 34600.00 |
| 121212 | 30302608 | HC ANES TIME 8 HR | 1 | 14870.00 |
| 121212 | 52005402 | HC PATH EXM-COMPL-LV4 | 2 | 1700.00 |
| 121212 | 52005501 | HC PATH EXM-EXTND LV5 | 2 | 3306.00 |
| 121212 | 52025244 | HC SP BREAST BIOPSY-RA | 2 | 1678.00 |

84.     Stanford's upcoded pathology charges resulted in $6684 of technical fees (" HC" Hospital charges) for the Stanford  whereas  Stanford was entitled to only bill for 2 units of pathology, totaling approximately $827.52  per the benchmark Medicare fee schedule.

| STANFORD'S CODING | | *CORRECT* MEDICARE ALLOWED | |
|---|---|---|---|
| CPT 88305 Level IV  (2 units) | $1700 | CPT 88307 (2 units) | $827.52 |
| CPT 88307 Level V  (2 units) | $ 3306 | | |
| CPT 88303  Level II  (2 units) | $ 1678 | | |
| Stanford Billed | $6684 | Correct Total Revenue | $827.52 |

85.     As illustrated  below, the surgeon's report ( ¶71 ) showed one complete  mastectomy specimen from each  breast.  However, Stanford coded 3

pathology specimen codes per breast, which was contrary to the surgeon's operative report that showed only one specimen was surgically removed.

*Correct* Coding

 

1 surgical specimen  =  1 pathology code

Stanford's Coding

 =   

1 Surgical specimen  3 pathology codes

    86.    A "double" or bilateral preventative skin and nipple sparing mastectomy involves the surgical removal of both breasts. In the presented example, the surgeons' report showed that two specimens were generated. The surgical report also stated that no nipple tissue was removed, and no other tissue was collected.



87.     Here, on 12/12/12 the Stanford surgeon's operative report correctly recorded that there were only <u>two (2) surgical</u> specimens generated in total by the surgeon: "SPECIMENS: 1 and 2" , one right breast and one left breast.

Correct:  2 specimens from bilateral mastectomy

 

88.     Stanford surgeon Dr. Dirbas testified in deposition that his operative report stated only  2 pathology specimens. His surgical report specifically listed only 2 tissues, 1 right breast and 1 left breast.  (Exh. F Dr. Dirbas Depo p.154-159) He later testified under oath that he sent 2 extra tissues, 1 from the nipple  and one from the flap. He also  testified that the patient had not consented to a nipple

cording or biopsy, and no where in his operative report was it recorded that he took any additional tissue other than the entire breast-  right and left. (Exh. F Dr. Dirbas Depo p.154-159)

89.    However, on 12/12/12, Stanford surreptitiously fabricated  on its pathology requisition form an additional 2 pathology specimens (for a total of four breasts specimens).  The purported four specimens were contradictory to the surgeons' transcribed, signed, and verified surgical report.

 
 

LABORATORY OF SURGICAL PATHOLOGY
STANFORD HOSPITAL _CLINICS
ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL # (650) 723-7211   FAX # (650) 725-7409
M.R. Hendrickson, M.D., R.L. Kempson, M.D., R.K. Sibley, M.D.
Co-Directors, Surgical Pathology, Dept. of Pathology

FIRST AMENDED COMPLAINT United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

Pathology Results (12/18/12 - 12/18/12)

SURGICAL PROCEDURE [411380593]                                          Resulted: 12/18/12 1506, Result Status: Final result

| Resulting Lab Narrative: | SUNQUEST LAB | Specimen: | 12/12/12 1450 |

Accession No: SHS-12-46585
SPECIMEN SUBMITTED:
A. RIGHT BREAST
B. LEFT BREAST
C. RIGHT UPPER MASTECTOMY SUBCUTANEOUS FLAP
D. LEFT BASE OF NIPPLE

GROSS DESCRIPTION:  Four specimens are received labeled with the patient's name and medical record number.

The first specimen labeled "right breast" is received fresh and placed into formalin on 12/13/12 at 9:44 am.  It consists of a 632 g, 20 x 22 x 3 cm right nipple-sparing mastectomy.  No axillary contents are attached.  No skin or nipple is present on the specimen.  The breast is oriented by the surgeon and is inked in the usual manner such that deep is black, anterior/superior is blue, anterior/inferior is green, and nipple bed is yellow.  No masses are palpated. The specimen is serially sectioned from medial to lateral into 0.8 cm thick sections.  The 25 macrosections are laid out flat such that deep is at 9 o'clock and superior is at 12 o'clock, The serial sections reveal predominantly white rubbery breast tissue with no masses, biopsy cavities, or other abnormalities.  The specimen is radiographed to reveal no clips, calcifications, or masses.  Representative sections are submitted as follows:

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

**Pathology Results (12/18/12 - 12/18/12) (continued)**

SURGICAL PROCEDURE [411380593] (continued)                    Resulted: 12/18/12 1506, Result Status: Final resu

intramammary node.

The second specimen labeled "left breast" is received in fresh and placed into formalin on 12/13/12 at 9:44 am. It consists of a 613 g, 18.5 x 18 x 3.5 cm left nipple-sparing mastectomy. No axillary contents are attached. No skin or nipple is present on the specimen. The breast is oriented by the surgeon and is inked in the usual manner such that deep is black, anterior/superior is blue, anterior/inferior is green, and the nipple bed is inked yellow. No masses are palpated. The specimen is serially sectioned from lateral to medial into 0.8 cm thick sections. . The 22 macrosections are laid out flat such that deep is at 9 o'clock and superior is at 12 o'clock. There are two palpable well-circumscribed nodules within the white rubbery breast tissue. The first nodule is located in macrosection 10, measures 1.2 x 1 cm, and is located 2 cm from the anterior margin and 2.2 cm from the deep margin. A second nodule measures 1 x 1 x 0.6 cm and is located in macrosection 12. This lesion is 2.5 cm from the nearest anterior margin and 2.4 cm from the deep margin. The remaining breast tissue is predominantly fatty with no biopsy sites or masses. The specimen is radiographed to reveal no clips, calcifications, or masses. Representative sections are submitted as follows:
B1 macrosection 1, lateral margin
B2 macrosection 9, outer lower quadrant
B3 macrosection 10 mid outer, first nodule
B4 macrosection 12, mid outer, second nodule
B5 macrosection 13, nipple bed
B6 macrosection 15, lower inner quadrant
B7 macrosection 18, inner upper quadrant
B8 macrosection 19, inner lower quadrant
B9 macrosection 22, medial margin.

The third specimen labeled "right upper mastectomy subcutaneous flap" is received in formalin and consists of multiple fragments of yellow lobulated fibroadipose tissue measuring 4 x 3.5 x 1 cm in aggregate. The specimen is inked black and serially sectioned at 0.3 cm intervals to reveal no masses, hemorrhage, or other abnormalities. Representative sections are submitted in cassette C1.

The fourth specimen labeled "left base of nipple" is received in formalin and consists of multiple fragments of yellow lobulated fibroadipose tissue measuring 3 x 2 x 1 cm in aggregate. White rubbery breast tissue is identified in one of the fragments, and this area is serially sectioned and entirely submitted in cassette D1. Oak (12/14/2012)

I have reviewed the specimen and agree with the interpretation above.
KRISTIN C JENSEN, M.D.
Pathologist
Electronically signed 12/18/2012 2:36 PM

Testing Performed By

| Lab - Abbreviation | Name | Director | Address | Valid Date Range |
|---|---|---|---|---|
| 14 - Unknown | SUNQUEST LAB | Dr Dan Arber | 300 Pasteur Drive Palo Alto CA | 05/30/12 0913 - Present |

90.    Stanford's surreptitious schemes in adding an unexplained 2 pathology specimens resulted in three pathology codes including 88305, 88307, and a "breast biopsy code" for one *contiguous* mastectomy surgical tissue removed together which correctly results in mandatory *bundling* into one code.

FIRST AMENDED COMPLAINT  United States *et. al*., vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

The third specimen labeled "right upper mastectomy subcutaneous flap" is received in formalin and consists of multiple fragments of yellow lobulated fibroadipose tissue measuring 4 x 3.5 x 1 cm in aggregate. The specimen is inked black and serially sectioned at 0.3 cm intervals to reveal no masses, hemorrhage, or other abnormalities. Representative sections are submitted in cassette C1.

The fourth specimen labeled "left base of nipple" is received in formalin and consists of multiple fragments of yellow lobulated fibroadipose tissue measuring 3 x 2 x 1 cm in aggregate. White rubbery breast tissue is identified in one of the fragments, and this area is serially sectioned and entirely submitted in cassette D1.  Oak (12/14/2012)

Official Copy

STANFORD

STANFORD HOSPITAL
450 BROADWAY STREET
REDWOOD CITY, CA 94063

Sex: F
Adm:12/12/2012

**FLOWSHEETS (continued)**

All Flowsheet Data (12/11/12 0000--12/13/12 2359) (continued)




**Pathology - All Orders**

SURGICAL PROCEDURE [411380592]

| Ordering user | Results, Shc Incoming Clinical 12/12/12 1450 | Authorized by | Dirbas, Frederick M, MD |
|---|---|---|---|
| Ordering mode | Standard | Frequency | Once 12/12/12 1450 - 1 C |
| Electronically signed by | Results, Shc Incoming Clinical 12/12/12 1450 | | |

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

Official Copy

🔘 STANFORD

STANFORD HOSPITAL
450 BROADWAY STREET
REDWOOD CITY, CA 94063

Sex: F

Adm:12/11/2012

**SURGERY REPORTS (continued)**

Progress Notes (continued)

According to the AMA's CPT coding manual, CPT codes in surgical pathology (88300 through 88309) represent services. The higher the code, the greater the fee.

- CPT 88305 is reduction mammoplasty / biopsy not requiring evaluation of margins. CPT 88307 is a breast excision with evaluation of margins as in a partial or simple mastectomy. CPT 88309 is a radical or modified radical mastectomy with regional lymph nodes.

- The code "reflects the physician work involved." The unit of service is the specimen. The CPT coding manual defines a specimen "as tissue or tissues that is (are) submitted for individual and separate attention, requiring individual examination and pathologic diagnosis."

- Dr. Dirbas testified under oath that Stanford nurses filled out the pathology slips. (Exh. F, Depo Dirbas p. 171- inset below)

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

FREDERICK DIRBAS, M.D.
November 12, 2014

Page 171

1    A.    No.

2    Q.    Do you know who signed it?

3    A.    It looks like it was a nurse.  I think that

4    says "RN" at the end.

5    Q.    Right.  Do you know who that is, by signature

6    that you're familiar with?

7    A.    No.

8    Q.    So what did you understand this document to

9    be?

10   A.    It looks like the pathology slip, we call it,

11   pathology form, that goes along with a specimen,

12   accompanies the specimen to pathology to identify

13   specimen.

14   Q.    Okay.  So is this, in essence, what goes to

15   pathology to say, "Hey, look, here's the tissue from

16   this procedure; please examine it, look for cancer and

17   other things"?

18   A.    Yes.  And it also indicates -- I forgot that

19   we had put two sutures at the base of the nipple, just

20   so that would be oriented as well, for the

21   pathologist.

## FACTS COMMON TO ALL CAUSES OF ACTION AND PLAINTIFFS

91.     This is an action brought on behalf of Plaintiffs, the United States of America, and the State of California (herein "Plaintiffs") pursuant to the Civil False Claims Act, 31 U.S.C.§§ 3729-33 for Medicare and Medicaid, California Insurance Frauds Prevention Act (Section 1871 *et seq.* of the California Insurance Code), and Government Code §§12650-12652 for Medi-Cal, jointly referred to herein as the "False Claims Action" (herein "FCA") or "Complaint".

92.     Relator Emily Roe by and through its undersigned, on behalf of Plaintiffs  United States of America *et al.* alleges as follows for its Complaint against Defendants collectively "Stanford," which are comprised of STANFORD HEALTH CARE (herein "Stanford" OR "SHC" ), THE BOARD OF DIRECTORS OF THE STANFORD HEALTH CARE, DR. FREDERICK DIRBAS, MD (herein "DIRBAS"), MS. DEBRA ZUMWALT, THE BOARD OF DIRECTORS OF THE LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, STANFORD HEALTH CARE ADVANTAGE, AND THE BOARD OF TRUSTEES OF LELAND JUNIOR UNIVERSITY, and DOES 1-10 who are agents, employees, or business associates of Defendants,  based upon personal knowledge and relevant documents.

93.     As a direct, proximate and foreseeable result of Defendants' habitual fraudulent schemes set forth herein and conducted as standard operating practice on a large scale, Stanford knowingly submitted, and caused to be submitted, hundreds of thousands of false or fraudulent statements, records, and claims for health care services from on or about before 2010 through current date.

94.     The practices complained of herein are *continuing.* As detailed *infra,* Defendants' actions and omissions have caused many years of improper

and false billings to the United States through the Medicare and Medicaid program, and the State of California through non-Medicare programs.

95.     Defendant's schemes have been purposeful and intended to result in unjust enrichment to Stanford *more* than the standard reimbursement which is allowed to other California providers. Stanford perpetuates its schemes with the intent to deceive payers and receive unjust enrichment.

96.     Stanford while purportedly operating as a U.S. "non-profit", is one of the top 5 most profitable hospitals in the U.S.  Stanford also demonstrated that it had doubled its annual Medicare revenue in a four-year period from 20120-2016 without any reciprocal increase or doubling of its expenses, overhead, staff, or supplies. (*See*  EXH. TT Stanford Form 990-Tax returns)

97.     As detailed below, Defendants' deliberate actions and omissions have caused many years of improper and false billings to the U.S. and California through Medicare and non-Medicare programs. Damages to the State,  U.S., and commercial insurance carriers are hundreds of millions of dollars. Defendant's upcoding and unbundling practices demonstrated  herein are continuing.

98.     Defendants' false claims acts are especially egregious given that Defendant are concurrently willfully fraudulently billing the government for healthcare and circumventing the tax laws by claiming "tax exempt" status.

99.     Defendants have also freely misappropriated tax advantage dollars afforded by their designation as an Internal Revenue Code for 503(c) "non-profit" for *improper* profits. Defendants have a model of habitually siphoning and co-mingling funds from government grants, Medicare and Medicaid subsidies, and private donations for ulterior artifices. Defendants' healthcare and billing entities are deliberately ambiguous as Defendants operate under multiple alter egos,  institutions and facilities, and their land is similarly

owned by various alter egos. Stanford freely admits that its various alter egos co-mingle certain departments, managed care contracting, materials, operating room, laboratory, and interventional radiology.

100.   As of 2016 Stanford has **nearly doubled** its Medicare net revenue from 2012.   Whereas in 2012 Stanford received $460.4 million in Federal funds from the Medicare Program, in the most recent year (2016), Stanford received $755.7 million in Federal funds from the Medicare Program accounting for a remarkable 64% four-year increase.



101.   As of Jan. 1, 2016 Stanford, in fact *lost* a major carrier due to its healthcare billing practices. Blue Shield of California *unilaterally* terminated all managed care contracts with Stanford because of  allegations of "exorbitant costs." Despite the major carrier and contract loss in 2016, Stanford inexplicably posted a substantial profit and revenue *increase* in 2016.

102.   It stands to reason that a medical facility that increases its revenue and production through *legitimate* services would be expected to require

more expenses like table paper, disposable supplies, gauze, syringes, gloves, and the like. However, a doubling of revenue without any significant increase in expenses is highly suspect for billing schemes and artifice as the basis for such a remarkable profit.   Although Stanford has nearly doubled its Medicare revenues in the four-year period from 2012 to 2016, Stanford has *not* doubled its expenses, staff, bed count, facilities, or services in that time to substantiate this increase in enrichment. ( See Stanford Form 990, non- profit U.S. tax filing)

103.   Stanford executives and department managers are known to push aggressive billing and maintain a culture of pushing profits at any cost.

104.   Stanford General Counsel and Vice President Ms. Debra Zumwalt is the designated medical and coding Compliance officer for all Defendants. Ms. Zumwalt and her office are known to harbor a general proclivity to turn a blind eye and suppress reports of improper billing allegations, as was done for more than one year in this case.

---

**Sent:** Sunday, September 10, 2017 1:27 PM
**To:** Frederick M. Dirbas <dirbas@stanford.edu>
**Cc:** Debra L Zumwalt <zumwalt@stanford.edu>
**Subject:** Re: Dr. Dirbas CMS Billing Audit and Advisory

---

September 10, 2017

Dr. Dirabs and Ms. Zumwalt,

Since we did not receive timely or any correspondence or acknowledgement from you following last week's communication , it will be assumed that you are both uninterested and/or unwilling to participate in the opportunity presented to review your billing and correct coding initiative compliance. Thus, we'll similarly assume that you decline the opportunity to meet and confer on this matter.

Regards,

---

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

105. Exhibits attached hereto are multiple emails between Relator and General Counsel Ms. Zumwalt. Relator notified Ms. Zumwalt and her office on several occasions of the significant, institutional non-compliant billing issues.

**Sent:** Friday, September 8, 2017 5:53:33 AM
**To:** dirbas@stanford.edu
**Cc:** zumwalt@stanford.edu
**Subject:** Dr. Dirbas CMS Billing Audit and Advisory

Dear Dr. Dirbas and Ms. Zumwalt,
Please find the following correspondence attached for your review and response.
As you know, Evid. Code section 1152 protects the content of any settlement-related communications, whether written or oral.
As you are also aware, Stanford and Dr. Dirbas are listed as defendants in the civil litigation suit *Does vs . Hong* et al.
In accordance with ABA Model Rules 4.2 as well as ABA Formal Opinion 11-461 , parties in litigation are free to communicate directly.
Thus, such open dialogue is permissible to facilitate resolution of matters that may otherwise not be as openly communicated.
Your response is requested this Friday by the close of business at 5.
Regards,
J. D

106. Ms. Zumwalt personally acknowledged receipt of billing non-compliance notice communications from Relator. Yet, Ms. Zumwalt failed to act ethically or properly, or to ensure that Stanford complied with its correct coding obligations.

## RE: Dr. Dirbas CMS Billing Audit and Advisory

Debra L Zumwalt <zumwalt@stanford.edu>

**Reply**

Mon 9/11/2017 8:59 AM

To:

Frederick M. Dirbas (dirbas@stanford.edu)
You replied on 9/19/2017 11:46 AM.
Risk Management is looking into the issues you raised.

*****************************

**Debra L. Zumwalt**
Vice President and General Counsel
Stanford University
Office of the General Counsel
Building 170, 3rd Floor, Main Quad
P.O. Box 20386
Stanford, CA 94305-2038
http://www.stanford.edu/dept/legal
Phone - (650) 723-6397
Fax - (650) 723-4323
E-mail - zumwalt@stanford.edu

.............................................

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any use, disclosure, dissemination, distribution or copying of any portion of this message or any attachment is strictly prohibited. If you think you have received this e-mail message in error, please notify the sender at the above e-mail address, and delete this e-mail along with any attachments. Thank you.

107.    On Sept 11, 2017 Ms. Zumwalt replied to relator that Ms. Zumwalt would reply further later. However, she failed to do so at any time.

108.    In fact, Relator's final email to Ms. Zumwalt came after the Stanford billing office had again initiated contact and astonishingly billed Relator in error on or about 3/22/18 for further $341 due for the 12/11/12 (5-year-old date of service) pre-operative visit. In fact, Stanford conceded that it owed Relator $341.97

from 2012, an amount which Stanford had concealed and failed to correct in its accounts despite notice by the commercial carrier of the unbundling.

## JD new Accounting Statement Received Stanford for DOS 12/11/12

Reply
Tue 3/27/2018 9:59 AM
To:
dirbas@stanford.edu;
zumwalt@stanford.edu
Cc:
Sent Items

EXH AAA p. 1 STANFORD BILL $341.97 Statement 03 07 2018 (1) Redacted a.pdf
569 KB

2 attachments (739 KB) Download all
Save all to OneDrive - Personal
Dear Dr. Dirbas and Ms. Zumwalt,

We received a new bill from Stanford this week  for "date of service 12/11/12 Dr. Dirbas" for $341.97 due.

This amount was disbursed by the patient in 2013 to Stanford, and no reprocessing notice or refund has been received at any time.

The recent invoice is attached in redacted form for your reference. As you recall, this date of service has been the subject of multiple prior correspondences ranging from at least March 2017 to 2018 to Ms. Zumwalt, Dr. Dirbas, as well as Stanford billing.

Could you let us know the basis for this new invoice for an unbundled office visit from more than 5 years ago?

Thank you in advance for your anticipated cooperation and understanding.

Sincerely,
JD

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

1          109.    On April 9, 2018 Stanford counsel Ms. Northrup then emailed

2    Relator acknowledging Relator's telephonic communication to Ms. Zumwalt's office,

3    and that Ms. Zumwalt had declined to respond.

Carolyn Northrop <carolyn.northrop@dbtlaw.org>

**Reply**
Mon 4/9/2018 2:12 PM
To:
Cc:
Angelina Felo (angelina.felo@dbtlaw.org);
Daniela Stoutenburg (daniela.stoutenburg@dbtlaw.org);
Sheryl Rodacker (sheryl.rodacker@dbtlaw.org)
Ms. Doe,

I understand from Debra Zumwalt's office that you contacted her office today to speak with her.  Please be advised that she has chosen to have all communications go through outside counsel for SHC, which is our office.  Therefore, if you have something you need to discuss with Ms. Zumwalt, you'll need to communicate it to our office.

I look forward to hearing from you.

Carrie

CAROLYN L. NORTHROP, ESQ.
DUMMIT, BUCHHOLZ & TRAPP
www.dbt.law

| SACRAMENTO | LOS ANGELES | SAN DIEGO | RIVERSIDE/SAN BERNARDINO |
|---|---|---|---|
| 1661 Garden Highway | 11755 Wilshire Blvd, 15th Floor | 101 West Broadway, Suite 1400 | 11801 Pierce St., 2nd Floor |
| Sacramento, CA 95833 | Los Angeles, CA 90025 | San Diego, CA 92101 | Riverside, CA 92505 |
| (916) 929-9600 | (310) 479-0944 | (619) 231-7738 | (951) 710-3277 |
| (916) 927-5368-FAX | | | |

THIS IS A PRIVILEGED AND CONFIDENTIAL COMMUNICATION INTENDED ONLY FOR THE ABOVE-NAMED RECIPIENT. RECEIPT OF THIS COMMUNICATION BY ANOTHER DOES NOT CONSTITUTE WAIVER OF THE ATTORNEY-CLIENT AND ATTORNEY WORK PRODUCT PRIVILEGES. ANY DISSEMINATION, COPY OR DISCLOSURE, OTHER THAN BY THE INTENDED RECIPIENT, IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US VIA RETURN E-MAIL AND DELETE THIS COMMUNICATION WITHOUT MAKING ANY COPIES. THANK YOU FOR YOUR COOPERATION.

THIS DOCUMENT MAY CONTAIN INFORMATION COVERED UNDER THE PRIVACY ACT, 5 USC 552(A), HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT, PUBLIC LAW 104-191, AND DOD DIRECTIVE 6025.18. IT MUST BE PROTECTED IN ACCORDANCE WITH THOSE PROVISIONS.

110.    Stanford Hospital and Clinics located in Santa Clara County is one of the top three most profitable hospitals in the U.S. by patient-service surplus.  In 2013, patient care surplus at Stanford was $224,661,648, and surplus per adjusted discharge was $1,339.49.

111.    In a more  recent year (2016), Stanford received a total of net patient service revenue of $3,893,005,000 and $3,393,413,000 in the prior year (2015). On average Stanford receives 1/3 of its Gross Patient Service revenue from Medicare.

112.    Of the total $3,893,005,000 funds collected by Stanford in 2016, 34% of funds were from Medicare, 4% from Medi-Cal, 55% from Managed care- "Discount Fee for Services", and 7% Self-Pay or Indemnity.



113.    At the end of the fiscal year in August 31, 2016 Stanford has account receivables of 12% from Medicare, 18% from Blue cross, and 11% from Blue Shield. SHC did not believe significant credit risks exist with these three payers.

114.    Stanford reported that SHC's Medicare cost reports have been audited by the Medicare administrative contractor through August 31, 2006.

115.    More significantly, the Stanford schemes that have resulted in false billings to Medicare and the State that began in at least 2010, and most likely earlier, as alleged more specifically *infra,* include but are not limited to the following:

- upcoding patients' office visits to artificially inflate the base Medicare reimbursement paid for professional medical services by Stanford physicians and health care providers;

- <u>artificially unbundling the pre-operative visit</u> and inflating the global fees paid through surgical services rendered to patients to qualify for high adjustment payments of 10-20% greater funds per surgical procedure;

- <u>fraudulent and false patient pre-operative evaluations</u> scheduled on the day or days before surgery and unbundled to reflect a distinct and separate evaluation and management service; and

- failing to mitigate or cease the conduct once put on notice and demanded to cease unlawful billing.

116.    Further, Defendants Stanford conspired to violate the FCA by causing the submissions of false or fraudulent claims, conspired to make and use, or cause to be made or used, false records material to false or fraudulent claims, and once put on notice of the unlawful billing, conspired to not return Medicare and non-Medicare overpayments from being returned to the government, and respective carriers.

117.    Stanford Health Care Advantage (herein "SHCA") is a new Medicare Advantage plan offered by Stanford Health Care for Santa Clara and Alameda County Residents. Stanford upcodes and unbundles services for this plan, causing similar schemes to result in very expensive health care costs to the Federal

Government. Scheme perpetuators like Frederick Dirbas, M.D. and other surgical oncology surgeons are on the panel for SHCA.

118. Stanford healthcare is *expensive*. While in 2015 California commercial carriers like Blue Shield publicly unilaterally terminated[7] their contracts with Stanford based on recognizance of Stanford's disproportionate and "expensive" billings, the Medicare program and other carriers like Anthem Blue Cross have not.

119. According to Stanford, Blue Shield unilaterally terminated its' contract with Stanford. "In early October 2015, Blue Shield made a unilateral decision that Stanford Health Care would be excluded from their Individual and Family plan networks in 2016. This was unrelated to the contract renegotiation in May 2015 for the general agreement with Blue Shield." (Accessed at https://stanfordhealthcare.org/content/dam/SHC/patientsandvisitors/billing/docs/201 6-covered-california-faqs-for-shc.pdf)

120. Blue Shield recognized Stanford's unlawful and exorbitant billings. Effective Jan. 1, 2016 Blue Shield of California terminated Stanford Hospitals from its' networks. Blue Shield kicked out two Stanford Hospitals including Stanford Health Care, Stanford Medical Group, and Stanford's University Health Alliance, and Lucile Packard Medical Group out of its PPO network because of "high costs".

121. As a result, Medicare overbillings by Stanford revealed in an audit certification conducted by Plaintiffs was covered up and the billing schemes in place at Stanford that resulted in the false billings identified by Plaintiffs continued unabated, resulting in additional false or fraudulent claims to Medicare.

---

[7] "In early October 2015, Blue Shield made a unilateral decision that Stanford Health Care would be excluded from their Individual and Family plan networks in 2016. This was unrelated to the contract renegotiation in May 2015 for the general agreement with Blue Shield." Accessed at https://stanfordhealthcare.org/content/dam/SHC/patientsandvisitors/billing/docs/2016-covered-california-faqs-for-shc.pdf

122.    By these actions and the other actions detailed herein, the Defendants have violated several laws, including without limitation, the Federal and State False Claim Statutes. Defendants' fraudulent conduct has had a dramatic negative financial impact on Medicare, Medicaid, and commercial carriers.

## DEFENDANTS

123.    Defendants have innumerable alter egos and names including Stanford Health Care which includes Stanford Hospital, Lucile Packard Children's Hospital, Stanford Medical Group, Lucile Packard Medical Group, and University Healthcare Alliance.

124.    Stanford Health Care (herein "SHC") operates as a non-profit, hence circumventing taxes on its sizeable healthcare earnings. As a California corporation, Stanford is organized as a "tax-exempt" institution under section 501(c)(3) of the Internal Revenue Code. Its governing board is The Board of Directors of Stanford Health Care.

## NATIONAL PROVIDER IDENTIFIER " NPI"

125.    The Centers for Medicare (herein "CMS") and Federal health care programs utilize the National Provider Identifier (herein "NPI"). NPI's are assigned to institutions as well as individual health care providers. Billing CMS requires utilization of both the institution's NPI and the individual rendering providers.

126.    NPI 1437292927 is registered to Stanford Health Care located at 300 Pasteur Drive Stanford, California 94305.

127.     NPI Number 1437292927 has the "Organization" type of ownership and has been registered to the following primary business legal name (which is a provider name or healthcare organization name) - Stanford Health Care. The enumeration date of this NPI Number is 02/14/2007. NPI Number information was last updated at 03/07/2017.

128.     Stanford's other registered legal business name is Stanford Hospital and Clinics. Stanford surgical providers' reimbursement data was obtained and analyzed for representative ones below and attached hereto as exhibits.

| NPI | PROVIDER | MEDICARE BILLINGS |
|---|---|---|
| 1437292927 | STANFORD HEALTH CARE | |
| 1154457091 | FREDERICK DIRBAS, M.D. | Billed $1,618,328.50 from approximately 2011-2017 |
| 1881725638 | CANDICE SCHULTZ, PA | $414 Annual billing to Medicare |
| 1104951508 | IRENE WAPNIR, M.D. | Billed $1,818,659.75 from 1/2008 to 10/2017 |
| 1437292927 | ERIC SOKOL, MD | |

| 1326009572 | GORDON LEE, M.D. | Billed $5,629,251.95 from 2010-2016 |
|---|---|---|

| | | |
|---|---|---|
| 1891830881 | GEOFFREY GURTNER, MD FACS  (Breast) | $961,810.00 Uses CPT 15777 (biologic artificial tissue) 19340, 19342, 19371 |
| 1205978806 | CARL BERTELSEN, M.D. ( General surgery) | Billed $2783156.35 to Medicare from 1/2014 to 10/2017 at average of $60,503 per month |
| 1477697563 | PETER LORENZ, M.D. (Plastic Surgery) | |
| 1760681191 | DUNG NGUYEN, MD, PHARM.D ( Plastics) | $2,695,000.65 Billed Medicare from 11/2012 to 10/2017; Lot of 19340, 19371, 19370, 19340, few 19342, lots 15777; Very aggressive billing. All visits 99204 or 99205 |
| 1346401841 | NAZERALI, MD | Billed $2,299,493.26 to Medicare |
| 1437327046 | GEORGE A. POULTSIDES, MD | |

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

| 1083678726 | MARTIN I. BRONK, M.D. | |
|---|---|---|
| 1447446190 | NATALIE KIRILCUK, M.D. (Pelvic Floor Testing) | |
| 1477749752 | AMANDA J. WHEELER (Surgical Oncology) | $1,494,584.50 billed to Medicare   From   09/2013 to 10/2017   Lot  of  99205, 99215, 99214 billed pre-op visits |
| 1689636680 | PETER NARUNS, MD | |
| 1184823205 | KIRK A. CHURUKIAN MD, (Plastic Surgery) | |
| 1053513473 | DERRICK WAN, MD FACS (Plastic) | |

129.    Stanford recognized additional fees for its hospital services. SHC recognized $55,195,000 and $103,667,000 in net patient service revenue under these programs and $45,809,000 and $73,585,000  in other expense for California Hospital Quality Assurance Fee Program (herein "HQAF") to the California Department of Health Care Services for the years ended August 31, 2016 and August 31, 2015, respectively.



130.    Defendants' main business address where they receive payments for medical services is in Los Angeles, California. Stanford Billing Office receives all by mail payments and checks at the Address of P.O. Box 740715 Los Angeles, CA 90074-0715. The insurance carrier as well as Relator also submitted payments to the main billing company address in the Central District. (Exh. N accessed Nov. 26, 2017 @https://stanfordhealthcare.org/content/dam/SHC/patientsandvisitors/billing/images/shc-billing-statement-summary-2016.jpg)

131.    Stanford as a registered medical service provider is registered as physically located (Business Practice Location) at 300 Pasteur Drive Stanford, CA 94305. Phone 650-723-4000 and Fax 650-498-5840.

132.    The provider's official mailing address is:  1804 Embarcadero Road, Suite 100 Stanford, CA  94305-3341 US The contact numbers associated with the mailing address are: Phone 650-723-4000 Fax 650-498-5840 The authorized official registered with the "1437292927" NPI Number is Mr. David J. Connor.  The authorized official title (position) is Chief Financial Officer. He can be reached as the authorized official at the following phone number 650-497-0391.

133.    Lucile Salter Packard Children's Hospital ("LPCH") at Stanford is also a nonprofit, California corporation. It is a tax-exempt institution under section 501(c)(3) of the Internal Revenue Code. Its governing board is The Board of Directors of the Lucile Salter Packard Children's Hospital at Stanford.

134.    The two hospitals are legal corporations separate from the University and from each other. Stanford also owns and operates multiple other satellite hospitals and facilities including Stanford Outpatient Clinics and Surgery at Redwood City.

135.    Stanford Medicine is a term that encompasses all the healthcare entities, including both hospitals and their foundations and the School of Medicine. It replaces the term "Stanford University Medical Center." Stanford Medicine and Stanford University Medical Center are not legal entities.

136.    Professional services are reimbursed based on a fee schedule in Federal funds from the Medicare Program. Medicare payments accounted for a significant percentage of Stanford's net service revenues, second only to Blue Cross.

137.    Stanford recognized additional fees for its hospital services. SHC recognized $55,195,000 and $103,667,000 in net patient service revenue under these programs and $45,809,000 and $73,585,000  in other expense for California Hospital Quality Assurance Fee Program (herein "HQAF") to the California Department of Health Care Services for the years ended August 31, 2016 and 2015, respectively.

138.    The State of California enacted legislation in 2009 which established a Hospital Quality Assurance Fee ("HQAF") Program and a Hospital Fee Program. These programs imposed a provider fee on certain California general acute care hospitals that, combined with federal matching funds, would be used to provide supplemental payments to certain hospitals and support the State's effort to maintain

health care coverage for children. The effective period of this Hospital Fee Program was April 1, 2009 through December 31, 2010.

139.     In 2016 and 2017, while other California providers experienced decreased revenues because of the implementation of the Affordable Care Act, Stanford reported a 38% income increase and only modest 4% increase in expenses.

140.     Hence in one year alone, Stanford increased its income by large double digits without substantive changes in its payer mix or services to account for the exorbitant health care revenue.

141.     In a recent year (2016), Stanford received $755,658,000 in Federal funds from the Medicare Program. This Net Patient Service Revenue is a net of contractual allowances (but before provision for doubtful accounts), by major payor for the years ended August 31, 2016.

142.     In the prior year (2015), Stanford received $732,377,000 in Federal funds from the Medicare Program. Medicare payments accounted for a large percentage of Stanford's net service revenues. In the prior years (2013), Stanford received $519,403,000 in Federal funds from the Medicare Program. Medicare payments accounted for a large percentage of Stanford's net service revenues.

143.     In the preceding year (2012) Stanford received $460,442,000 in Federal funds from the Medicare Program.

144.     In 2013, Medicare and Medicaid's fee-for-service model incentivized hospitals to conduct more tests and procedures in order to earn more money. Stanford did more than that with schemes to unbundle codes and charge exorbitant charges for manufactured charges. For example, when on a bilateral simple mastectomy only two tissue specimens were generated, Stanford artifices resulted in charges for 6 pathology codes in violation of the one specimen, one pathology code rule.

| STANFORD'S CODING  1 TISSUE | *CORRECT* CODING |
|---|---|
| Three(3) or more pathology codes billed | One (1) pathology code billed |
| CPT 88307, 88305, 88303 | CPT    88307 |
| Stanford Fee              $3400 | Correct Fee              $600 |

   

145.    For example,  fraudulent upcoding was uncovered in Stanford's bills with respect to Stanford's tissue  pathology (CPT 88300-88309) billing on 12/12/12.  While Dr. Dirbas's operative report reflects 2 specimens, pathology billed for SIX specimens, hence violating the one specimen, one code rule.

146.    Either Dr. Dirbas's operative report was  false and he failed to note that he submitted 2 additional specimens, one under the left nipple and one under the right breast tail, or the pathology department upcoded and unbundled 2 surgical specimens into 6. (Exhibits certified Stanford Medical records p. 102 and 109)

147.    Plaintiffs estimate that damages caused to the Medicare program by Defendants' violations of the causes of action herein exceed hundreds of millions of dollars cumulatively as of the date the original complaint was filed.

148.    Stanford processes very few billing inquiries at its billing office location, 4700 Bohannon Drive, 2nd Floor Menlo Park Ca 94025. Most billing and coding is handled in the Los Angeles center, and Stanford's billing operations call center for consumers is in Texas.

149.    Stanford conducts business and receives significant enrichment through its billing entity address at P.O. box 743447 in LOS ANGELES, CA 90074-3447.

150.    Stanford conducts business through the state of Texas with a division of its billing and collection service in that State.

151.    Stanford has numerous satellite offices and hospitals including

- Patient Financial Services, Valley Memorial Center  1111 E. Stanley Blvd. Livermore,  CA  94550,  Telephone  925.264.6500,  Email: billing_ValleyCare@STANFORDhealthcare.org

- Stanford Medicine Outpatient Center and Stanford Medicine Redwood City; 450 Broadway, Redwood City, CA 94063. Phone: (650) 721-7332

- Stanford Health Care Advantage  which received Federal Medicare funds and administrates a Medicare Advantage plan - PO Box 72530, Oakland, CA 94612-8730

## JURISDICTION AND VENUE

152.    This District Court has jurisdiction over the subject matter of this action pursuant to 28  U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

153.    Under 31 U.S.C. §3730(e)(4)(A), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this Complaint.

154.    Even to the extent there has been any such public disclosure, Plaintiff meets the definition of an original source, as that term is defined under 31

U.S.C. § 3730(e)(4)(B). Specifically, Plaintiff voluntarily disclosed to the Government the information upon which allegations or transactions at issue in this complaint are based prior to any purported public disclosure under 31 U.S.C. §§ 3730(e)(4)(A).

155. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and, Relator voluntarily provided the information to the Government before filing its complaint. Relator therefore qualifies as an "original source" of the allegations in this Complaint such that the so-called public disclosure bar set forth at 31 U.S.C.§ 3730(e)(4) is inapplicable.

156. Relator concurrently served upon the Attorney General of the United States, the United States Attorney for the District of California, and the State of California the original complaint and a written disclosure summarizing the known material evidence and information in the possession of Plaintiff related to the original Complaint, in accordance with the provisions of 31 U.S.C. §3730(b)(2). The disclosure statement is supported by material evidence, and documentary evidence has been produced with the disclosure. The documents referenced in the disclosure statement, and those produced in connection therewith or subsequently, are incorporated herein by reference.

157. Plaintiff shall serve any amended complaints upon the Attorney General of the United States, United States Attorney for the District of California, the Attorney General for the State of California, and the California Insurance Commissioner.

158. This Court has personal jurisdiction and venue over the Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because each Defendant has minimum

contacts with the United States. Moreover, Defendants can be found in, reside, and/or transact business in this District. Stanford's central collection and billing center for all payments and  primary billing location is in Los Angeles, California. All statements direct payments to be remitted to the Central California office, hence venue is proper.

159.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants collect a significant portion of their enrichment at the billing offices in Los Angeles.  Thus, each Defendant transacts business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 and the California codes have been committed by Defendants in this District. Therefore, venue is proper within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. § 3732(a).

## PARTIES

160.    The real parties in interest ("Plaintiffs") to the False Claim Act (herein "FCA") Qui Tam claims herein are the United States of America and the State of California. Accordingly, at this time, Relator is pursuing its cause of action on behalf of the United States on the FCA Qui Tam claims set forth herein. See, e.g., 31 U.S.C. § 3730(b)(1), and the State of California pursuant to the  California Insurance Frauds Prevention Act § 1871.4 of the Insurance Code, and Cal. Gov't Code §12650-12656.

161.    Relator Emily Roe is an individual. Relator brings this Qui Tam action based upon direct and unique information obtained about Defendants, or those with whom the Defendants conduct business. The identity of these individuals has been provided in the pre-filing Disclosure Statement(s) produced to the United States pursuant to the Federal FCA, and to the State of California.

162.     Defendants are Stanford *et. al*, its multiple alter egos, and DOE defendants herein whereas DOES 1-10 inclusive   are employees, agents, and/or business associates of Defendants whose real names are currently not known to Plaintiffs.



- 4 Bay Area hospitals
- Stanford Health Care Alliance network – over 500 PCPs
- University Medical Group
- Stanford Express Care
- Clickwell Care (online PC)
- Aetna partnership
- Stanford Health Plan
- SU School of Medicine

163.     Defendant Stanford HealthCare is a non-profit foundation based in California. H o w e v e r , Stanford currently provides healthcare services to patients in California and nationwide, portions of which are provided through their telemedicine portals. Stanford's anatomical pathology lab and consultation service also renders health services throughout California, as well as to other states.

164.     Stanford provides health services and bills throughout Southern California through its telemedicine portals. For example, according to advisory.com in 2015  Stanford Medicine Clinic provided 60% of its visits as "virtual visits", 23% of which were video visits and 37% were video visits. Only 40% of Stanford's 2015 visits of more than 6500 visits were "in-person visits". Thus, Stanford   renders

medical services through California as well as other states, making venue in this District Court proper.

165.     As of 2016 Stanford has **nearly doubled** its Medicare net revenue from 2012. Whereas in 2012 Stanford received $460.4 million in Federal funds from the Medicare Program, in the most recent year (2016), Stanford received $755.7 million in Federal funds from the Medicare Program accounting for a remarkable 39 % increase over four years.

| 2012 | 2016 |
|---|---|
| $460.4 million | $755.7 million |
| Medicare Funds to Stanford | Medicare Funds to Stanford |

166.     Of this tremendous increase in enrichment through Medicare payments,  several tens of millions of dollars are likely profited because of what is believed with certainty be a wide spread practice institution-wide at Stanford of over-billing via the schemes described earlier.

167.     Stanford executives and department managers are known to push aggressive billing and maintain a culture of pushing profits at any cost. Stanford has a "conceal and suppress" culture in healthcare billing whereby any evidence or complaints of non-compliance by Stanford are swiftly quashed.

168.     Stanford has achieved astounding profitability from 2012 to 2016 through deceptive billing and unsupported coding practices.  Stanford pushes billers and coders to upcode all services to the highest code possible, and disregard correct coding initiatives and rules. (See Decl. Gaines on Stanford billing practices in 2015).

169.     Defendants were the subject of prior successful False Claims Actions which resulted in monetary disgorgement by Stanford. Although Stanford

was required to remit penalties to the State of California however  Stanford pre-emptively negotiated to keep that FCA Complaint out of public view.

170.    For example, Stanford was also the subject of a prior successful FCA prosecution in California for habitual false anesthesia time block billing in the Lucille Packard Children's Hospital.   The Stanford Children's Hospital improper billing case was settled by Defendants for monetary penalties and restitution  to the State of California on or about 2013. Upon information and belief, that case was brought by relator Rockville Recovery Associates, a medical billing audit firm that reported Stanford's unscrupulous billing practices and double-charging of surgical patients.

171.    Although Stanford has astonishingly nearly doubled its Medicare revenues in the four (4) year period from 2012 to 2016, Stanford has not doubled its expenses or staff, bed count, facilities, or services in that period to substantiate this increase in enrichment.

172.    Defendants collectively herein "Stanford" devised four key unlawful billing schemes to increase Defendants' revenues, especially Medicare dollars. Stanford intended this scheme to obtain unjust enrichment in violation of national fee schedules. From 2012 to 2016 Stanford nearly doubled their Medicare revenues.

173.    Through these various schemes, Defendants collected and retained unjust enrichment from Medicare, Medicaid, commercial insurance carriers, *and* individual payers.

174.    One of Stanford's key schemes was upcoding and unbundled billing for high reimbursing surgical and anesthesia services.

175.     Subject of this specific action is the four schemes executed by the surgical departments including the Stanford hospital in Palo Alto and the "Stanford Cancer Center" on Blake Wilbur Drive.

176.     Stanford executives with knowledge of the fraudulent billing activities alleged herein include General Counsel and Vice president Ms. Debra Zumwalt, who is the head of compliance at Stanford. From 2017 through March 2018, Ms. Zumwalt was notified of the demonstrated schemes and institution's billing noncompliance.

177.     Stanford billing compliance officer Ms. Chantel Susztar is the Director of Hospital Integrity. She is another executive with knowledge of the fraudulent billing activities demonstrated herein.   Ms. Susztar signed the correspondence dated "Feb. 7, 2018" which <u>admitted</u> to unbundling and improper billing of surgical  preoperative visits on 12/11/12.  (Exh. L)



February 7, 2018

Re: Refund of Payment

Dear Dr. ███

It has come to our attention that we inadvertently billed in error for a preoperative established patient ᵒ visit on December 11, 2012 that is generally included as part of the global surgical package. Because of ᵒ billing in error, Anthem Blue Cross directed Stanford Health Care to bill you for the owed amounts as yo not satisfied your annual out-of-pocket deductible. Our records indicate that you made a payment in th amount of $341.97. As such, enclosed with this correspondence is a check for a refund in full of the amᵒ you paid in this regard. At this time, we consider this matter closed without any additional follow up ne

It has also come to our attention that Anthem Blue Cross was inadvertently billed for two packages of Alloderm with respect to the surgery you underwent at Stanford Health Care on December 12, 2012. Bᵃ our internal review, only one package of Alloderm should have been billed to Anthem Blue Cross. Accᵒ we have contacted Anthem Blue Cross and have asked them to re-open this matter. We have also subnᵒ amended/reduced charges to reflect this change. We await a re-adjudication of this claim by Anthem E Cross to determine if any amounts should also be reimbursed to you based on this billing error.

Sincerely,

*Chantel M. Djiewit Susztar,* RHIT, CDIP, CCS, CCS-P, CHC

Chantel M. D. Susztar, RHIT, CDIP, CCS, CCS-P, CHC
Director, Hospital Billing Integrity
Compliance Department
Stanford Health Care

300 Pasteur Drive MC5780
Stanford, CA 94305

enclosure

178.     General Counsel and Vice president Ms. Debra  Zumwalt  was assisted by Stanford counsel Ms. Carolyn Northrup and Ms. Daniella Stoutenburg, and Stanford University faculty and professors including Dr. Frederick Dirbas and Dr. Roy Hong, who were accomplices in the billing frauds.

# RELATOR

179.     Relator is a U.S. trained and certified professional medical coder and biller, as certified by the American Academy of Professional Coders (herein "AAPC"). As such, Relator has specialized training and expertise in coding guidelines and an auditor for insurance billing.

180.     Relator is an actively practicing U.S. Board certified physician and surgeon, licensed by the Medical Board of California in good standing. Relator is an appointed expert for the California Department of Consumer Affairs and is an appointed expert for the California Board of Medical Quality Assurance.  In the capacity as a designated expert, Relator has been retained as an expert and testified on behalf of the State and the California Department of Consumer Affairs in matters involving medical coding.

181.     In December 2012, Relator underwent a major surgery at Stanford. In November of 2016 while auditing the chart and billing records for that service, Relator uncovered a course of conduct of at least four upcoding and unbundling billing schemes.

182.     Relator's surgery resulted in more than $17,700 of upcharges that became known to Relator, Ms. Zumwalt, and Stanford executives. (Exh K,L)

183.     In December 2012 Stanford billed Relator and her commercial carrier nearly $150,000 for a 23-hour total hospitalization and mastectomy.

184.     In March 2018, Stanford Compliance Officer Ms. Chantel Susztar *admitted* to falsely billing nearly 10% of the total billed fees for Relator. (Exh. MM).

185.     On March 27, 2018, more than five years after the service date, Stanford voluntarily sent Relator a refund check for the fraudulently unbundled and upcoded 12/11/12 preoperative visit.

186.     Stanford's $341.97 check dated "1/25/18" was postmarked and mailed on 3/27/18. (Exh. K,L)

187.     On June 15, 2018 Stanford counsel Ms. Stoutenburg corresponded with relator, admitted her personal knowledge that the pre-operative visit on 12/11/2 had been unbundled, and admitted that Stanford had double charged for 2 units of Alloderm when they had used only one.  Stanford counsel wrote that Stanford was in process of reissuing a new a refund check to relator for the 2012 overbilling. Counsel also sternly directed relator, an *active* Stanford medical account holder and *active* patient, to not contact Stanford or Ms. Zumwalt.





## **FIRST SCHEME: UNBUNDLED PRE-OPERATIVE VISITS**

188.     Stanford  habitually and freely unbundled surgical fees and charged countless patients for "preoperative visits"  the day or two before surgery.

189.     For example, here on date of service 12/11/12 Stanford unbundled and  billed  for  a  pre-operative  visit  for  $458  and  upcoded  services  which  were provided  by  the  physician  assistant  (herein  "PA").   No  attending  physician  ever

cosigned the dictation and no indicator showed that the billing attending was present at the 12/11/12 visit. Since major surgery was scheduled for 12/12/12, a "pre-operative visit" charge was not either allowed nor should have ever been charged pursuant to global fee schedule rules.

190.    Stanford records demonstrate that PA Schultz provided the 12/11/12 pre-operative services, unbundled the charge, and then wrongly billed under Dr. Dirbas's NPI.   There was no statement or signature from Dr. Dirbas that he provided any of the 12/11/12 visit, although Stanford billed high level visits under Dr. Dirbas rather than the true mid-level provider's NPI. ( Exh. E, N Stanford Records )

## SECOND SCHEME: UPCODING MID-LEVEL PROVIDERS

191.    Stanford habitually upcodes and bills high level physician codes under the physician NPI's for services rendered by Stanford's full-time mid-level providers including physician assistants (herein "PA") and nurse practitioners (herein "RNP").

192.    Medicare has a standard "payment differential" and *lower fee schedule for mid-level providers* whereby a mid-level is paid at 80-85% of the physician allowable fee for the same CPT code. For example, Medicare reimburses approximately $87 for a physician  CPT 99213 visit, whereas they may reimburse roughly $69 for a mid-level providing 99213.  Hence, Stanford circumvents CMS's lower payment differential by *almost never* billing under the mid-level's NPI.

193.    For example, Stanford employs several full-time "advanced practice providers" who are mid-level providers (PA, RNP) in the department of plastic surgery. Stanford, however, is known to bill the majority of mid-level services

under the higher paying physician NPI, regardless of the correct rendering provider or "incident to" rules. (Exh. Q)

194.    According to CMS, Kathryn Kamperman, RNP received total Medicare payments totaling $7618 over four years, from 2012 through 2015.  Also according to CMS, Jennifer Seither, RNP billed and received  grand total payments of $1640 in 2014,  and $2702 in 2013 for her Medicare patient services.   Ms. Seither purportedly only saw a total of 11 Medicare patients in 12 months, at an average reimbursement per patient visit of $31.22.

195.    For example, Ms. Candice L. Schultz, a PA works full-time at Stanford department of surgery at about *2000 hours* annually. However,  in 2012 Medicare showed that Schultz, PA only billed 12-total visit in one year under her *own* NPI. The rest of her visits were billed under the physician NPI  Dr. Dirbas who billed and collected $63,201 for 143 patient encounters.  CMS data would incredulously mean that Ms. Schultz only saw 12 patients independently for an entire 12 months. That calculates to Ms. Schultz spent 166 hours per patient encounter.

196.    In 2015, Medicare shows that Stanford PA Ms. Schultz  billed and received a grand total payment of $905 for 22 patients under her own NPI. Again calculating Ms. Schultz's full-time Stanford employment hours of 2000 hours per annum, reflects that she spent 90.9 hours per patient encounter and billed $41 per encounter. These figures simply defy belief and show that Stanford habitually refuses to  properly bill CMS under its rendering mid-level providers.

197.    For example, Stanford falsely billed the 12/11/12 pre-operative visit under the physician Dirbas's  NPI, whereas physician assistant Candice Schultz, PA-C  entirely provided the service without the doctor on premises.

198.    Even if the 12/11/12 unbundled visit was chargeable, which it was not, Stanford was *obligated* to bill under the rendering  mid-level provider's NPI (not

the doctor's), which would result in about 15-20% less reimbursement[8] to Stanford per encounter. (Ref. https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf)

199. Because of its unbundling on 12/11/11, Stanford billed an extra $458 and received unjust enrichment for CPT code "99215", "comprehensive patient exam" for a pre-operative visit before major surgery with Dr. Dirbas codified as a double mastectomy CPT code "19304".

200. On the day before the surgery (pre-op) was unbundled as an "unrelated" visit and up-coded for $458. Hence, in 2013, Stanford invoiced and collected unjust enrichment of $341 directly from the Relator.

201. In March 2018, four months after the filing of this action, and 5 years after the date of service Stanford admitted in correspondence its upcoding and unbundling. On 3/27/18 Stanford mailed Realtor a check for $341 and stated it would continue to process the additional refund for the upcoded ($17,300) units of Alloderm.

202. Relator learned that Stanford bills exclusively under the physicians with the intent to receive higher reimbursement even when the mid-level providers provide independent care without the supervising physician on site.

203. Stanford employee, Physician Assistant (herein "PA") named Candice Schultz, NPI Number 1881725638 provided the entirety of the pre-operative office visit service to Relator on 12/11/12. Not only was the unbundled billing fraudulent on its own basis, but also the PA did not bill the service under her own NPI

---

[8] 110 - Physician Assistant (PA) Services Payment Methodology (Rev. 2656, Issuance: 02-07-13, Effective: 02-19-13, Implementation: 02-19-13) See chapter 15, section 190 of the Medicare Benefit Policy Manual, pub. 100-02, for coverage policy for physician assistant (PA) services. Physician assistant services are paid at 80 percent of the lesser of the actual charge or 85 percent of what a physician is paid under the Medicare Physician Fee Schedule. There is a separate payment policy for paying for PA assistant-at-surgery services. See section 110.2 of this chapter.

number. Had the PA billed the service correctly under her own NPI, the reimbursement was reduced by 15-20% for a "mid-level provider".

204.    Upon information and belief, Stanford **Physician** Assistant ("PA") Candice Schultz, PA NPI Number: 1881725638 billed a total of only 12 services to CMS for a grand total of $195. Whereas Ms. Schultz worked more approximately 2000 hours per annum, Stanford failed to properly capture and codify the care provided by the PA. Instead, Stanford fraudulently billed <u>all</u> services under the physician NPI for greater reimbursement.    (Ref.    last    accessed  4/21/18 https://data.cms.gov/utilization-and-payment-explorer)

The screenshot below accessed in October 2017 reflects the billings of Ms. Schults on behalf of Stanford.



205.    Hence, it defies belief that Stanford's full time PA's working 2000 hours per year only provided several hundred dollars of services as billed to Medicare.

206.    For example, Ms. Schultz PA-C provides the bulk of medical services for Dr. Dirbas's patients when Dirbas is on vacation, off-site, and/or  he is

operating in surgical suites in the Stanford Hospitals. Hence, it simply defies belief that working full time, Ms. Schultz's NPI shows only 12 encounters in one annum. ( Exh.

207.    Had Stanford billed correctly, the PA would be billed at a reduced fee schedule, and with the correct coding for a "global surgery fee" with the global codes would <u>not</u> have resulted in any extra enrichment for the pre-op visit.

## STANFORD'S UPCODING AND UNBUNDLING IS A DEMONSTRABLE COURSE OF CONDUCT

208.    Relator obtained billing and payment ledgers for multiple surgeons in the Stanford Department of Surgery. Adjudicated claims ledgers  demonstrated that Stanford had an institution wide custom and practice of unbundled billing of pre-operative visits. The reports examined were for  dates of service from 2010 through 2017 for approximately ten surgeons in the Stanford Departments of surgery and Plastic surgery.

209.    Relator requested Stanford's  Medicare reports in November 2016 but did not receive all the full reports until on or about late 2017.

210.    On or about February 2017 and on March 9, 2017 Relator contacted Stanford billing managers to discuss billing noncompliance issues.

211.    On March 14, 2017 Relator directly emailed Dr. Dirbas, and later other Stanford executives including the  Stanford Office of the General Counsel and Vice President and Chief Legal Officer Debra Zumwalt regarding  Stanford's upcoded and unbundled services.

212.    On March 15, 2017 Relator notified Stanford counsel Ms. Stoutenburg and Ms. Northrup, as well as Defendant Dr. Dirbas of the Medicare and non-Medicare billing noncompliance.

213.    On September 8, 2017 Relator directly notified Ms. Debra Zumwalt, General Counsel to Stanford vis-à-vis electronic communication at zumwalt@stanford.edu of her institutions' non-Medicare and Medicare billing claims non-compliance.  Ms. Zumwalt confirmed receipt of Relator's communication but declined to intervene or respond to the billing discrepancies.

214.    On September 10, 2017 Relator again notified Ms. Debra Zumwalt (herein "Zumwalt" or "Stanford General Counsel"), General Counsel to Stanford at zumwalt@stanford.edu,  as well as Dr. Frederic Dirbas at dirbas@stanford.edu of the billing noncompliance and asked to begin discussions with Stanford on new billing processes to ensure compliance.

215.    Shortly thereafter, Ms. Zumwalt replied to Relator and confirmed receipt of the email regarding Stanford's noncompliant billing practices.

216.     Relator contacted Stanford general counsel Ms. Zumwalt at zumwalt@stanford.edu and Dr. Dirbas  dirbas@stanford.edu several more times by email from 2017 through 2018, without any acknowledgement by these parties.

217.    Relator filed and served the  Qui Tam Complaint on or about December 4, 2017.

218.    From 2012 to March 2018, Defendants and their representatives had not only failed to acknowledge or to take steps to mitigate their unjust enrichment in Relator's account, but they filed motions in limine in Court to suppress evidence of their billing fraud.

219.    Astonishingly on March 8, 2018 (which was more than 5 years after the date of service, and 3 months after filing this under seal Complaint in this action), Stanford sent a **new bill** to Relator for Dr. Dirbas's  unbundled pre-operative visit.

220.    On March 7, 2018 Stanford invoiced Relator for another $341.97 for DOS Dec. 11, 2012. ( inset below)



**Stanford**
HEALTH CARE
STANFORD MEDICINE

**Monthly Statement**
Page 1 of 5

**YOUR INFORMATION**

Statement Date   3/7/2018
Guarantor Name
Guarantor ID #   10077
Account Numbers   Located on following pages
Payment Due Date   4/4/2018

**YOUR ACCOUNT SUMMARY**

| | |
|---|---|
| Total Charges | $458.00 |
| Patient Payments | $0.00 |
| Insurance Payments | $0.00 |
| Insurance Adjustments | $-116.03 |
| Other Adjustments | $0.00 |
| **AMOUNT DUE NOW** | **$341.97** |

**QUESTIONS?**

**YOUR PAYMENT OPTIONS**

Online: www.stanfordhealthcare.org/billing

Phone: 800.549.3720

Mail: Please complete coupon below and return with your check made payable to STANFORD HEALTH CARE.

Call Us: 800.549.3720 | Mon-Fri, 8:00am-5:00pm
Visit Us: 2465 Faber Plane, Palo Alto, CA 94303
Online: www.stanfordhealthcare.org/billing

Please see the reverse side of this statement for additional information on Financial Assistance.

**A MESSAGE FOR YOU**

Please pay your bill online or sign up for paperless billing at myhealth.stanfordhealthcare.org/activation/Lookup or activate your MyHealth account, using access code PASSF-#

MRN required for MyHealth activation is   192

*my*HEALTH

Access your health information anytime and anywhere. You can use MyHealth to:

- Message your care team
- View your lab results
- Schedule your appointment
- Pay your bill

Thank you for choosing Stanford Health Care.
Please detach and return the bottom portion of this statement with your payment

**Stanford**   P.O. BOX 740715
HEALTH CARE   LOS ANGELES, CA 90074-0715
STANFORD MEDICINE

**Amount Due**
**Payable Upon Receipt**   **$341.97**

Guarantor ID   10C
Statement Date   3/7/2018



STANFORD HEALTH CARE
P.O. BOX 740715
LOS ANGELES, CA 90074-0715

We care about protecting your financial information. For credit card payments, please visit us online at www.stanfordhealthcare.org/billing

Unless otherwise indicated in the account number field below, your payment will post to your patient plan amount due aicd then to the oldest account on this statement. Please post my payment to the account number _____

Page   of 5

**Account Details**

| ate | Description | | Pmts/Adjs | Insurance Balance | Patient Balance |
|---|---|---|---|---|---|
| Patient:  [ Name Withheld] | | | | Status Due Upon Receipt | |
| Service Provider: Dirbas, Frederick M | | | | | |
| Location: Blake Wilbur Clinics | | | | | |
| 12/11/2012 | EVAL/MGMT OF EST PATIENT | $458.00 | | | |
| | CONTRACTUAL ADJ - BLUE CRO | | $-116.03 | | |
| | Totals | $458.00 | $-116.03 | $0.00 | $341.97 |
| | Patient Balance | | | $0.00 | $341.97 |
| | Balance Due | | | | $341.97 |

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

221.    On March 23, 2018 the following screenshot was captured from Relator's Stanford billing account from "Stanford MyHealth". The ledger reflected that on Jan. 23, 2018 Stanford had internally reprocessed the unbundled 2012 claim and ordered a *refund check*. However, Relator had not received any refund from Stanford.

# Recent Payments

## Payments from 1/1/2011 to 3/31/2018

| DATE | DESCRIPTION | SOURCE |
| --- | --- | --- |
| 01/25/2018 | PATIENT REFUND AP CHK | Refund |
| 02/14/2013 | TRXF PT PMT FR HB TO PB | HB/PB Transfer (#V |
| 02/12/2013 | PBO/PFS PATIENT ACCOUNT BALANCE PAYMENT | CC-VISA |
| 01/18/2013 | PBO/PFS PATIENT ACCOUNT BALANCE PAYMENT | Check (#023820) |
| 12/12/2012 | SMO POS ACCOUNT PAYMENT | CC-VISA (#Visa/22 |
| 12/05/2012 | TRXF PT PMT FR HB TO PB | HB/PB Transfer (#23748) |

222.    On March 27, 2018 Stanford sent Relator a letter from its billing compliance officer admitting that the first two upcoding schemes described herein were 100% accurate and true. (Exh. K)

223.    On March 27, 2018 Stanford sent Relator a check for $341.97 for the 2012 unbundled visit. However, according to Anthem Blue Cross there was no patient responsibility for the unbundled visit and Anthem notified Stanford on Jan.

20, 2013 of the disallowed the unbundled code but Stanford failed to refund the account.   (Exh. L- inset below)



224.       On March 27, 2018 Relator received the following letter dated "2/7/ 18" but postmarked 3/26/18 from Stanford Health Care. (Exh. K) The letter **_admitted_** the preoperative unbundling practice alleged in this action and offered a refund to Relator nearly six (6) years after the occurrence.

Stanford  "Director, Hospital Billing Integrity  and Compliance Department" wrote

> "*It has come to our attention that we inadvertently billed in error for a preoperative established patient c visit on December 11, 2012 that is generally included as part of the global surgical package.*"  "*Our records indicate that you made a payment in the amount of $341.97. As such, enclosed with this correspondence is a check for a refund in full of the amount you paid in this regard.*"

225.       Stanford's March 27, 2018 letter also fully admitted the second upcoding scheme described herein, fraudulent upcoding of number of units of surgical prosthesis and parts.

"*It has also come to our attention that Anthem Blue Cross was inadvertently billed for two packages of Alloderm with respect to the surgery you underwent at Stanford Health Care on December 12, 2012. B, our internal review, only one package of Alloderm should have been billed to Anthem Blue Cross.*"

*Sincerely,*

*Chantel M. D. Susztar, RHIT, CDIP, CCS, CCS-P, CHC*

226.     On April 15, 2018 Relator obtained the following claims ledger through production from Defendants' subpoena to Anthem Blue Cross (herein "ABC"). ABC's ledgers show that on 1/30/13 Anthem reprocessed and denied Defendant's 12/11/12 claim for the unbundled pre-operative visit. ABC  assigned the pre-op visit  as a mandatory write off as "provider responsibility". However, Stanford billed relator for $341 and never reprocessed the claim. At the time that Stanford billed the individual insured for $341, Stanford knew or should have known they were not entitled to continue billing but did not do so.  A true and correct screenshot with minor redaction of non-Stanford parties of the ABC subpoena ledger is inset below. ABC remitted these payments to Stanford as indicated below.

| Claim# | Date | | Billed $ | Entity | Paid $ | | | | | |
|--------|------|------|----------|--------|--------|------|------|------|------|------|
| 12354B72541 | 12/12/12 | 12/13/12 | $146,804.68 | 12/21/12 | STANFORD HOSPITAL & CLINI | $30,936.14 | $823.55 | $0.00 | $0.00 | $0.00 | $113,044.99 |
| 12156B8.3739 | 12/12/12 | 12/12/12 | $1,010.00 | 12/24/12 | STANFORD MEDICAL CENTER | $0.00 | $633.10 | $0.00 | $0.00 | $0.00 | $376.90 |
| 12363BM1736 | 12/12/12 | 12/12/12 | $5,310.00 | 1/8/13 | STANFORD MEDICAL CENTER | $3,608.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,702.00 |
| 13009BP0616 | 12/12/12 | 12/12/12 | $6,740.00 | 1/29/13 | STANFORD MEDICAL CENTER | $3,089.22 | $0.00 | $0.00 | $0.00 | $0.00 | $3,650.78 |

| Claim# | Date | | Billed $ | Entity | Paid $ | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12347803210 | 12/11/12 | 12/11/12 | $458.00 | 12/17/12 | STANFORD MEDICAL CENTER | $0.00 | $341.97 | $0.00 | $0.00 | $0.00 | $116.03 | $0.00 |
| 12347803210 | 12/11/12 | 12/11/12 | $0.00 | 1/30/13 | STANFORD MEDICAL CENTER | $0.00 | ($341.97) | $0.00 | $0.00 | $0.00 | $341.97 | $0.00 |
| 12352865741 | 12/11/12 | 12/11/12 | $744.00 | 12/20/12 | STANFORD HOSPITAL & CLINI | $0.00 | $410.90 | $0.00 | $0.00 | $0.00 | $333.10 | $0.00 |
| 12314649071 | 11/8/12 | 11/8/12 | $653.00 | 11/8/12 | STANFORD MEDICAL CENTER | $0.00 | $464.60 | $0.00 | $0.00 | $0.00 | $168.40 | $0.00 |
| 12317803423 | 11/8/12 | 11/8/12 | $216.00 | 11/12/12 | STANFORD MEDICAL CENTER | $95.11 | $0.00 | $0.00 | $0.00 | $0.00 | $120.89 | $0.00 |
| 17311827816 | 11/8/12 | 11/8/12 | $539.00 | 11/20/12 | STANFORD HOSPITAL & CLINI | $0.00 | $331.05 | $0.00 | $0.00 | $0.00 | $207.95 | $0.00 |

## **BREAST SURGERY BACKGROUND**

## **DEFENDANTS VIOLATED SPECIAL FEDERAL LAW PROTECTIONS FOR WOMEN UNDERGOING MASTECTOMY AND BREAST RECONSTRUCTION**

227.     For general perspective, about 1 in 8 U.S. women (about 12%) will develop invasive breast cancer over a lifetime. In 2017, an estimated 252,710 new cases of invasive breast cancer are expected to be diagnosed in women in the U.S., along with 63,410 new cases of non-invasive (in situ) breast cancer. (Ref. https://seer.cancer.gov/statfacts/html/breast.html)

228.     Data released by the Agency for Healthcare Research and Quality (AHRQ) show that while breast cancer rates have remained constant, the rate of women undergoing mastectomies increased 36 percent between 2005 and 2013, including a more than tripling of double mastectomies. (Ref. https://www.ahrq.gov/news/newsroom/press-releases/2016/mastectomy-sb.html)

229.     Medicare is the expected primary payer for 44.5% of all hospital-based ambulatory surgery center unilateral mastectomies, and 14.7% of all bilateral

mastectomies. Non-Medicare is the payer for about 50% of mastectomies and reconstructions.

230.    For instance, a query with California's Office of Statewide Health Planning and Development (herein "OSHPD") showed that Stanford discharged 224 mastectomy patients in 2012, and 217 patients in 2013.  Stanford's upcoded and unbundled claims for units of surgical products likely targeted these patients. (Exh I)

231.    For example, Stanford surgeon Dr. Dirbas billed Medicare $1,618,328.50 in a 5-year period. Dr. Dirbas billed non-Medicare (commercial carriers and Medi-Cal) *much more* than $1.6 million in the same time.   Stanford surgeon Dr. Gordon Lee had similar billings  in the millions of dollars.

232.    Stanford billed and received more than $700 million dollars in Federal funds from Medicare. Stanford was asked to reply with institutional  timely compliance with correct coding initiatives. Stanford failed to reply.

233.    Corrective action because of this Action will result in immense benefit to beneficiaries and save federal and state healthcare dollars.   This suit is also grounds for institutional awareness and improved coding through Stanford's awareness of the foregoing CMS and Federal guidelines for correct coding.

234.    In 2017, informational copies of the aforementioned records were made available to Stanford executives, Stanford Counsel, Dr. Dirbas, and Ms. Zumwalt Vice President of Stanford University and the  Stanford Office of the General Counsel for the purpose of alerting Stanford and the department of Surgery to urgently correct the unbundling of any preoperative visits moving forward, and to also timely institute a billing compliance plan, both of which Stanford declined to do.

235.    The upcoding and unbundling in this action are of public interest and impact a large portion of healthcare spending. Stanford's fraudulent coding identified through this action demonstrates institutional areas for change. Defendant's

institutional upcoding and unbundling "errors" have not been corrected by Defendants.

## STATUTORY BACKGROUND

### THE MEDICARE PROGRAM

236.     Congress established the Medicare Program in 1965 when it enacted Title XVIII of the Social Security Act. Medicare is a federal health care program as defined at 42 U.S.C. '1320b-7b(f) and is a health care benefit program as defined at 18 U.S.C. ' 24(b). Medicare provides free or below-cost health care benefits to certain eligible beneficiaries, primarily persons sixty-five years of age or older. Individuals who receive Medicare benefits are often referred to as Medicare beneficiaries.

237.     Medicare consists of four distinct parts: Part A provides hospital insurance with coverage for inpatient hospital services, skilled nursing care, and home health and hospice care; Part B provides supplementary medical insurance for physician services, outpatient services, and certain home health and preventive services; Part C is a private plan option for beneficiaries that covers all Part A and B services, except hospice; and Part D covers prescription drug benefits.

238.     The Centers for Medicare and Medicaid Services (herein "CMS") is a federal agency within the United States Department of Health and Human Services (herein "DHS"). CMS administers the Medicare program through its contractors.

239.     CMS contracts with public and private organizations, usually health insurance carriers, to process Medicare claims and perform administrative functions. CMS currently contracts with Noridian  administer and pay Part B claims from the Medicare Trust Fund. The Medicare Trust Fund is a reserve of monies provided by

the federal government.

240.     Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules ,regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

241.     The American Medical Association has established certain codes to identify medical services and procedures performed by physicians, which is known as the Physicians Current Procedural Terminology (herein "CPT")  system. CPT codes are widely used and accepted by health care providers and insurers, including Medicare and other health benefit programs.

242.     Medicare maintains a Unique Physician/Practitioner Identification Number (AUPIN@) System. The purpose of the system is to provide a unique identifier for each physician, non-physician practitioner, or medical group practice requesting or receiving Medicare payment, and to provide beneficiaries and other interested entities with the identification of each physician or non-physician practitioner assigned a UPIN and who are participating in the Medicare program.

243.     Providers of health care services to Medicare beneficiaries seeking reimbursement under the program must submit a claim form ("HCFA1500") containing certain required information pertaining to the Medicare beneficiary, including the beneficiary's name, health insurance claim number (herein "HIC), date the subject service was rendered, location where the service was rendered, type of services provided, the CPT code, number of services rendered, an ICD-9 code reflecting the patient's diagnosis, charges for each service provided, the provider's UPIN, and a certification that such services were personally rendered by the provider.

244.     Medicare providers are entitled to be paid only for medically-

necessary services provided to eligible Medicare beneficiaries. Medicare requires providers to maintain complete and accurate medical records documenting each patient's care and treatment and the specific services provided to each patient.

## 1) FIRST SCHEME: UNBUNDLED PRE-OPERATIVE VISITS

**STANDARD MEDICARE AND "CMS" GLOBAL SURGERY FEE RULE**

245.    "CPT" is Correct Procedural Terminology and is the set of codes that standardize and codify standard medical services and surgeries. CPT designates separate codes for visits and separate codes for procedures. Office visits are coded as five-digit codes beginning with "992_ _". There are only five levels of service.

| CPT CODES OFFICE VISITS | New Patient | Return Patient |
|---|---|---|
| Low Level Complexity | 99201 | 99211 |
| | 99202 | 99212 |
| Mid-Level Complexity | 99203 | 99213 |
| | 99204 | 99214 |
| Highest Level Complexity | 99205 | 99215 |

246.    CPT  code 9920_ codes specify a *new* patient visit, or one not seen by the provider in three years.

247.    CPT code 9921_ codes designate a return patient visit.

248.    CPT's 5th digit for office visits designates the level of complexity, from 1 (the lowest complexity and least priced service) to 5 (the highest complexity

and most expensive service).  For example, Defendants in this action coded nearly all

visits as 99205 or 99215, which demanded the highest payments. From 2010 to 2016,

Defendants billed Medicare from $379 to $653 for a new patient CPT code 99205

visit . They billed Medicare $263 to $458  for a return patient, CPT code 99215 visit.

       249.    Defendant Dirbas testified under oath that he did <u>not</u> sign the pre-

operative visit note for Relator's records. (Dirbas Depo p.74)



**SURGERY REPORTS**

Progress Notes

Filed by Schultz, Candice, PA at 12/11/2012  8:23 PM/ Draft: Not Electronically Signed
Status:            Unsigned Transcription

Official Copy

STANFORD

STANFORD HOSPITAL
450 BROADWAY STREET
REDWOOD CITY, CA 94063

:F

Enc. Date:12/28/12

Scan on 12/19/2012 11:34 AM (below)

13 1019 766418

Page 1 of 2

**Stanford Hospital and Clinics**

STANFORD HOSPITAL
450 BROADWAY STREET
HIM_MEDICAL RECORDS MC5200
REDWOOD CITY, CA 94063

Sex: F

Adm:12/11/2012

| Unsigned | | | | | |
|---|---|---|---|---|---|
| Author: | Schultz, Candice, PA | Service: | (none) | Author Type | Physician Assistant |
| Filed: | 12/11/12 2023 | Note Time: | 12/11/12 1910 | Trans. ID: | S542372800 |
| Trans Status: | Unavailable | | | | 151358 |

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

Official Copy

**STANFORD**
HOSPITAL

STANFORD HOSPITAL
450 BROADWAY STREET
REDWOOD CITY, CA 94063

: F

Enc. Date:12/28/12

Scan on 12/19/2012 11:34 AM (below)

131019766418

Page 1 of 2

**Stanford Hospital and Clinics**

STANFORD HOSPITAL
450 BROADWAY STREET
HIM_MEDICAL RECORDS MC5200
REDWOOD CITY, CA 94063

Sex: F

Adm:12/11/2012

Unsigned

| Author: | Schultz, Candice, PA | Service: | (none) | Author Type | Physician Assistant |
| Filed: | 12/11/12 2023 | Note Time: | 12/11/12 1910 | Trans ID. | S542372800 |
| Trans Status | Unavailable | | | | 151358 |

Official Copy

**STANFORD**
HOSPITAL

STANFORD HOSPITAL
450 BROADWAY STREET
REDWOOD CITY, CA 94063

Sex: F

Adm:12/11/2012

**SURGERY REPORTS (continued)**

Progress Notes (continued)

| > 12/11/2012 8:23 PM | Schultz, Candice, PA | Unsigned Transcription |
| 12/11/2012 8:13 PM | Schultz, Candice, PA | Unsigned Transcription |
| 12/11/2012 7:10 PM | Schultz, Candice, PA | Unsigned Transcription |

5      Q. And in meeting with Dr. A, did you create a

6    note of that meeting with Dr. A?

7           MS. POLLARA: I'm sorry, I'm confused as to

8    what date you're referring to.

9           MS. STOUTENBURG: Right. That's part of the

10    problem.

11           MR. DOLAN: I'll cure it. Let's not

12    characterize it as -- I've been pretty good.  I'll

- 85 -

FIRST AMENDED COMPLAINT United States *et. al.,* vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

13   take care of it.

14        Q. So as part of your preoperative meeting with

15   Dr. A -- pardon me.

16             Did you create some sort of record of that

17   interaction?

18        **A. I believe my PA wrote a note, which I then**

19   **signed off.**

20        Q. Was your PA named Candice Schultz?

21        **A.   Yes.**

22        Q. How long had Candace Schultz been your PA?

23        **A. I think she started working with us that**

24   **year, but I don't recall exactly.**

25        Q. Did you form an understanding that Dr. A was

250.     Defendant Dirbas testified under oath that he failed to document

medical records when he examined Relator. (Dirbas Depo p.171)

22        Q.   So, Doctor, when you saw Dr. A in the morning

23   postoperative, did you make any notes of that visit?

24        **A.   I did not make any -- I did not make any**

25   **notes.**

Bridget Mattos & Associates
(415) 747-8710

- 86 -
FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

```
14          MR. DOLAN:  Q.  Your resident would be
15   Dr. Kazaure?
16      A.   Yes.
17      Q.   And it indicates that she signed her progress
18   note on December 13th at 8:44 a.m.; correct?
19      A.   That appears to be correct.
20      Q.   And to your knowledge, did you sign the note
21   as well, at some point in time?
22      A.   I typically would.  I don't see my signature,
23   my electronic signature here.
```

(p.174 Depo Dirbas)

```
11      Q.   Did you make any note anywhere of your
12   evaluation of the breast and its condition of having
13   what you thought was potentially compromised
14   vasculature?
15      A.   Well, I talked to my residents that day.  I
```

p. 202 Dirbas Depo

251.     In comparison, from 2010-2016 Defendant DIRBAS billed Medicare CPT code 99211 (the lowest service) *only once*. The charge for CPT 99211 was $23.

252.     The "global surgical package", also called global surgery fee , includes all the necessary services normally furnished by a surgeon before, during, and after a procedure. CMS assigns a fixed total or " global" fee for a codified surgery.

The global fee payment for a code encompasses the work required to perform the surgery as well as the before and after-care for the surgery.

253.    Physicians who furnish the surgery and furnish all usual pre-and post-operative care may bill for the global package by entering the appropriate CPT code for the surgical procedure only. Separate billing is not allowed for visits or other services that are included in the global package. Thus, a surgeon cannot unbundle and bill separately for the pre-operative visit the day before surgery.

254.    Office visits or "Evaluation and Management" services (herein "E/M" or "visits") the day before surgery are *included* in the surgical fee package, and not separately billable.

255.    Dr. Dirbas testified under oath that he routinely made patients come in for **several** preoperative visits at Stanford, and the Stanford billing records show he unbundled these and charged for them. (p.221 Dirbas Deposition)

```
4            THE WITNESS:  I believe I would have
5       discussed it during one of the preoperative visits.
6       Probably at the first visit, would not be likely that
7       I would have done it the day before surgery, day or
8       two before surgery.
9            MS. POLLARD:  All right.
```

256.    The national global surgery policy became effective for surgeries performed on and after January 1, 1992. A national definition of a *"global surgical package"* has been established to ensure that payment is made consistently for the same services across all A/B MAC (B) jurisdictions, thus preventing Medicare payments for services that are more or less comprehensive than intended. (Reference       https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/GlobalSurgery-ICN907166.pdf)

257.     Medicare established a national definition of a "global surgical package" to ensure that Medicare Administrative Contractors (MACs) make payments for the same services consistently across all jurisdictions.

258.     Medicare payment for a surgical procedure includes the pre-operative, intra-operative, and post-operative services routinely performed by the surgeon or by members of the same group with the same specialty. Physicians in the same group practice who are in the same specialty must bill and be paid as though they were a single physician.

259.     Medicare includes the following services in the global surgery payment when provided in addition to the surgery:  Pre-operative visits after the decision is made to operate. For major procedures, this includes preoperative visits the day before the day of surgery.

260.     The Medicare approved amount for these procedures *includes* payment for the following services related to the surgery when furnished by the physician who performs the surgery. Therefore, a global fee paid for performing a mastectomy (a major surgery) already includes in that total fee an amount for pre-operative and post-operative visits. Thus, the surgeon is not entitled to unbundle and bill separately for pre-operative visits.

261.     These services are not billable for payment:

- For minor procedures, this includes pre-operative visits the day of surgery.

- Intra-operative services that are normally a usual and necessary part of a surgical procedure

- All additional medical or surgical services required of the surgeon during the post-operative period of the surgery because of complications, which do not require additional trips to the operating room.

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

- Follow-up visits during the post-operative period of the surgery that are related to recovery from the surgery
- Post-surgical pain management by the surgeon.

262.     Global surgery applies in any setting, including an inpatient hospital, outpatient hospital, Ambulatory Surgical Center (ASC), and physician's office. When a surgeon visits a patient in an intensive care or critical care unit, Medicare includes these visits in the global surgical package.

263.     Major procedures have a 90-day post-operative period which by definition includes one day pre-operative.  Also, the day of the procedure is generally not payable as a separate service. Thus, the total global period is 92 days, counting 1 day before the day of the surgery, the day of surgery, and the 90 days immediately following the day of surgery.

264.     Pursuant to CMS, codes with "090" are major surgeries (90-day post-operative period).

265.     Medicare  has multiple national contractors that administrate its plans. Palmetto GBA and Noridian are  such carriers.  Palmetto provides a simple tool for  providers  to  lookup  CMS  global  days.  (Ref. https://www.palmettogba.com/palmetto/global90.nsf/Front?OpenForm#step1)

266.     For example, entering CPT code "19302" into CMS's search tool reflects this is a major surgery code for mastectomy with a 90-day global period. Thus, the pre-operative visit before this surgery must not be unbundled and is not separately chargeable. (Screenshot inset below.)

Code: **19302**
Description: **P-mastectomy w/lymph node removal**
Modifier:
Global Days: **90 days**

267.    For example, entering the CPT code "19125" into this search tool reflects that this is a major surgery code for mastectomy with a 90-day global period. Thus, the pre-operative visit before this surgery must not be unbundled and is not separately chargeable. (Screenshot inset below.)

Code: **19125**
Description: **Excision breast lesion**
Modifier:
Global Days: **90 days**

268.    Similarly, the following major surgery codes used by Defendants also have a 90-day global code which precludes Defendants from unbundling and billing separately for *any* pre-operative or post-operative visits:  19125, 19342, 19340, 19120.

## FEW EXCEPTIONS TO GLOBAL SURGICAL SERVICE FEES

269.    In this action, Defendants habitually and freely upcoded, unbundled, and billed for pre-operative visits. Pre-operative visits are  included in the payment for the global surgery fees. There is no evidence here that any exceptions applied to any cases. All cases were unbundled pre-operative visits which were charged after the decision for surgery was made. Some visits were billed for *post-operative* visits which were also included in the global surgery fee.

270.    However, it is noted that the following services are *not* included in the global surgical payment. These services may be billed and paid for separately: • Initial consultation or evaluation of the problem by the surgeon to determine the need for major surgeries. This is billed separately using the modifier "-57" (Decision for Surgery). This visit may be billed separately only for major surgical procedures.

271.    Evaluation and Management services (herein "E/M" or "visit") on the day before major surgery, or on the day of major surgery that result in the *initial decision to perform* the surgery are *not included* in the global surgery payment for the major surgery. Therefore, these services may be billed and paid separately.

## DEFENDANTS FREELY "UNBUNDLED" AND VIOLATED GLOBAL SURGERY FEE RULES

272.    Defendants performed major surgery services codes with "090" which qualify as global fees with a 90-day post-operative period.

273.    Defendants unlawfully and knowingly unbundled and separately coded for pre-operative visits which they knew or should have known were part of the global surgery fee for major surgeries.

274.    Defendants unlawfully and willfully unbundled and coded for pre-operative visits the day before major surgery. This unbundling practice yielded Defendants upwards of 20-50% greater and unjust enrichment from the surgery.

275.    For example, a mastectomy surgery is coded as "19301" and reimbursed approximately $900. Rather than accept $900 for the surgery, Stanford surgeon deliberately upcoded the service to receive enrichment of $1200 for the same surgery. This increased revenue was obtained when the surgeon unlawfully unbundled and charged a separate fee for an extensive or comprehensive pre-operative office visit, which lawfully would have not been separately reimbursable. Had the surgeon billed and coded correctly, CMS would have paid him only $900 in total for the surgery and the pre-and postoperative visits.

276.     Here, the surgeons upcoded and billed for unbundled services, causing CMS to pay Defendants a total of $1200. Thus, Defendants obtained unjust enrichment through submitting false claims.

**REPRESENTATIVE UNBUNDLED GLOBAL FEE CASES:**

**A. DEPARTMENT OF SURGERY**

**1. FREDERICK DIRBAS, M.D. (NPI 1154457091)**

277.     Representative cases of Stanford's improper and unbundled billings are inset below.

- Here, Stanford unlawfully unbundled and billed for a pre-operative visit on the day before surgery, which was part of the global surgery fee.
- 99205 and 99214 are evaluation and management ("EM") or "office visit" codes.
- 19301 is a mastectomy code, a major surgery under CMS rules which has a 90 day "global" period.

| Date of Service | | | | CPT Code | | Modifier | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1/24/2012 | 1/24/2012 | 22 | 1 | 99205 | | | | | 2330 |
| 2/21/2012 | 2/21/2012 | 22 | 1 | 99214 | | | | | 2330 |
| 2/22/2012 | 2/22/2012 | 22 | 2 | 19301 | LT | GC | | | 2330 |
| 4/4/2012 | 4/4/2012 | 22 | 2 | 19301 | 58 | RT | GC | | 2330 |

278.     In the aforementioned case, on 2/22/12 CMS beneficiary underwent a major surgery CPT 19301. Code 19301 includes the day before and 90 days afterwards as a global surgical fee. On 1/24/12 CMS was billed and paid for a comprehensive, high level, new patient E&M code as CPT 99205. The decision for surgery was made at that first visit.

On 2/21/12 CMS was wrongly billed and *paid* Stanford for a separate extended evaluation and management "E&M" service as 99214. This was one day before surgery. The 2/21/12 professional services were included in the global fee paid to Stanford for the surgery code.

279.     According to CMS, is it improper for a surgeon to charge a visit the day before major surgery, when the surgeon already made a decision for surgery, and scheduled surgery less than 30 days prior. If a surgeon prefers to meet with the patient the day or two before surgery to touch base and answer questions before surgery, that "pre-op" encounter is not separately chargeable and is encompassed in the global surgery code and fee.

280.     As another example, Defendant Dr. Dirbas unlawfully billed and received payment from CMS for an unbundled *pre-operative visit* the day before he performed a major surgery on the same Medicare beneficiary.

| Date | | Place | | CPT Code | | |
|------|------|------|------|------|------|------|
| 9/1/2015 | 9/1/2015 | 22 | 1 | 99214 | | |
| 9/2/2015 | 9/2/2015 | 22 | 2 | 19125 | RT | GC |

281.     Pursuant to CMS guidelines, the 9/1/15 visit was included in the global surgery fee paid to the surgeon for the surgery performed on 9/2/15. Thus, Stanford's unjust enrichment from unbundling the 9/1/15 pre-op visit was unlawful, must be reimbursed to CMS, and subjects Stanford to FCA recovery.

282.     CPT codes 19120 and 19125 are used for excision of breast lesions, where attention to surgical margins and assurance of complete tumor resection is unnecessary. CPT code 99214 is an extended evaluation and management service, or office visit.

283.     As a <u>third</u> example, Defendants Dirbas and Stanford unlawfully billed and received CMS payment for a pre-operative visit the day before major surgery on the same beneficiary.

| Date of Service | CPT code | Modifier | |
|---|---|---|---|
| 6/9/2016 | 99205 | | |
| 6/28/2016 | 99215 | | |
| 6/29/2016 | 19302 | LT | |

On 6/29/16 surgery was performed.  Pursuant to CMS, the pre-operative visit 6/28/16 visit was included in the global surgery fee.  Defendant unlawfully unbundled and collected fees for the 6/28/16 visit. The fee was unlawful and must be reimbursed to CMS.

CPT code 99215 is the highest reimbursed return patient visit, a comprehensive evaluation and management code. It is unlawful to separately bill this code for a pre-operative visit.  CPT 19302 is a major surgery code with a 90-day global fee basis. Medicare also requires the burden of "medical necessity" and there is no indication that a comprehensive level visit was even medically necessary.

284.     A <u>fourth</u> example, on 5/19/16 Defendants Dirbas and Stanford billed a new patient visit. On that date a decision for mastectomy was made.

| Date of Service | CPT code | Description |
|---|---|---|
| 5/19/2016 | 99205 | New patient comprehensive exam on May 19, 2016 and decision for surgery was made. Surgery scheduled on 6/6/16. |
| 6/2/2016 | 99215 | Medicare was unlawfully charged for a  pre-operative visit as a high level comprehensive return visit. By CME rules, this visit 4 days before surgery is not separately chargeable. |

| 6/6/2016 | 19307 | Surgery date where Global surgery code for modified radical mastectomy including removal of under arm lymph nodes has a 90-day global period and includes the pre-op visit. |

On 6/2/16, Defendants then unbundled and unlawfully billed a pre-operative visit. On 6/6/16 Defendants performed a modified radical mastectomy surgery. Per CMS, the 6/2/16 visit was included in the mastectomy global fee.

Thus, Defendants were not entitled to "double dip" and collect unjust enrichment for a visit which was calculated and included in CMS global surgery fee.

285.   A <u>fifth</u> example, Defendants unlawfully billed and received reimbursement for a pre-operative visit on 6/21/16.

| Date of Service | CPT code | Description |
|---|---|---|
| 6/7/2016 | 99205 | New patient comprehensive exam charged on  June 7, 2016 and decision for surgery was made.  Surgery scheduled for 6/22/16. |
| 6/21/2016 | 99215 | Medicare was unlawfully charged for a  pre-operative visit as a high level comprehensive return visit. By CME rules, this visit 1 day before surgery is *not* separately chargeable. |
| 6/22/2016 | 19301 | Global surgery code for Partial mastectomy or lumpectomy of breast is a major surgery code with a 90-day global fee and includes the pre-operative and post-op care. |

CPT code 99215 is the highest paying return patient office visit. Defendant's unbundling resulted in unjust enrichment of approximately $200. Had it not been for Defendants' unconscionable billing, CMS would have paid at least 20% less for the total surgical care of this beneficiary.

286.   A <u>sixth</u> example, on 11/29/12 Defendants Dirbas and Stanford unbundled and received CMS payment for a pre-operative visit.

| Date of Service | CPT code | Description |
| --- | --- | --- |
| 11/20/2012 | 99205 | Defendants charged a new patient visit code for the highest level and highest paying code. The decision to proceed with surgery was made and was scheduled for 12/17/12. |
| 11/29/2012 | 99214 | Defendants unlawfully unbundled and billed for a pre-operative visit  before surgery. |
| 12/17/2012 | 19301 | This mastectomy code is a major surgery with a 90-day global service. The global fee reimbursement includes the pre-operative and postoperative care . |

CPT code 99214 is the 2nd highest paying office visit code for a return patient. Defendant's illegal unbundling resulted in unjust enrichment of approximately $130. Had it not been for Defendants' unlawful upcoding CMS would have paid at least 20%  less for the global care of this beneficiary.

287.    A seventh example, Defendants Dirbas and Stanford unlawfully charged a pre-operative visit on 8/14/12.

| Date of Service | CPT code | Modifier | Description |
| --- | --- | --- | --- |
| 8/2/2012 | 99205 | GC | New patient comprehensive visit charged and decision for surgery made. Surgery scheduled for 8/22/12. |
| 8/14/2012 | 99215 | | Defendants unlawfully billed for a pre-operative visit. They coded it as the highest paying comprehensive visit. |
| 8/22/2012 | 19301 | LT | Patient underwent surgery (mastectomy), a major surgery code with a 90-day global. |
| 8/22/2012 | 38525 | 51 | Open excision of lymph nodes is also a 90-day global code. Thus, the pre-operative visit was included in this fee. |

288.    An eight example, Defendants Dirbas and Stanford unlawfully upcoded and unbundled a  pre-operative visit on 2/7/2013.

| Date of Service | CPT code | |
| --- | --- | --- |
| 1/24/2013 | 99205 | New patient comprehensive code billed. Decision for surgery made and mastectomy scheduled for 2/20/13. |

| 2/7/2013 | 99215 | Unlawfully billed  a pre-operative visit. Used the highest paying code. |
| 2/20/2013 | 38525 | Lymph node Dissection with a 90-day global fee service. |
| 2/20/2013 | 19303 | Mastectomy major surgery code with a 90-day global fee service |

CPT code 99215 is the highest paying office visit code for a return patient. Defendant's illegal unbundling practice resulted in unjust enrichment of approximately $200 to Defendants. Had it not been for Defendants' unlawful upcoding, would have paid at least 20%  less for the care of this beneficiary.

(Inset from Exhibit "B":  CMS production of billing and payment records to Defendant Dirbas and Stanford)

289.    A ninth example, Defendants Dirbas and Stanford unlawfully billed a pre-operative visit on 9/1/2015.

| | | | | | | Claim ID | Date of service | | Code | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 217 | | | | | I68208 | 1043315740 | 6/30/2015 | 1 | 99205 | | |
| 217 | | | | | I68208 | 1043315740 | 9/1/2015 | 1 | 99214 | | |
| 217 | V4382 | | | | | | 9/2/2015 | 2 | 19125 | RT | GC |

CPT code 99215 is the highest paying office visit code for a return patient. Defendant's illegal unbundling resulted in unjust enrichment of approximately $200. Had it not been for Defendants' unconscionable billing, CMS would have paid at least 20%  less for the global surgery  of this beneficiary.

290.    A tenth example, Defendants unlawfully billed an office visit for 9/28/10 in the global post-operative period.

| Date of Service | | CPT code | Modifier | | | Diagnosis | | Provider UPIN |
|---|---|---|---|---|---|---|---|---|
| 9/9/2010 | 1 | 99204 | | | | 2330 | 00G589351 | |
| 9/20/2010 | 2 | 19125 | RT | | | 2330 | 00G589351 | |

| 9/20/2010 | 2 | 19126 | 59 |  |  | 2330 | 00G589351 |
| 9/28/2010 | 1 | 99213 |  |  |  | 79380 | 00G589351 |

Per CMS, the major surgery codes including CPT 19125 and 19126 have a 90-day global period. Thus, the 9/28/10 charge was only 10 days after surgery and should not have been billed. ( Inset from Exhibit B)

291.    An eleventh example, CMS records showed that on June 2016 Defendants persisted in their course of conduct and schemes.

Date of service                                    Codes billed

| 6/9/2016 | 6/9/2016 | 22 | 1 | 99205 |  |
| 6/28/2016 | 6/28/2016 | 22 | 1 | 99215 |  |
| 6/29/2016 | 6/29/2016 | 22 | 2 | 19302 | LT |

On 6/28/16 Defendant Dirbas and Stanford billed and received unjust enrichment from Medicare for a CPT 99215, an extensive office visit, billed the day before a major mastectomy surgery on 6/29/16. Defendants unbundled the pre-operative visits performed by a mid-level provider, billed the visits under the physician NPI, and did so with intent to increase profits.

292.    A twelfth example, Defendants unbundled a "preoperative visit" as a high code "99215" to Medicare on June 21, 2016, resulting in $263 of false claims and fraudulent billing.

| Billing NPI | Paid Date | Check# | Diagnosis | Service Date | CPT | DR. NPI | Billed$ |
|---|---|---|---|---|---|---|---|
| 1437292927 | 6/3/2016 | 0890157581 | C50911 | 5/19/2016 | 99205 | 1154457091 | 458.00 |
| 1437292927 | 6/22/2016 | 0890223673 | C50911 | 6/2/2016 | 99215 | 1154457091 | 263.00 |
| 1437292927 | 7/5/2016 | 0890266751 | C50412 | 6/6/2016 | 19307 | 1154457091 | 3924.00 |

293.    A thirteenth example, Defendants unbundled and billed two pre-operative visits after the decision for surgery was made on 7/19/16 and 7/28/16.

Defendant fraudulently billed at least $512 in just professional fees to Medicare. Defendants also billed fraudulent facility and durable medical goods ( prosthesis and artificial tissue) fees in the tens of thousands of dollars.

| Billing NPI | Paid Date | Check# | Diagnosis | | Service Date | CPT | DR. NPI | Billed$ | |
|---|---|---|---|---|---|---|---|---|---|
| 1437292927 | 8/17/2016 | 0890437334 | C50912 | A77115 | 7/19/2016 | 99205 | 00G589351 | 458.00 | 1 |
| 1437292927 | 8/22/2016 | 0890451982 | C50912 | | 7/28/2016 | 99215 | 00G589351 | 263.00 | 1 |
| 1437292927 | 8/22/2016 | 0890451982 | C50912 | E57089 | 8/2/2016 | 99215 | 00G589351 | 263.00 | 1 |
| 1437292927 | 9/6/2016 | 0890504876 | C50912 | E57089 | 8/16/2016 | 99215 | 00G589351 | 263.00 | 1 |
| 1437292927 | 9/16/2016 | 0890551469 | C50812 | | 8/22/2016 | 19301 | 00G589351 | 1452.00 | 7 |
| 1437292927 | 9/16/2016 | 0890551469 | C50812 | | 8/22/2016 | 38525 | 00G589351 | 1277.00 | 2 |

294.   A fourteenth example, Defendants unbundled and billed a pre-operative visit after the decision for surgery was made in blatant violation of global surgery fees.

| Billing NPI | Paid Date | Check# | Diagnosis | | Service Date | CPT | DR. NPI | Billed$ |
|---|---|---|---|---|---|---|---|---|
| 1437292927 | 3/21/2016 | 0889863483 | N62 | I26240 | 2/9/2016 | 99205 | 00G589351 | 458.00 |
| 1437292927 | 4/4/2016 | 0889917583 | N62 | I26240 | 2/25/2016 | 99215 | 00G589351 | 263.00 |
| 1437292927 | 4/18/2016 | 0889975531 | D0501 | | 3/15/2016 | 19125 | 00G589351 | 4238.00 |

295.   A fifteenth example, on 8/31/16 Defendants unbundled and billed a pre-operative visit after the decision for surgery was made in blatant violation of global surgery fees.

| Billing NPI | Paid Date | Check# | Diagnosis | Service Date | CPT | DR. NPI | Billed$ |
|---|---|---|---|---|---|---|---|
| 1437292927 | 7/20/2016 | 0890330050 | C50911 | 6/23/2016 | 99205 | 00G589351 | 458.00 |
| 1437292927 | 8/31/2016 | 0460624744 | C50912 | 7/19/2016 | 99215 | 00G589351 | 263.00 |
| 1437292927 | 9/1/2016 | 0890494148 | C50811 | 7/20/2016 | 38525 | 00G589351 | 2554.00 |

296.    A <u>sixteenth example</u>, on 3/31/16 Defendants unbundled and billed a pre-operative visit after the decision for surgery was made in blatant violation of global surgery fees.

| Billing NPI | Paid Date | Check# | Diagnosis | Service Date | CPT | DR. NPI | Billed$ |
|---|---|---|---|---|---|---|---|
| 1437292927 | 5/6/2016 | 0890052014 | C50911 | 3/31/2016 | 99215 | 00G589351 | 263.00 |
| 1437292927 | 5/3/2016 | 0890036036 | R591 | 4/1/2016 | 38525 | 00G589351 | 1277.00 |

297.    A <u>seventeenth[9] example</u>, Defendants unbundled and upcoded bills to a commercial carrier (Anthem Blue Cross) for a pre-operative visit on 12/11/12 as CPT 99215 $458.

| Date of Service | CPT code | Billed Amount |
|---|---|---|
| 11/8/2012 | 99205 | $653 |
| 12/11/2012 | 99215 | $458 |
| 12/12/2012 | 19303 | $3370 |
| 12/12/2012 | 19303 | $3370 |

| STANFORD'S CODING | | CORRECT CODING | |
|---|---|---|---|
| CPT 99215 (pre-op visit) | $458 | CPT    No Charge Pre-op | $0 |
| Stanford Fee | $458 | Correct Fee | $0 |

Relator underwent major surgery CPT 19303 on 12/12/12. Defendants already charged a new patient visit on Nov. 8, 2012 CPT 99205 and had made a decision for surgery. Defendants directly collected $341.97 from the patient for 12/11/12 for an assigned insurance deductible. Defendant concealed their

---

[9] Relator's Explanation of Benefits from Stanford and Anthem Blue Cross

FIRST AMENDED COMPLAINT United States et. al., vs. Stanford et. al. QUI TAM (31 USC § 3729(a))

fraudulent unbundling from the insurance carrier through schemes of improper modifiers. Thus, in December 2012 the carrier was unable to detect the unbundled pre-operative visit, and unable to deny the service as a provider responsibility.

Defendants also upcoded and unbundled multiple other services as referenced for relator's services on 12/12/12. Stanford habitually upcoded and unbundled pathology bills whereby Defendants violated the standard one specimen, one code rule. Here, Stanford billed three codes for one simple mastectomy specimen. For example:

| STANFORD'S CODING | | *CORRECT* CODING | |
|---|---|---|---|
| CPT 88305 Level IV  (2 units) | $ 1700 | CPT 88307 (2 units) | $1600 |
| CPT 88307 Level V  (2 units) | $ 3306 | | |
| CPT 88303  Level II  (2 units) | $ 1678 | | |
| Stanford Fee | $6684 | Correct Fee | $1600 |

## 2. DR. AMANDA WHEELER, M.D.  (NPI  1477749752)

298.       Amanda J. Wheeler, M.D. is a surgeon employed by Defendants. Dr. Wheeler's NPI is 1477749752 in the Surgical Oncology Department at Stanford.

299.       From 09/2013 to 10/2017 Stanford billed $1,494,584.50 just to Medicare for Dr. Wheeler's professional  services. That total does not include Stanford's facility fees, surgical supplies, durable medical goods, and non-Medicare fees which Stanford charged for this provider.

300.     Dr. Wheeler habitually unbundled and billed pre-op visits in violation of global surgery fees. She also billed a disproportionate number of high level codes 99205 and 99215.

301.     As an example, on Jan 25, 2017 Stanford and Dr. Wheeler unbundled a preoperative visit before surgery on Jan 26, 2017.

| ICN | Billing NPI | Paid Date | Check# | Diagnosis | Service Date | CPT | Billed$ |
|---|---|---|---|---|---|---|---|
| 0217027740710 | 1437292927 | 020217 | 0534596634 | C50911 | 1/25/2017 | 99214 | 186.00 |
| 0917037248060 | 1437292927 | 030217 | 0891153581 | C50511 | 1/26/2017 | 19303 | 3574.00 |

| STANFORD'S CODING | | *CORRECT* CODING | |
|---|---|---|---|
| CPT 99214 (pre-op visit) | $186 | CPT   No Charge Pre-op | $0 |
| Stanford Fee | $186 | Correct Fee | $0 |

302.     As another example, on April 19, 2017 Stanford and Dr. Wheeler unbundled a preoperative visit before surgery on April 20, 2017.

| ICN | Billing NPI | Paid Date | Check# | Diagnosis | Service Date | CPT | Billed$ |
|---|---|---|---|---|---|---|---|
| 0217115892980 | 1437292927 | 050917 | 0891403538 | C50912 | 4/19/2017 | 99214 | 186.00 |
| 0917137314440 | 1437292927 | 053117 | 0891483685 | C50412 | 4/20/2017 | 19303 | 7148.00 |

| STANFORD'S CODING | | *CORRECT* CODING | |
|---|---|---|---|
| CPT 99214 (pre-op visit) | $186 | CPT   No Charge Pre-op | $0 |
| Stanford Fee | $186 | Correct Fee | $0 |

303.     As a third example, on May 17, 2017 she unbundled a preoperative visit before surgery on May 18, 2017.

| ICN | Billing NPI | Paid Date | Check# | Diagnosis | Service Date | CPT | Billed$ |
|---|---|---|---|---|---|---|---|
| 0917076019270 | 1437292927 | 033117 | 0891261518 | Z9013 | 3/15/2017 | 99214 | 186.00 |
| 0217082778740 | 1437292927 | 040717 | 0891286967 | D0511 | 3/16/2017 | 14000 | 3741.00 |
| 0217082778740 | 1437292927 | 040717 | 0891286967 | D0511 | 3/16/2017 | 19120 | 6971.00 |

| STANFORD'S CODING | | *CORRECT* CODING | |
|---|---|---|---|
| CPT 99214  (pre-op visit) | $186 | CPT    No Charge Pre-op | $0 |
| Stanford Fee | $186 | Correct Fee | $0 |

304.    As a fourth example, on May 17, 2017 Stanford and Dr. Wheeler unbundled a preoperative visit before surgery on May 18, 2017.

| ICN | Billing NPI | Paid Date | Check# | Diagnosis | Service Date | CPT | |
|---|---|---|---|---|---|---|---|
| 0217157894180 | 1437292927 | 062017 | 0891553881 | C50912 | 6/5/2017 | 99214 | 186.00 |
| 0217166811200 | 1437292927 | 062917 | 0891588092 | D0512 | 6/6/2017 | 14000 | 3741.00 |
| 0217166811200 | 1437292927 | 062917 | 0891588092 | D0512 | 6/6/2017 | 19301 | 1452.00 |

| STANFORD'S CODING | | *CORRECT* CODING | |
|---|---|---|---|
| CPT 99214  (pre-op visit) | $186 | CPT    No Charge Pre-op | $0 |
| Stanford Fee | $186 | Correct Fee | $0 |

305.    As a fifth  example, on May 17, 2017 she unbundled a preoperative visit before surgery on May 18, 2017.

| ICN | Billing NPI | Paid Date | Check# | Diagnosis | Service Date | CPT | |
|---|---|---|---|---|---|---|---|
| 0917138171240 | 1437292927 | 060117 | 0891489014 | C50911 | 5/17/2017 | 99214 | |
| 0217149664050 | 1437292927 | 061217 | 0891525828 | C50811 | 5/18/2017 | 19301 | RT |

| STANFORD'S CODING | *CORRECT* CODING |
|---|---|

| CPT 99214  (pre-op visit) | $186 | CPT   No Charge Pre-op | $0 |
|---|---|---|---|
| Stanford Fee | $186 | Correct Fee | $0 |

## **SECOND SCHEME: STANFORD UPCODED LEVEL OF SERVICE TO HIGH CODES CPT 99205 AND 99215.**

306.     In the examples, the surgeon always upcoded maximum fees and high-level codes as a 99205 for new patients, and 99215 or 99214 for return patients.

307.     Examples of Defendants' upcoding is demonstrated in the visits. Notwithstanding that Defendants fraudulently unbundled global surgery fees,  but they also habitually coded  a significant portion of visits as the  highest-level codes, CPT 99215 and 99214.

308.     Medical necessity is a requirement of the CMS program and Defendants' medical records have not justified that a level 5 code was always medically necessary.

309.     Defendants' medical records have also failed to demonstrate why a pre-operative level 5 code the day before surgery was medically necessary.

310.     Defendants' medical records failed to demonstrate that the attending surgeon who billed under his NPI provided the services.

311.     Defendants' medical records failed to substantiate the "incident to rules" where a PA or RNP provided the office visits but never billed under the PA or RNP's  own NPI.

312.     Defendants' CMS payment legers and medical records have also failed to demonstrate any compliance with incident to billing for mid-level providers. For incident to billing, the doctor must be on site in the same location as the PA and directly supervising.

313.     Here, the surgeons were operating in the main hospital at <u>300 Pasteur Drive</u> and the PA's were seeing patients in the <u>cancer center building at 875 Blake Wilbur Drive  Wilbur Street.</u>



Accessed at Google,  the route from the hospital to the clinic is  4 min drive time via Welch Rd and Pasteur Dr.

314.     Defendants habitually refused to properly billed under the mid-level provider's NPI. Had Defendant billed under the correct PA or RNP provider, Defendant would have been paid 15-20% *less* than if a physician had provided the services.

315.     Defendants' medical records have also failed to demonstrate that a pre-operative level five (5) code the *day before surgery* was medically necessary.

316.     CPT code 99205 is the highest paying office visit code for a new patient. CPT codes 99215 is the highest paying office visit code for a return patient.

317.    Defendants' illegal unbundling and upcoding resulted in unjust enrichment of approximately $200-$500 per patient.   Had it not been for Defendants' unlawful upcoding and unconscionable billing, CMS would have paid at least 15-20% *less* for the care of each beneficiary.

## THIRD SCHEME: UPCODED MID LEVEL PROVIDERS

## DEFENDANTS FREELY UPCODED AND FALSELY BILLED UNDER THE PHYSICIAN NPI WHEN MID LEVEL PROVIDERS INDEPENDENTLY RENDERED SERVICES.

318.    For instance, Defendant surgeon Dr. Dirbas routinely used a mid-level provider Candance Schultz, PA (physician assistant) to provide for much of patients' initial, pre-operative, and postoperative services. Stanford exclusively charged all services under the surgeon's NPI although the mid-level provider rendered the services, especially the immediate pre-operative charges.

319.    Had Stanford billed correctly under the mid-level provider, Stanford would receive 15-20% less per service. (See  CMS Chapter 110 - Physician Assistant (PA) Services Payment Methodology (Rev. 2656, Issuance: 02-07-13, Effective: 02-19-13, Implementation: 02-19-13.) [10]

320.    Stanford regularly charged for the highest level of office visit for new patients as CPT "99205".  By time requirements alone are this level code is a very lengthy 60-minute visit.  Therefore, Stanford's surgeons billed fees for an office visit code  "99205" in one day would amount to 1 hour (60 minutes) *per* patient. If the surgeon's  charges were to be believed, he would, on a 7-hour work

---

[10] Accessed https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf

FIRST AMENDED COMPLAINT United States *et. al*., vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

day, have only an ability to see and bill 7 patients in this type of exam, and would not have time to see other lower level patients or do any operations.

321.    Defendants not only unlawfully billed pre-operative visits in violation of CMS global surgery fee rules, Defendants also  illegally billed for these upcoded   services under his NPI which were provided by a PA or unlicensed intern.[11]

322.    Stanford improperly billed for services and invasive testing when no physician was on site.

323.    Stanford billed for tens of thousands of dollars per patient claim of surgical supplies which were never used.

324.    Stanford surgery department fraudulently billed Medicare, Medi-Cal, and commercial insurance for pelvic floor testing by non-licensed assistants even though the purported supervising Stanford Cancer Center surgeon was no longer employed by Stanford.

325.    Stanford continued to bill Medicare, Medi-Cal, and commercial carriers for procedures and testing which cannot be billed unless the responsible physician is on site. Stanford billed all procedures by unlicensed staff, students, and interns as though a physician had been present for the Pelvic Floor testing. (See Young Complaint ¶156 "Stanford Health Care Defendants Continued to Fraudulently Bill Patients and Their Insurance, Including Medical Patients, For Pelvic Floor Testing with A Physician Present, Although No Physician Was Present for Testing After the Cancer Center Surgeon Was Forced Out."

326.    Stanford leadership including CEO David Entwistle, COO Quinn McKenna, and CFO Linda Hoff valued profits above safety.  Staff was kept

---

[11] Accessed same site, under 100.2 - Interns and Residents (Rev. 1, 10-01-03) B3-2020.8, B3-8030

lean and profits continued to soar, resulting in the doubling of revenues from 2012 to 2016. Stanford utilized unlicensed and non-qualified staff to perform tests and procedures, examine post-operative patients before hospital discharge, and other maneuvers which endangered patients and subjected them to inferior care.

327.    Stanford habitually pushed aggressive and unsubstantiated billing. Stanford ordered and required its coders and billers to upcode services in disregard of required supportive medical documentation. Stanford's schemes were habitual, purposeful, and expressly  intended to maximize healthcare profits. Stanford billers are instructed to maximize coding and billing regardless of the medical documentation and records. (See also *Gaines vs. Stanford*, 3:16-cv-02831 Calif. Northern District Court, False Claims Acts)

## FOURTH SCHEME: VIOLATION OF "INCIDENT-TO" BILLED FOR NEW PATIENTS

328.    Stanford assigned mid-level providers to evaluate and examine new patients. However, Stanford "upcoded" and billed the services under the physician's NPI rather than the mid-level providers. Stanford's upcoding was done with intent to  capture 15-20% greater insurance fees per patient encounter.

329.    A "mid-level" provider is defined as a licensed physician assistant or nurse practitioner. Stanford habitually failed to bill services under the true mid-level rendering provider, a profit-driven practice which constitutes false claims.

330.    For example, a physician level 3 visit for a new patient coded as CPT 99203 reimburses an average of $100 with a second  carrier. The same visit coded as a physician assistant visit pays roughly $82. Hence, Stanford's improper

upcoding of rendering provider generated an average of 18-20% extra per new patient encounter who was seen by the mid-level provider.

## DEFENDANTS' CONDUCT IS CONTINUING, AND MUST BE RESTRAINED

331.    Stanford's practices complained of herein are <u>continuing</u>. As detailed above, the Defendants' actions and omissions have caused many years of improper and false billings to the United States through the Medicare program, and the State of California through non-Medicare programs.

332.    For example, CMS evidence showed that on June 2016, Defendants were still unbundling pre-operative visits performed by a mid-level provider, billing the visits under the physician NPI, and doing so with intent to increase revenues. On 6/28/16 Defendant Dirbas billed and received unjust enrichment from Medicare for a CPT 99215, an extensive office visit, billed the day before a major mastectomy surgery on 6/29/16.

| Date of service | CPT codes billed | |
|---|---|---|
| 6/9/2016 | 99205 | |
| 6/28/2016 | 99215 | |
| 6/29/2016 | 19302 | LT |

## B. DEPARTMENT OF UROGYNECOLOGY

333.    Stanford employee Dr. Eric Sokol NPI 1437292927 is a provider at Stanford Department of Urogynecology. On information and belief, Plaintiffs allege providers in the urogynecology department also engaged in the schemes described herein, with unbundling of pre-operative visits, upcoding for mid-level providers, and improper number of surgical devices and prosthesis.

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

## C.  DEPARTMENT OF GENERAL SURGERY

334.    Brendan Visser, M.D. Department of General Surgery , NPI 1134210628 is an employee at Stanford. On information and belief, Plaintiffs allege providers in the general surgery department also engaged in the schemes described herein, with unbundling of pre-operative visits, upcoding for mid-level providers, and improper number of surgical device and prosthesis.

## D. DEPARTMENT OF GASTROINTESTINAL ONCOLOGY

335.    Dr. Natalie Kirilcuk, M.D.  is registered under  NPI 144744619. Dr. Kirilcuk was an employee of Stanford in the relevant period and headed the pelvic floor clinic and unit.   On information and belief, Plaintiffs allege that Stanford through Dr. Kirilcuk and providers in this department also engaged in the schemes described herein, in particular with unbundling of pre-operative visits, upcoding of office visits, upcoding  for mid-level providers, and upcoded number of surgical devices  and prosthesis, and improper billing of procedures without licensed physician presence or supervision.

## FIRST CAUSE OF ACTION

### CIVIL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-33 ("FCA"); "QUI TAM ACTION."

#### By Plaintiff United States of America

#### Against all STANFORD Defendants and DOES 1 through 10

336.    Plaintiff U.S.  incorporates by reference and reallege the preceding paragraphs.

337.    This is a claim for damages and penalties under the Civil False Claims Act, codified at 31 U.S.C. §§ 3729-33 brought by the United States of America.

338.    It is illegal to:

(1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.

(2) Knowingly present multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud.

(3) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(4) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

339.    It is also illegal to "knowingly assist or conspire with any person" to do any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

340.     Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA") or "Qui Tam" actions  provide that every person who violates this code section is subject to civil penalties of tens of thousands of dollars of penalties per act.

341.     By the acts described above, Stanford violated FCA and submitted false, fraudulent or misleading bills to payors by regularly and freely unbundling and separately charging for pre-operative visits which were part of a global fee schedule, and thus not eligible for separate billing.

342.     Stanford Defendants submitted false, fraudulent, or misleading bills to CMS through use of time-based or complex level billing of the highest level paying codes designating comprehensive visits for pre-operative services.   These separate pre-operative charges for visits implied that the patient is being billed separately for "free" visits before or after surgery when in fact all such services are captured in other codes or in the surgeon's separate bill.

343.     Stanford Defendants submitted false, fraudulent or misleading bills to payors by inflating the bills through unjustified pre-operative visit, thereby rendering illusory any global surgery fees that CMS set, or the insurers had negotiated with the Stanford Defendants, either on their own or through national correct coding guidelines.

344.     Because of the above-described conduct, Plaintiffs are entitled to damages as provided for by 31 U.S.C. §§ 3729-33.


**SECOND CAUSE OF ACTION**

**CALIFORNIA INSURANCE FRAUDS PREVENTION ACT ("IFPA"),**

**PURSUANT TO INSURANCE CODE SECTION 1871 et. seq.**

**By Plaintiff The State of California Against all STANFORD Defendants and DOES 1 through 10**

345.     Plaintiff , The State of California, incorporates by reference and realleges the preceding paragraphs.

346.     This is a claim for damages and penalties under the Insurance Frauds Prevention Act, codified at Cal. Ins. Code § 1871.7, brought by the State of California.

347.     IFPA does not require proof that the insurer paid the fraudulent claim to justify the assessment of penalties. It only requires proof that the unlawful act led to the fraudulent claim.

348.     Insurance Code section 1871.7(b) provides that every person who violates false claim is subject to civil penalties of between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim for compensation.

349.     By the acts described above, Stanford violated IFPA whereby Stanford habitually submitted false, fraudulent or misleading bills to Payors by unbundling and upcoding schemes. Stanford's institutional schemes are summarized in ¶2,  but they include *unbundling* of  pre-operative and post-operative visits that are already captured in other revenue codes or in the surgeon's separate bills.

350.     Unbundling is a practice whereby a healthcare vendor separately charges for pre-operative visits or per-surgical services which are by definition part of a "global fee" schedule, and thus not eligible for separate billing. For example, major surgery codes like mastectomy are considered "global" such that the surgeon and institution are paid a "flat fee" which encompasses all related services *after* the decision for the surgery has been made, *through* the surgical service, and for 90 days after the surgery.

351.    Therefore, a mastectomy patient would not be charged for a pre-operative visit with the surgeon the day before surgery since the surgeon's "flat fee" or global fee includes monetary consideration for the before and after surgery.

352.    For example, Stanford billed a commercial carrier nearly $500 for an unbundled  pre-operative visit the day before mastectomy surgery. The carrier reimbursed Stanford $341.97 for the unbundled visit. Even though the carrier shortly thereafter  caught Stanford's unbundling and disallowed that claim, Stanford is still liable for IFPA since Stanford willfully billed for the wrongful  charges.

353.    Stanford additionally submitted false, fraudulent, or misleading bills to payors through use of *time-based* or complex level decision making  and doing so by billing the highest level paying codes for pre-operative services.

354.    Stanford's  unbundled charges for pre-operative visits demonstrates that Stanford was and continues billing patients for  what are "free" visits before or after surgery when in fact all such services are captured in global major surgical codes and the facilities' separate bill.

355.    Stanford in illusory fashion habitually inflated at least 11-15% of all its billings, including but not limited to the global fee schedules.   Stanford submitted false, fraudulent or misleading bills to payors through unbundling the pre-operative visit, thereby willfully violating Correct Coding Initiatives (CCI). Stanford habitually demanded additional unbundled fees on top of its global surgical fees; Stanford was lawfully required to accept the global fees as payment in full.

356.    Because of the above-described conduct, Plaintiffs are entitled to damages as provided for by California Insurance Code § 1871.7.


## **THIRD  CAUSE OF ACTION**

## **CALIFORNIA FALSE CLAIMS ACT ("CFCA")  FOR MEDI-CAL**

**(ARTICLE 9 OF CAL. GOV'T CODE §§§ 12650-12656)**

**By Plaintiffs State of California and United States Against All Defendants,  and DOES 1-10**

357.     Plaintiffs incorporate by reference and reallege the preceding paragraphs and allege that Stanford also violated the California False Claims Act (herein "CFCA")  for Medi-Cal (Cal. Gov't Code §§ 12650-12656).

358.     Medi-Cal (also "MediCal") and Medi-Caid ( also "Medicaid") are funded by both federal *and* state sources. CMS contributes federal funds to these programs. Rampant insurance fraud contributes substantially to rising healthcare premium costs, and the government instituted the referenced statutes to obtain assistance to prosecute insurance fraud.

359.     Stanford was a provider of healthcare services to Medi-Cal and Medi-Caid beneficiaries and collected unjust enrichment pursuant to the billing upcoding and unbundling schemes described herein the preceding paragraphs.

360.     CFCA like the federal False Claims Act, allows private individuals "qui tam plaintiffs" to bring an action on behalf of the government against an entity or person who "knowingly" has defrauded the government out of "money, property or services" through submitting a false claim, false record or false statement to the government for payment.

361.     The statute provides for treble damages, civil penalties of up to $10,000 for each false claim, and litigation costs including attorney's fees imposed on those who violate the CFCA.

362.     CFCA also allows the Attorney General to intervene up to the time of judgement, and grants up to 50% share of recoveries to the relator.

363.    The State of California will continue to suffer damage if Defendants continue their fraudulent activities, as health care costs and insurance rates will continue to increase more than they otherwise would or should.

364.    As described above, Defendants used schemes to defraud the State from health care funds through upcoding and unbundling.

## FOURTH  CAUSE OF ACTION

**DECLARATORY   AND   INJUNCTIVE   RELIEF,   PURSUANT   TO CALIFORNIA INS. CODE SECTION 1871.7(B)**

**By Plaintiff The State of California Against All Defendants, and DOES 1-10**

365.    Plaintiffs incorporate by reference and reallege the preceding paragraphs.

366.    Insurance Code Section 1871.7(b) empowers the Court "to grant other equitable relief, including temporary injunctive relief: as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public."

367.    The California Insurance Commissioner seeks equitable relief pursuant to Ins. Code section 1871.7(b).  Unless equitable and injunctive relief is granted, Defendants are likely to continue their unlawful conduct after the conclusion of this litigation. If Defendants are not restrained from their fraudulent activities, the State and its people will continue to suffer damages, as health insurance premiums will continue to increase more than they otherwise would or should.

368.    It is alleged that in addition to the upcoding and unbundling billing schemes described above, Stanford has used and continues to use contractual provisions to prevent challenges to their fraudulent billings. These contractual

provisions are contrary to Insurance Code and public policy and should therefore be declared unenforceable pursuant to Civil Code section 1667.

## **PRAYER**

### **FOR PLAINTIFF THE UNITED STATES OF AMERICA**

WHEREFORE, the United States prays for judgment against Defendants as

a. Judgment in an amount equal to three times the amount of each claim for compensation submitted by the Defendants from the commencement of the statutory period through the time of trial;

b. Liability to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal  Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person from the commencement of the statutory period through the time of trial;

c. Disgorgement of profits unlawfully acquired by Defendants;

d. An award to Relator of the maximum amount allowed pursuant to Civil False Claims Act, 31 U.S.C. §§ 3729-33 ; Attorneys' fees, expenses and costs of suit herein incurred, pursuant to Civil False Claims Act, 31 U.S.C. §§ 3729-33;

e. An injunction against each of the defendants for any continuing conduct violating the Civil False Claims Act, 31 U.S.C. §§ 3729-33;

f. An order directing Defendants to cease and desist from violating Civil False Claims Act, 31 U.S.C. §§ 3729-33;

g. An order and findings declaring that any contractual provisions used by Defendants to prevent challenges to fraudulent billings are against the public policy of the United States of America and therefore unenforceable; and

Such other and further relief as the Court deems just and proper.

### FOR PLAINTIFF, THE STATE OF CALIFORNIA

WHEREFORE, the State of California prays for judgment against Defendants as

a. Judgment in an amount equal to three times the amount of each claim for compensation submitted by the Defendants from the commencement of the statutory period through the time of trial;

b. A civil penalty of $10,000 for each violation of Insurance Code § 1871.7 from the commencement of the statutory period through the time of trial;

c. Disgorgement of profits unlawfully acquired by Defendants;

d. An award to Relator of the maximum amount allowed pursuant to Insurance Code § 1871.7; Attorneys' fees, expenses and costs of suit herein incurred, pursuant to Insurance Code section 1871.7;

e. Declaratory and Injunctive Relief (Ins. Code Section 1871.7(b))

f. An injunction against each of the defendants for any continuing conduct violating Insurance Code § 1871. 7(b);

g. An order directing Defendants to cease and desist from violating California Insurance Code § 1871.7;

h. An award of damages and punitives pursuant to Cal. Gov't Code §§ 12650-12656.

i. An order and findings declaring that the contractual provisions used by Defendants to prevent challenges to fraudulent billings are against the public policy of the State of California and therefore unenforceable; and  Any such other and further relief as the Court deems just and proper.

### ON BEHALF OF PLAINTIFF STATE OF CALIFORNIA

WHEREFORE, The State of California  prays for  Declaratory and Injunctive Relief to halt Defendants' fraudulent conduct as follows:

   a.  An injunction against each of the defendants for any continuing conduct violating the False Claims Acts; and

   b.  An order directing each of the defendants to cease and desist from violating False Claims Acts.

Damages Sought Will Be in Amounts to Be Proven at Trial.

**JURY TRIAL DEMANDED**

On behalf of Plaintiffs the United States of America, the State of California, and *ex. relator* Emily Roe.

s/ Gloria Juarez

Date: June 20, 2018        _____

GLORIA JUAREZ

LAW OFFICE OF GLORIA JUAREZ

Attorneys for Relator, Emily Roe

1   Date: June  20, 2018        s/ Gloria Juarez

2                               GLORIA JUAREZ

3                               Attorneys for Relator, Emily Roe

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                              - 121-

28   FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))

## ELECTRONIC SERVICE LIST

**United States Attorney General for the District of California**

NICOLA T. HANNA
United States Attorney
Ms. DOROTHY A. SCHOUTEN
Assistant United States Attorney
Chief, Civil Division
DAVID K. BARRETT (SBN 149882)
Assistant United States Attorney
Chief, Civil Fraud Section
BRENT A. WHITTLESEY (SBN 73493)
Assistant United States Attorney
  Room 7516, Federal Building
  300 N. Los Angeles Street
  Los Angeles, California 90012
  Tel: (213) 894-0522
  Fax: (213) 894-7819
Email: David.Barrett@usdoj.gov
   Brent.Whittlesey@usdoj.gov

**State of California**

Agent for Service of Process to

California Department of Insurance

300 Capitol Mall, Suite 1700

Sacramento, CA 95812.

Service of court filings must be directed to the following address:

custodianofrecords@insurance.ca.gov

Diane.Pinney@insurance.ca.gov

Nicholas Campins, Esq.

California Department of Insurance

Fraud Liaison Bureau

45 Fremont Street, 21st Floor

San Francisco, CA 94105

(415) 538-4149 Direct Telephone

Nicholas.Campins@insurance.ca.gov

Summer.Volkmer@insurance.ca.gov

Lori.Higa@insurance.ca.gov

**Attorney General of California**

Mr. Xavier Becerra, Attorney General

- 122 -

FIRST AMENDED COMPLAINT United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC § 3729(a))

Siobhan A. Franklin, Deputy Attorney General
1455 Frazee Rd. Suite 315
San Diego, CA 92108
Telephone (619) 688-6071
Facsimile (619) 688-4200
Siobhan.Franklin@doj.ca.gov

California Department of Justice
Attn: False Claims Unit
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

**Los Angeles County  District Attorney**
Healthcare Fraud Division
300 N. Los Angeles St. Room 751
Los Angeles, CA 90012-3308

Office of District Attorney
210 W Temple St 18FL
Los Angeles, CA 90012
MS. JACKIE LACEY, District Attorney
MR. JOHN NIEDERMANN, Assistant Head Deputy District Attorney
Email        jniedermann@da.lacounty.gov

Attorney General of the United States
950 Pennsylvania Avenue, Northwest
Washington, DC 20530
Phone General US OAG #202-514-2000,
press 0/ 800-447-8477
False claim DHS OIG
Email askdoj@usdoj.gov (no attachments)

FIRST AMENDED COMPLAINT  United States *et. al.*, vs. Stanford *et. al.* QUI TAM (31 USC  § 3729(a))