Gloria Juarez, California State Bar No. 109115
**LAW OFFICES OF GLORIA JUAREZ**
P.O. Box 4591
Montebello, CA  90640-9310
Tel: 213-598-4439
Fax: 714-919-0254
Email: gloria@thegjlaw.com
      tootsieglo@sbcglobal.net
ATTORNEYS FOR RELATOR EMILY ROE

## IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. [UNDER SEAL], *et al* <br><br> Plaintiff[s], <br><br> v. <br><br> [UNDER SEAL], <br><br> Defendant[s]. | **CASE NO. : CV17-08726-DSF-AFMx** <br> JUDGE:  Hon. Dale S. Fischer <br><br><br> **RELATOR'S LODGMENT OF EXHIBITS IN OPPOSITION TO MOTION TO DISMISS** <br><br><br> DATE:     February 10, 2020 <br> TIME:     1:30 p.m. <br> CTRM:  7D (First Street Courthouse) |

**LODGMENT OF EXHIBITS IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS**

001

# Exhibit  A

**From:** Campins, Nicholas
**Sent:** Thursday, August 15, 2019 11:41 AM
**To:** Sheeder, Frank <Frank.Sheeder@alston.com>
**Cc:** Neumeister, Mitch <Mitch.Neumeister@insurance.ca.gov>
**Subject:** Roe v. Stanford Case No. 2:17-cv-08726 (CD Cal)

Hi Frank:

I hope you are doing well.  A Complaint filed against Stanford in the Central District of California was recently unsealed.  The case number is 2:17-cv-08726.  Attached is a copy of the Complaint (which is also available publicly on PACER and which I just downloaded from that site).

As Docket entry 30 reflects, the State of California, by and through, the Insurance Commissioner has previously declined intervention in this matter without prejudice in 2018.   The United States has also declined intervention as that entry notes.  Nevertheless, in my opinion, there are certain elements of the Complaint which are worthy of serious analysis by Stanford.

In that vein, I humbly suggest that you reach out to Relator's counsel and discuss this matter with her before the litigation becomes active.  Here is her information:

Gloria Juarez
LAW OFFICES OF GLORIA JUAREZ
26081 Merit Circle , Suite 112
Laguna Hills, CA 92653
Telephone (213)598-4439
Gloria Juarez tootsieglo@sbcglobal.net; and gloria@thegjlaw.com

I broached this issue with her only moments ago and she said she would welcome such a dialogue.  I am also more than happy to participate in some of the calls if it would facilitate the dialogue.

Thank you.

Nick Campins
Senior False Claims Trial Attorney
California Department of Insurance
Fraud Liaison Bureau
45 Fremont Street, 21st Floor
San Francisco, CA  94105

003

# Exhibit  B

# GJ

**Gloria Juarez**
**LAW OFFICES OF GLORIA JUAREZ**

**ORANGE COUNTY OFFICE**
**26081 Merit Circle , Suite 112**
**Laguna Hills, California 92653**
**Tel. 213-598-4439**
**Fax 714-919-0254**

**LOS ANGELES OFFICE**
**P.O. Box 4591**
**Montebello, California 90640-9997**
**Tel. 213-598-4439**
**Fax 714-919-0254**

December 16, 2019

Mr. Frank Sheeder, Partner
Alston & Bird
2200 Ross Ave., Suite 2300
Dallas, TX 75201
Tel.  (214) 922-3420/ Cell.  (214) 208-9900
Email: Frank.Sheeder@Alston.com
Email: Brad.Smyer@alston.com
FOR DEFENDANTS STANFORD ET AL.

**RE: 2:17-cv-08726-DSF-AFM United States of America et al v. Stanford Healthcare et al.**

Dear Mr. Sheeder,

We are in receipt of your email correspondence dated December 12, 2019. This communication follows my December 13, 2019 email.

We discussed last week that my office represents the Relator in this action which was brought on behalf of the real parties in interest who are the United States, the State of California, and the California Insurance Commissioner.

1

# GJ

**LAW OFFICES OF GLORIA JUAREZ**
**2:17-cv-08726-DSF-AFM United States of America et al v. Stanford Healthcare et al.**

As you are aware from your prior work with Stanford defendants and the earlier IFPA false claims[1] settlement with CDI, the Department's consent is required prior to any dismissal. We believe that similar to the IFPA statues[2], Federal U.S.C. 3279 codes have a strong provision for consent as to dismissal of parties. Pursuant to 31 U.S.C. 3230 (b)(1) my office even if authorized by the relator arguably lacks standing to dismiss parties as you have requested without consent of the "real party(ies) in interest"[3].   Accordingly, any request would need to be run through the proper parties for stipulation. If your interpretation of the statute is different as to consent, please let us know your thoughts.

With all due respect to your office, our preference is that we proceed in discussions of certain allegations in the Complaint in advance of the *proposed* dismissal of the 5 defendants.

As I noted previously, my office has not entered into any agreement with your office as to any party dismissals and has no authority to do so without relator's express consent. In the interim, please do not make any representations to others or the Court regarding the status of any agreement or "memorializing" any agreement. Although the Department of Justice has expressly entered a declination to intervene *without prejudice* (See Docket No. 30), Relator also lacks standing to stipulate to unilateral dismissal decisions without coordination with their office.

Thus, we're not convinced that we even have standing to stipulate to your request for the party dismissals considering applicable statute. Should you believe that our understanding of the procedural standing is incorrect in anyway, please notify.

### Early Communications

As to CDI and Mr. Nick Campin's August 2019 outreach to your office, and my office's earlier email and telephonic correspondences to you in September 2019, we had anticipated meaningful preliminary discussions as to the allegations in the Complaint.

*Sans* a timely response from your office to those communications, we ultimately proceeded under the understanding that that either your office did not represent the Stanford defendants, or in the alternative you had not received the email correspondences since moving to your firm. We remained under that *impression*, until your office's outreach last week. I thus must apologize that in hindsight, your apparent September 19, 2019 email had gone entirely unnoticed during a period of counsel unavailability. Had I been aware of your email, I would have timely responded.

---

[1] California IFPA- Insurance Frauds Prevention Act, Insurance Code Section 1871 et. Seq.

[2] California Insurance Code 1871 (e)(1) "Any interested persons, including an insurer, may bring a civil action for a violation of this section for the person and for the State of California.   The action shall be brought in the name of the state.   The action may be dismissed only if the court and the district attorney or the commissioner, whichever is participating, give written consent to the dismissal and their reasons for consenting."

[3] Your office contends that Stanford HealthCare is the only "real party" and 5 of the 6 defendants are not parties.

# GJ
**LAW OFFICES OF GLORIA JUAREZ**
2:17-cv-08726-DSF-AFM United States of America et al v. Stanford Healthcare et al.

**Service of Summons and Complaint**

Please disregard our early September 13, 2019 correspondence and subsequent telephonic contact with your office as to preliminary discussion of acceptance of service and as to possible Rule 4(d)(1) waiver.

As you know, our office proceeded under mistaken assumption that you no longer represented defendants, and thus had ordered personal process service to Defendants *prior* to receiving your December 12, 2019 communication.

Accordingly, we anticipate the process server effectuating service no later than the end of this month. Should service fail, or your office otherwise provide alternate direction we would be amendable.

**Docket No. 36**

On Dec. 6, 2019 docket number 36 reflects Relator's Statement. A *courtesy* electronic copy of the conformed filing is attached hereto.

In relevant part, the last paragraph summarizes my office's intention as to seeking leave to seal the action, pending informal mediation and mutually favorable resolution of disputes in this FCA. We are informed and believe that the DOJ would not oppose such a procedural request.

> *"Defendant(s) have not filed an appearance, an answer, or a motion for summary judgment.  In the interest of expeditious resolution of all of the  claims by Defendants in this action, Relator respectfully seeks leave of court herein that should a resolution of the claims in this action be reached by all parties prior to the litigation commencing or substantially proceeding, that upon signed stipulation of all parties, the court grant in its order leave to seal this action, the Complaint, and First Amended Complaint.  31 U.S.C. § 3730(c)(3) Therefore, it would also be requested that the Court at the court's calendar preference, may consider a case management conference set for all parties on or about mid-March 2020 to allow Defendants to make their first appearance, and parties time to meet and confer on the pending two causes of action."*

**Docket No. 38**

On Dec. 9, 2019 docket number 38 reflects the Court's Order *adopting* Relator's aforementioned pleading for a status conference calendared for March 16, 2020.

3

## GJ

**LAW OFFICES OF GLORIA JUAREZ**

**2:17-cv-08726-DSF-AFM United States of America et al v. Stanford Healthcare et al.**

**<u>Week of January 6, 2020 Meeting</u>**

We are fully agreeable to your proposed collaborative meeting in the first full week of January 2020.   In light of Mr. Campin's offer to mediate discussions in this matter, would it be acceptable that we request coordination with his office to join our telephonic conference?

We sincerely look forward to working with you, and your response. Please note the preferred email addresses for all further communications are Gloria@theGjLaw.com *and* toosieglo@sbcglobal.net.   Thank you in advance for your anticipated courtesy and cooperation.

Very Truly Yours,

/S/ GJ

Gloria Juarez

4

# GJ

**LAW OFFICES OF GLORIA JUAREZ**

**2:17-cv-08726-DSF-AFM United States of America et al v. Stanford Healthcare et al.**

# Exhibit  C

# GJ

**Gloria Juarez, Esq.**
**LAW OFFICES OF GLORIA JUAREZ**
**26081 Merit Circle, Suite 112**
**Laguna Hills, CA 92653**
**Telephone (213) 598-4439**
**Fax 714-919-0254**
**Gloria@theGJLaw.com**

Mr. Frank Sheeder
Counsel for Defendants

RE: UNITED STATES et. al *ex. relator* Roe  vs. STANFORD *et. al.*      CV 17-08726-DSF

December 31, 2019

**Delivery by Email**

Dear Counsel,

We are following up on my office's telephonic outreach attempt to you last evening.

We respectfully request your review of our prior meet and confer correspondence dated December 16, 2019. It is our belief that we have yet to receive responses to substantial portions of our communication, which were requested.

As you stated, Defendants were personally served on December 17, 2019, other than several of your defendant clients who appeared to be evading service not in good faith. A copy of the First Amended Complaint was sent to you on August 15, 2019 by the California Department of Insurance. In response to your representation that your office represents the Defendants, our office also subsequently transmitted courtesy electronic copies of the FAC *and* Exhibits. Nonetheless, we contend  that the FAC has been properly served.

Any perceived deficiency your office contends in naming defendant "The Leland [*Stanford]* Junior University" is at best a simple procedural amendment "erroneously named", and not a reasonable basis for evading service. There is no ambiguity as to the named Defendants. Thus, we assert that all Defendants have been served compliant with local rules.

Notwithstanding the foregoing, we have no objection to Defendants' proposed request for Waivers of Service of Summons pursuant to Rule 12 (for 60 days), conditioned on straightforward agreement for a stipulation of parties to file a Second Amended Complaint on or

Page | 1
UNITED STATES et. al *ex. relator* Roe  vs. STANFORD *et. al.*      CV 17-08726-DSF

010

about our conference the week of January 6th, 2020.  ((Rule 12(b), (e) or (f), whichever is earlier. Fed. R. Civ. P. 15(a))  While we are amenable to all discussions prior to the commencement of litigation, the basis for a possible SAC are  two-fold, one to more narrowly tailor the U.S.C. 3279 claims (as the 1871 State Claims were dismissed *without prejudice*), and two,  to better streamline the allegations.

Please forward the proposed request for waivers to us for review, and indicate your agreement to the stipulation. Thank you in advance for your anticipated cooperation and assistance.

Happy holidays to you both, and happy New Year's.

Very Truly Yours,

GJ

Page | 2
UNITED STATES et. al *ex. relator* Roe  vs. STANFORD *et. al.*        CV 17-08726-DSF

011

# Exhibit  D

# GJ

**Gloria Juarez, Esq.**
**LAW OFFICES OF GLORIA JUAREZ**
**26081 Merit Circle, Suite 112**
**Laguna Hills, CA 92653**
**Telephone (213) 598-4439**
**Fax 714-919-0254**

Mr. Frank Sheeder
Mr. Brad Smyer
Alston & Bird
Counsel for Defendants
Email: Frank.Sheeder@alston.com
Email: Brad.Smyer@alston.com

RE: UNITED STATES et. al *ex. relator* Roe vs. STANFORD *et. al.*  CV 17-08726-DSF

January 4, 2020

**Expedited Delivery by Email**

Dear Mr. Sheeder,

We are following up on my office's telephonic outreach attempts and multiple written communications[1], which are incorporated by reference herein. Our prior correspondence dated 12/31/2019 requested a *timely* response, however we did not receive any communication from you until 4 days subsequent.

Counsel, your *two* correspondences dated January 3, 2020 contain voluminous misstatements and misguided representations, a few of which we have timely addressed herein.

Regrettably, your December 12, 2019 email also substantially misconstrued our telephonic conversation through a "follow-up" surreptitious email which blatantly misrepresented that Relator had agreed to dismiss all Defendants *except* Stanford Healthcare, which was *untrue*.

Moreover, as you are aware we have requested your review of our prior meet and confer correspondence dated December 16, 2019. It is our belief that we have yet to receive substantive responses to large portions of our communications which have been requested. (*See* Dirbas below). In light of the circumstances, we must respectfully request that all substantive communications be

---

[1] Relator counsel written correspondences to defendants include and are not limited to December 31, 2019, December 16, 2019, email on or about August 15, 2019, and multiple telephone calls including September 13, 2019, December 11, 2019. All correspondences have been addressed to Frank.Sheeder@alston.com, and 214-922-3420 or 214-208-9900.

Page | 1

UNITED STATES et. al *ex. relator* Roe  vs. STANFORD *et. al.*       CV 17-08726-DSF

013

LAW OFFICES OF GLORIA JUAREZ

in writing in order to facilitate transparency and memorialize mutual understanding of certain matters.

### Service of Summons and First Amended Complaint

In relevant history, please allow me to delineate the statement of facts.  On August 15, 2019 California Department of Insurance ("CDI") emailed you the First Amended Complaint ("FAC"), with our office's contact information for pre-litigation mediation. You neither responded to CDI, nor contacted us. On or about September 17, 2019 we again initiated both telephonic and email communication with your office as to waiver of service of the FAC and discussions thereto.

In early December 2019,  Relator acting under court order (Docket Entry No. 33), timely ordered  FRCP Rule 4 personal service of the Summons and Complaint to all Defendants (Relator Statement to OSC 4:3-4). As you are aware, several Defendants then evaded personal service, requiring expanded and significantly more costly service efforts by third party process servers to comply with the order reflected by Docket No. 33.

In response to your mid December 2019 representation that your office represents "Defendants", Relator counsel's office also subsequently transmitted courtesy electronic copies of the FAC *and* Exhibits, while engaging in further discussion as to service of process.

In mid-late December 2019, Relator also transparently emailed Defendants the service of process dated notifications from the third-party processor.  The proof of service showed effectuated personal service on December 17, 2019, other than several of the defendants who appeared to be tactically evading service *not* in good faith.

Through at least December 31, 2019, Relator in writing accepted a proposed party stipulation to *proceed in an alternate Rule 4 "Notice of Waivers" and withheld filing the effectuated proofs of service with the court,* conditioned on a straightforward request. You did not respond to our time sensitive request to confirm the same. Your assertion of  "non-cooperation" and proceeding with service despite your consideration of a "waiver" appears rather misleading, especially in light of the court's order, Docket No. 33.

Similar to your January 3, 2020 correspondence, you have in prior email (on or about December 17, 2019) fully acknowledged your awareness of when and the manner in which your Defendant clients were served. The former intimates that your office is apparently highly offended that the service of process by the 3rd party server as to all Defendants had not immediately ceased, despite the fact that your office stated it does not represent all Defendants. It is thus further *unintelligible* why you now dispute your office's prior acknowledgements of service of summons and complaint having been effectuated on December 17, 2019 as to *some* Defendants.

Notwithstanding the foregoing, we will re-state that we had no objection to Defendants' proposed request for Waivers of Service of Summons pursuant to Rule 4 conditioned on straightforward agreement for a stipulation of parties to file a SAC.

### Defendant Dr. Fred Dirbas

There is certain ambiguity in your firm's inferred election to exclude this one defendant, Dr. Dirbas. Your communications never address this named party ,and have  failed to address our

---

Page | 2

UNITED STATES et. al *ex. relator* Roe  vs. STANFORD *et. al.*        CV 17-08726-DSF

014

LAW OFFICES OF GLORIA JUAREZ

question.   Therefore, please clarify if your firm contends it is *not* representing Defendant (Stanford employed doctor) Dr. Dirbas, then your knowledge of his current representation. As you know, if Dr. Dirbas was served, and you maintain your assertion that you don't represent this Stanford employee, then the 21-day answer deadline was triggered and litigation has commenced.

### All Stanford Defendants

As we stated, we believe that any perceived deficiency your office contends in naming defendant "The Leland [*Stanford]* Junior University" is at best a simple procedural amendment "erroneously named", and not a reasonable basis for evading service or calling these "non-legal entities". There is no ambiguity as to the named Defendants or their "legal standing" and no basis for your assertion that "they do not exist". As you know, the FAC pleads that several named Defendants are  "alter egos", as there is substantial co-mingling of their assets, revenues,  and funds.[2]

### Defendants' Threat to File a Meritless "Motion to Dismiss"

Defendants' January 3, 2020 letter states "*The basis for the motion is that the case should be dismissed under Rule 10(a) because the Relator is not identified and is attempting to proceed improperly under a pseudonym."*  We believe that your reliance on Rule 10(a) as to an anonymized Relator is not supported by statute. Furthermore, this new "basis" for a dismissal appears at best frivolous within the meaning of Rule 11(b)(1) and Rule 11(b)(3).

Moreover, upon your initiated request for an in person "mediation" this coming week of January 6th, 2020 in Los Angeles, we had made preparations for such a  meeting in good faith, only to learn at the 11th hour that you have unilaterally canceled the same without justification or reason.

### Rule 11 Sanctions

In light of Defendants' bad faith conduct and attempt to mislead the court with patently false allegations of Rule 10(a) issues, Relator intends to seek sanctions (and if required file a separate motion) pursuant to Rule 11 for Defendants' frivolous and fabricated basis for a motion to dismiss. (Rule 11(b)(1)).

Based on the fact that Defendants have threatened to file a knowingly frivolous  motion to dismiss for Rule 10(a) an anonymized Plaintiff, it should not  take substantial detective work for the court to see that Defendants are intending to misuse the court's processes simply as delay tactics in this litigation.

Relator has filed this action anonymously, under the pseudonym "Emily Roe," for at least three separate and legally sufficient reasons. Importantly, Relator has a constitutional right to protect her and her minor children's medical privacy, which are neither the thrust of this U.S. 3279 case or directly raised therein.  Next, Relator has proceeded anonymously under good cause court

---

[2] Arturo Devesa vs Stanford et al.

Page | 3

UNITED STATES et. al *ex. relator* Roe  vs. STANFORD *et. al.*      CV 17-08726-DSF

LAW OFFICES OF GLORIA JUAREZ

015

orders which are well known to Defendants.   Moreover, as a practicing physician and expert consultant for the Department of Consumer Affairs, Relator relies on referrals from other medical professionals and expert case review referrals from the State. Stanford healthcare and Stanford University have become a dominant force in healthcare and medical academics in California. Accordingly, if Relator's identity were to become publicly known, Relator's assistance in a false claims action against Stanford and an entire cadre of its referring physicians and consultants could substantially adversely impact both Relator's health (physical harm) and medical care at Stanford, and her career and family's finances.

**First,** defense counsel Mr. Sheeder conceded telephonically with Ms. Juarez on or about December 16,  2019 that "*I know all about the [underlying Doe] malpractice action*". Therefore, it is reasonable to infer that Mr. Sheeder knew of the multiple court orders in effect as to and ordering the Plaintiff's anonymity, as well as knew Plaintiff's true name.

**Second**, the *Doe* court flat rejected Stanford's argument in their motion to dismiss that parties could not proceed in litigation given Plaintiff was among some million Stanford patients. That court in rejecting Stanford's motion to dismiss cited in fact that the anonymity was justified and would remain based on just cause and good showing.[3]

Here, this action is brough by two Plaintiffs the United States and the State of California, the real parties in interest. Fed. Rule 10 states that *"the title of the complaint must name all the parties*", which this Complaint as a written instrument in  fact conforms. There is no stated preclusion in Rule 10 for an anonymized party who is named accordingly, and this rule does not support Defendant's contention.   Even assuming *arguendo* that Defendant's alternate interpretation of the statute was well founded, Defendants are aware of Relator's true name, thereby there is no prejudice or ambiguity in the proceeding. (We intend to reflect the same with the Declarations of Gloria Juarez and Relator.)

 **Third**, as Defendants know or should know, Relator and her minor children are  *active Stanford patients* with *current accounts*, hence publicly disclosing Relator's name would potentially place Relator and her family at substantial risk for prejudice and physical  harm through likely loss of access to their Stanford doctors. Moreover, Defendants are well aware that Relator has had substantial apprehension about Stanford publicly disseminating her name and private medical history, and has of late required medical treatment from physical effects of this threatened harm.

**Fourth,** even though Relator has asserted her claims anonymously, there is nothing ambiguous or uncertain about the Complaint. Moreover, the 31 U.S.C.  3279 Complaint filed for Plaintiff the United States is thrust at allegations of institutional and widespread Medicare billing upcoding and unbundling (healthcare fraud) by Defendants, and arguably has no bearing on Relator's anonymity.   Relator is neither a direct plaintiff nor defendant here.

Defendants are also fully aware of the identity of Relator as documented, and provided by Relator in the underlying malpractice case and California Code of Civil Procedure §364 notice.

---

[3] Sept, 9, 2014 Court Order denied Stanford's demurrer and granted that Plaintiff could proceed anonymously.

Page | 4

UNITED STATES et. al *ex. relator* Roe  vs. STANFORD *et. al.*      CV 17-08726-DSF

LAW OFFICES OF GLORIA JUAREZ

016

Therefore, should Defendants assume such a blatantly frivolous position in litigation, as to seek a Federal Rule 12 and Rule 10(a) based "dismissal" alleging anonymity, then Relator will seek Rule 11 sanctions against Defendants and their counsel.

**In closing**, if your office  decides to proceed with the frivolous "motion to dismiss" (and one arguably where you are well aware there is no legally sufficient basis to do so) based on "Rule 10(a)" "anonymized Relator",  please (1) inform the Court that Relator  opposes your motion; (2) inform the Court that the Relator has stated intent to seek sanctions against you pursuant to Rule 11 ; and (3) attach a copy of this correspondence (under seal if required by Rule 5.2), and the prior to your motion.

In the interests of providing a prompt response to your demand for a personal meet and confer, we have not addressed every issue raised therein, but will do so at another time to the extent it becomes necessary to do so.  Nor have we cited all of the applicable authorities and case law that support Relator's position.  Again, we will cite additional authorities to the Court should that become necessary.

Unless we receive written communication  from you before the close of business on Monday January 6, 2020 stating otherwise, it will be assumed that you are filing the Rule 10(a) based motion to dismiss, and we will begin preparing our Rule 11 motion for sanctions.

Very Truly Yours,

/S/ GJuarez
Gloria Juarez, Esq.

LAW OFFICES OF GLORIA JUAREZ
ATTORNEYS FOR RELATOR

---

Page | 5

UNITED STATES et. al *ex. relator* Roe  vs. STANFORD *et. al.*        CV 17-08726-DSF

LAW OFFICES OF GLORIA JUAREZ

017

# Exhibit  E

# ALSTON & BIRD

Chase Tower
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
214-922-3400 | Fax: 214-922-3899

January 3, 2020

Ms. Gloria Juarez, Esq.
Law Offices of Gloria Juarez
*VIA email to tootsieglo@sbcglobal.net and gloria@thegjlaw.com*

Re:     *U.S. ex rel. Roe, et al. v. Stanford Healthcare Billing Department, et al.*, 2:17-cv-08726-DSF-AFM

Dear Ms. Juarez,

As you know from our previous communications, we represent Stanford Health Care, Stanford Health Care Advantage, The Leland Stanford Junior University, and Ms. Debra Zumwalt (collectively, the "Moving Defendants").

We request to meet and confer with you about a motion we intend to file on behalf of the Moving Defendants. The basis for the motion is that the case should be dismissed under Rule 10(a) because the Relator is not identified and is attempting instead to proceed improperly under a pseudonym.

We have availability for a telephonic conference on Monday, January 6, 2020, from 9:00 a.m. to noon, and from 1:30 p.m. to 4:00 p.m., PST.  Please let us know a time that works best for you and we will give you a call.

We will look forward to hearing from you as to when you are available on Monday and to conferring on this motion.

Sincerely,

Frank E. Sheeder

Alston & Bird LLP                                                                        www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

019

# Exhibit  F



**GLORIA JUAREZ, ESQ. <gloria@thegjlaw.com>**

---

## RE: Roe vs Stanford

**Kortum, Frank (USACAC) <Frank.Kortum@usdoj.gov>**　　　　　　　　Fri, Nov 1, 2019 at 1:51 PM
To: Gloria Juarez <tootsieglo@sbcglobal.net>
Cc: "gloria@thegjlaw.com" <gloria@thegjlaw.com>

Ms. Juarez,


We're continuing to monitor this case and can seek to intervene if appropriate (even after declination) so please feel free to
send me any information you deem relevant so we can evaluate it.  (With respect to the *Sequoia Orange* case, please be
advised that we're not seeking to dismiss the complaint at this time.)


Frank Kortum (213.894.6841)

---

021

# Exhibit  G



**U.S. Department of Justice**

Civil Division

*Washington, DC 20530*

January 10, 2018

**PRIVILEGED AND CONFIDENTIAL; FOR INTERNAL GOVERNMENT USE ONLY**

**MEMORANDUM**

TO:  Attorneys
    Commercial Litigation Branch, Fraud Section

    Assistant U.S. Attorneys Handling False Claims Act Cases
    Offices of the U.S. Attorneys

FROM:  Michael D. Granston  *MDG*
    Director
    Commercial Litigation Branch, Fraud Section

SUBJECT: Factors for Evaluating Dismissal Pursuant to 31 U.S.C. 3730(c)(2)(A)

**Introduction**

Over the last several years, the Department has seen record increases in *qui tam* actions filed under the False Claims Act (FCA), 31 U.S.C. § 3729 et seq., with annual totals approaching or exceeding 600 new matters. Although the number of filings has increased substantially over time, the rate of intervention has remained relatively static. Even in non-intervened cases, the government expends significant resources in monitoring these cases and sometimes must produce discovery or otherwise participate. If the cases lack substantial merit, they can generate adverse decisions that affect the government's ability to enforce the FCA. Thus, when evaluating a recommendation to decline intervention in a *qui tam* action, attorneys should also consider whether the government's interests are served, in addition, by seeking dismissal pursuant to 31 U.S.C. § 3730(c)(2)(A).

Historically, the Department has utilized section 3730(c)(2)(A) sparingly, in large part because the statutory text makes clear that relators can proceed with certain *qui tam* actions following the government's declination. Moreover, a decision not to intervene in a particular case may be based on factors other than merit, particularly in light of the government's limited resources.

PRIVILEGED AND CONFIDENTIAL; FOR INTERNAL GOVERNMENT USE ONLY

Accordingly, we have been circumspect with the use of this tool to avoid precluding relators from pursuing potentially worthwhile matters, and to ensure that dismissal is utilized only where truly warranted.

While it is important to be judicious in utilizing section 3730(c)(2)(A), it remains an important tool to advance the government's interests, preserve limited resources, and avoid adverse precedent. The Department plays an important gatekeeper role in protecting the False Claims Act, because in *qui tam* cases where we decline to intervene, the relators largely stand in the shoes of the Attorney General. That is why the FCA provides us with the authority to dismiss cases. This memo is intended to provide a general framework for evaluating when to seek dismissal under section 3730(c)(2)(A) and to ensure a consistent approach to this issue across the Department. We reviewed those cases in which the government moved to dismiss relators pursuant to this statutory provision since 1986, when this provision was added to the FCA. As discussed below, we identified approximately seven factors that the government has relied upon in seeking to dismiss a *qui tam* action pursuant to section 3730(c)(2)(A). To ensure consistency across the Department, these factors should serve as a basis for evaluating whether to seek to dismiss future matters, though they are not intended to constitute an exhaustive list, and there may be other reasons for concluding that the government's interests are best served by the dismissal of a *qui tam* action.[1]

Finally, as noted below, when the Department is considering dismissal, relators should be advised of this possibility since it will inform their judgment regarding whether to voluntarily dismiss their actions.

**Discussion**

The False Claims Act authorizes the Attorney General to dismiss a *qui tam* action over the relator's objection:

> The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the

---

[1]     In jointly handled and monitored cases, the prior approval of the Assistant Attorney General is required for a motion to dismiss a qui tam action, including under section 3730(c)(2)(A). In delegated cases, the authority for dismissing a *qui tam* complaint will generally be vested in the U.S. Attorney unless dismissal would present a novel issue of law or policy, or for any other reason raises issues that should receive the personal attention of the Assistant Attorney General. *See* Civil Division Directive 1-15, Subpart 1(e). In order to maintain consistency and evaluate the appropriateness of Assistant Attorney General approval, U.S. Attorneys' Offices should provide notice to the assigned Fraud Section attorney at least 10 days prior to filing any motion to dismiss in a delegated matter. In addition, for reporting purposes, the Department will collect information on an annual basis regarding the number of *qui tam* complaints dismissed upon motion by the United States. The Fraud Section will work with the Executive Office of United States Attorneys to formulate a reporting mechanism.

PRIVILEGED AND CONFIDENTIAL; FOR INTERNAL GOVERNMENT USE ONLY

motion and the court has provided the person with an opportunity for a hearing on the motion.

31 U.S.C. § 3730(c)(2)(A).[2]  The FCA does not, however, provide a standard of review for evaluating such a request for dismissal.  As a result, courts have developed two differing standards.  *Compare United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) (holding that the United States must identify a "valid government purpose" that is rationally related to dismissal) *with Swift v. United States,* 318 F.3d 250, 252 (D.C. Cir. 2003) (holding that the United States has an "unfettered right" to dismiss a *qui tam* action).

Moreover, the FCA does not set forth specific grounds for dismissal under section 3730(c)(2)(A).  However, below is a non-exhaustive list of factors that the Department can use as a basis for dismissal, along with citations to cases where the government has previously sought dismissal based on these factors.

1. *Curbing Meritless Qui Tams*

The Department should consider moving to dismiss where a *qui tam* complaint is facially lacking in merit—either because relator's legal theory is inherently defective, or the relator's factual allegations are frivolous.  Examples of inherent legal defects include *qui tam* actions where the relator failed to allege an actionable obligation to support a reverse false claim violation, *see, e.g.*, *United States ex rel. Hoyte v. American National Red Cross*, 518 F.3d 61 (D.C. Cir. 2008); *United States ex rel. Wright*, No. 5:03-264 (E.D. Tex. Feb. 3, 2005), or to allege a non-federal defendant that is not covered by sovereign immunity.  *See, e.g., United States ex rel. Carter v. Board of Governors of the Federal Reserve, et al.*, No. 12-0129-cv-W-HFS (W.D. Mo. May 1, 2013); *United States ex rel. Casey v. Blevins*, No. 4:02-CV-60 (E.D. Ark. July 5, 2002); *Braswell v. Unger*, No. 4:14-cv-02574-JAB (D. Az. August 11, 2015).  Factually frivolous cases can take a number of forms.  *See, e.g., United States ex rel. Roach v. Obama*, No. 14-0470 (D.D.C. December 18, 2014); *United States ex rel. May v. City of Dallas*, 2014 WL 5454819, at *5 (N.D. Tex. Oct. 27, 2014); *United States ex rel. Berg v. Obama*, 383 F. App'x 7 (D.C. Cir. 2010) (per curiam); *United States ex rel. Lachkovich v. Ashcroft, et al.*, No. 08-cv-00066-WYD-BNB (D. Colo. March 13, 2008).

In certain cases, even if the relator's allegations are not facially deficient, the government may conclude after completing its investigation of the relator's allegations that the case lacks merit.  In such a case, the Department should consider dismissing the matter.  *See United States ex rel. Nasuti v. Savage Farms, Inc.*, 2014 WL 1327015, at *11 (D. Mass. Mar. 27, 2014), aff'd, 2015

---

[2]     This is just one of several mechanisms contained in the FCA to ensure that the United States retains substantial control over lawsuits brought on its behalf.  *See also* 31 U.S.C. § 3730(c)(1) (providing government with "the primary responsibility for prosecuting the action" when it intervenes); 31 U.S.C. § 3730(c)(2)(B) (allowing government to settle actions over relator's objections); 31 U.S.C. § 3730(c)(2)(C) (providing government with mechanism to restrict relator's participation in the case); 31 U.S.C. § 3730(b)(1) (requiring relator to obtain government consent prior to any dismissal of the action).

PRIVILEGED AND CONFIDENTIAL; FOR INTERNAL GOVERNMENT USE ONLY

WL 9598315 (1st Cir. 2015) (dismissing *qui tam* claims that government concluded were
"factually incorrect and without foundation."); *United States ex rel. Dreyfuse v. Farrell, et al.*,
3:16-cv-5273 (S.D. W.Va. March 28, 2017) (granting government's motion to dismiss claims
that were submitted to state agency and which did not implicate any federal programs or funds);
*United States ex rel. Stierli v. Shasta Services, Inc.*, 440 F. Supp. 2d 1108, 1113 (E.D. Cal. 2006)
(granting government's motion to dismiss because, among other things, there was not any false
or fraudulent claim paid or approved by the federal government); *United States v. Fiske*, 968 F.
Supp. 1347, 1353 (E.D. Ark. 1997) (holding that relator's allegations, even if true, do not involve
the submission of any false or fraudulent claim to the federal government).  These cases may be
rare, in part, because to maximize its resources the government typically will investigate a *qui
tam* action only to the point where it concludes that a declination is warranted.  This may not
equate to a conclusion that no fraud occurred.  If the Department is concerned that a case lacks
any merit, but elects to afford the relator an opportunity to further develop the case, the
Department attorney may consider advising the relator that dismissal will be considered if the
relator is unable to obtain additional support for the relator's claims by a specified date.

2.  *Preventing Parasitic or Opportunistic Qui Tam Actions*

The Department should consider moving to dismiss a *qui tam* action that duplicates a pre-
existing government investigation and adds no useful information to the investigation.  In these
cases, the government should consider whether the relator would receive an unwarranted
windfall at the expense of the public fisc because Congress intended for the relator share to
incentivize and award the provision of meaningful information and assistance instead of merely
providing duplicative information already known to the government.  *See* 132 Cong. Rec. 29,
322 (1986) (citing S. Rep. No. 99-345, at 28 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266,
5293) (discussing factors relevant to awarding a relator share, including "the significance of the
information provided" and whether the government was already aware of the information prior
to relator providing it).  For example, in *United States ex rel. Amico, et al. v. Citi Group, Inc., et
al.*, No. 14-cv-4370 (CS) (S.D.N.Y. August 7, 2015), relators filed a *qui tam* action against Citi
Group and its subsidiaries alleging fraud in connection with the marketing and sale of residential
mortgage backed securities; however, the Department of Justice had been investigating the same
conduct for several years prior to the filing and had engaged in extensive settlement negotiations
before relators filed their complaint.  The government successfully moved to dismiss the action
under section 3730(c)(2)(A) because, among other factors, relators' belated complaint provided
no assistance to the government in its pre-existing investigation.  *See also United States ex rel.
Piacentile v. Amgen Inc.*, No. 04-cv-3983-SJ-RML, 2013 WL 5460640, at *4 (E.D.N.Y. Sept.
30, 2013) (granting government's motion to dismiss *qui tam* complaint filed by serial relator who
filed one of ten *qui tams* alleging similar wrongdoing by the same defendant).

3.  *Preventing Interference with Agency Policies and Programs*

Dismissal should be considered where an agency has determined that a *qui tam* action threatens
to interfere with an agency's policies or the administration of its programs and has recommended
dismissal to avoid these effects.  For example, in *United States ex rel. Ridenour v. Kaiser-Hill
Co., LLC*, 397 F.3d 925 (10th Cir. 2005), relator alleged that a security contractor submitted false
claims to the Department of Energy for deficient security services at Rocky Flats, a

PRIVILEGED AND CONFIDENTIAL; FOR INTERNAL GOVERNMENT USE ONLY

radiologically-contaminated nuclear weapons manufacturing facility that was slated to undergo decontamination and closure.  The government successfully moved to dismiss the action because, among other things, litigation would delay the clean-up and closure of the facility by diverting agency personnel and resources away from the project.  397 F.3d at 937; *see also United States ex rel. Sequoia Orange Co.*, 151 F.3d at 1146 (concluding that valid government interests supporting dismissal included the Department of Agriculture's desire to "end the divisiveness in the citrus industry" by promulgating new citrus marketing regulations to replace invalidated regulations upon which the relator based its claims); *United States ex rel. Toomer v. TerraPower*, No. 4:16-cv-00226-BLW (D. Idaho) (Under Seal) (seeking dismissal of allegation that defendant's invention constituted government property, based in part on the concern that this allegation would hinder the Energy Department's ability to collaborate with private sector partners).  Finally, there may be instances where an action is both lacking in merit and raises the risk of significant economic harm that could cause a critical supplier to exit the government program or industry.  *Cf. United States ex rel. Harmon v. Trinity Indus., Inc.*, 872 F.3d 645 (5th Cir. 2017) (reversing $680 million judgment against highway guardrail manufacturer based on alleged manufacturing defects that agency concluded did not affect eligibility of defendant's claims).

4.  *Controlling Litigation Brought on Behalf of the United States*

Relatedly, the Department should consider dismissing cases when necessary to protect the Department's litigation prerogatives.  For example, in *In Re Natural Gas Royalties Qui Tam Litigation*, MDL Docket No. 1293 (D. Wyo. October 9, 2002), relator filed separate *qui tam* actions in various districts against more than 300 defendants accused of underpaying royalties owed to the United States in connection with natural gas produced from federal lands.  After intervening as to a limited number of defendants, the government sought to dismiss certain declined claims to, among other things, avoid interference with the government's ability to litigate the intervened claims.  The court agreed, finding that the interest in avoiding interference with ongoing litigation warranted dismissal of the declined claims.  *See also Lion Raisins v. Kagawa, et al.*, No. CV-F-02-5665-REC-LJO (E.D. Cal. Nov. 3, 2003) (granting government's motion to dismiss, concluding that government's desire to avoid interference with pending Federal Torts Claims Act action involving the same parties was a valid government purpose that was rationally related to dismissal).  In addition, in *United States ex rel. Wright v. Agip Petroleum Co.*, No. 5:03-264 (E.D. Tex. Feb. 3, 2005), the government moved to dismiss, in part, to avoid the risk of unfavorable precedent.  *See id.*  Finally, in *United States ex rel. Piacentile*, 2013 WL 5460640, the government moved to dismiss a declined claim that was serving as an obstacle to the settlement of the government's intervened claims.  *But cf. United States ex rel. Schweizer v. Oce*, 677 F.3d 1228 (D.C. Cir. 2012) (once the government reaches a settlement with defendant of relator's claims, the dismissal of those claims is governed by section 3730(c)(2)(B), requiring a showing that the settlement is fair, adequate, and reasonable, rather than by section 3730(c)(2)(A)).[3]

---

[3]     In each of the foregoing cases, in addition to determining that the dismissed claims were interfering with the government's litigation prerogatives, the government's briefs make clear that the government had determined that the claims lacked substantial merit.

PRIVILEGED AND CONFIDENTIAL; FOR INTERNAL GOVERNMENT USE ONLY

5. *Safeguarding Classified Information and National Security Interests*

In certain cases, particularly those involving intelligence agencies or military procurement contracts, we should seek dismissal to safeguard classified information.  For example, in *United States ex rel. Fay v. Northrup Grumman Corp.*, No. 06-cv-00581-EWN-MJW, 2008 WL 877180 (D. Colo. Mar. 27, 2008), the relator alleged that a defense contractor defrauded the United States in connection with work performed on a classified contract.  After declining to intervene, the Department moved to dismiss the action under section 3730(c)(2)(A), asserting that continued litigation would pose "an unacceptable risk to national security" due to the potential for disclosure of classified information.  Applying the *Sequoia Orange* standard, the Court agreed, concluding that the claims and defenses were inextricably tied to classified information and dismissal was rationally related to the valid government interest of preventing the disclosure of such information.  *Id.* at * 6-7.  *See also United States ex rel. Matseki v. Raytheon Co.*, 634 F. App'x 192 (9th Cir. 2015) (per curiam) (holding that government interest in avoiding disclosure of classified information was sufficient basis for dismissal); *United States ex rel. Schwartz v. Raytheon Co.*,150 F. App'x 627 (9th Cir. 2005) (holding that "federal interest in protecting military and state secrets" was valid basis for dismissal); *United States ex rel. Ridenour*, 397 F.3d at 936-37  ("The Government demonstrated that classified documents required in the litigation would present a risk of inadvertent disclosure, implicating national security.").  Finally, it should be noted that the government need not demonstrate that continued litigation *will* result in the disclosure of classified information.  In jurisdictions that apply the "rational basis" basis test, the government has a strong argument that the *risk of disclosure*, alone, justifies dismissal.  *See United States ex rel. Ridenour*, 397 F.3d at 937 (finding risk of inadvertent disclosure of classified information, "even if theoretically minimal," sufficed to justify dismissal).  (In jurisdictions that apply the "unfettered right" standard, no showing by the government is required.)

6. *Preserving Government Resources*

The Department should also consider dismissal under section 3730(c)(2)(A) when the government's expected costs are likely to exceed any expected gain.[4]  *See, e.g.*, *Swift v. United States,* 318 F.3d 250, 251 (D.C. Cir. 2003) (the government moved to dismiss the complaint, arguing that the amount of money involved did not justify the expense of litigation even if the allegations could be proven); *United States ex rel. Nicholson v. Spigelman, et al.*, No. 1:10-cv-03361, 2011 WL 2683161, at *2 (N.D. Ill. July 8, 2011) (explaining that the estimated government losses, even with statutory penalties and damages multiplier, were less than the costs of monitoring the litigation and responding to discovery requests)  Examples of potential costs may include, among other things, the need to monitor or participate in ongoing litigation, including responding to discovery requests.  *See, e.g.*, *United States ex rel. Sequoia Orange Co.*, 151 F.3d at 1146 (holding that district court "properly noted that the government can legitimately consider the burden imposed on taxpayers by its litigation, and that, even if the relators were to litigate the FCA claims, the government would continue to incur enormous internal staff costs"); *United States ex rel. Levine v. Avnet, Inc.*, No. 2:14-cv-17-WOB-CJS, 2015 WL 42359 (E.D. Ky.

---

[4]      Cost to the government includes the opportunity cost of expending resources on other matters with a higher and/or more certain recovery.

PRIVILEGED AND CONFIDENTIAL; FOR INTERNAL GOVERNMENT USE ONLY

Apr. 1, 2015) (holding that dismissal of *qui tam* complaint "will further [the government's] interest in preserving scare resources" that would otherwise be spent "monitoring [relator's] action"). In some cases, the government may also be liable for the defendant's litigation costs if the defendant prevails in the action. *See, e.g.*, FAR §31.205-47(c).

7. *Addressing Egregious Procedural Errors*

The Department may also seek dismissal of a *qui tam* action pursuant to section 3730(c)(2)(A) based on problems with the relator's action that frustrate the government's efforts to conduct a proper investigation. For example, in *United States ex rel. Surdovel v. Digirad Imaging Solutions*, No. 07–cv-0458, 2013 WL 6178987 (E.D. Pa. Nov. 25, 2013), the relator ignored repeated requests from the Office of the U.S. Attorney to serve the *qui tam* complaint and disclose material facts as required by 31 U.S.C. § 3730(b). The Court granted the government's motion to dismiss the action because the "egregious procedural errors completely frustrated the government's ability to investigate the relator's claims." *Id.* at *4. *But cf. State Farm Fire and Cas. Co. v. United States ex rel. Rigsby*, – U.S. –, 137 S.Ct. 436, 440 (2016) (holding that relators' violation of FCA's seal requirement did not mandate automatic dismissal of relators' complaint).

\* \* \*

Several additional points are in order with respect to the use of the government's dismissal authority under section 3730(c)(2)(A). First, while the Department's position has been that the appropriate standard for dismissal under section 3730(c)(2)(A) is the "unfettered" discretion standard adopted by the D.C. Circuit rather than the "rational basis" test adopted by the 9th and 10th Circuits, we should argue that even the latter standard was intended to be a highly deferential one. Moreover, in those jurisdictions where the standard remains unresolved, in many cases the prudent course may be to identify the government's basis for dismissal and to argue that it satisfies any potential standard for dismissal under section 3730(c)(2)(A).

Second, the factors identified above are not mutually-exclusive, and the Department has often relied on multiple grounds for dismissal (for example, lack of merit and need to safeguard classified information). Nor, as noted above, are the factors identified in this memorandum intended to constitute an exhaustive list—there may be other reasons for concluding that the government's interests are best served by the dismissal of a *qui tam* action.

Third, in some cases there may be alternative grounds for seeking dismissal other than section 3730(c)(2)(A), such as the first to file bar, the public disclosure bar, the tax bar, the bar on *pro se* relators, or Federal Rule of Civil Procedure 9(b). Although the Department has sometimes moved to dismiss on these grounds under section 3730(c)(2)(A), we believe the better approach is to assert these grounds separately since they can provide alternative, independent legal bases for dismissal. It may sometimes be appropriate, however, to move for dismissal under section 3730(c)(2)(A) in the alternative based on one or more for the factors listed above.

PRIVILEGED AND CONFIDENTIAL; FOR INTERNAL GOVERNMENT USE ONLY

Fourth, section 3730(c)(2)(A) does not require the government "to proceed in an all or nothing manner." *See Juliano v. Fed. Asset Disposition Ass'n*, 736 F. Supp. 348, 351–53 (D.D.C.1990) ("The [FCA] nowhere states that federal prosecutors are confined to proceed in an all or nothing manner, being forced to take or leave the qui tam plaintiff's charges wholesale."). In certain situations, it may be appropriate to seek only partial dismissal of some defendants or claims. *See id.* (granting motion for partial dismissal under 3730(c)(2)(A)); *United States ex rel. Grober v. Summit Medical Group, Inc.*, No. 02-177-C (W.D. Ky. July 9, 2004) (same).

Fifth, where a *qui tam* case is a potential candidate for dismissal, Department attorneys should consult closely with the affected agency as to whether dismissal is warranted under any of the factors set forth in this guidance. The agency's recommendation should be obtained in advance of the filing of any request to dismiss. In cases where dismissal under section 3730(c)(2)(A) is opposed by the agency (because, for example, it would require the government to disclose sensitive information or could result in other collateral consequences), there may be alternative ways to address the deficiencies while accommodating the agency's desire to forego seeking dismissal. For example, if the agency views the alleged falsity as immaterial, the United States can provide an agency declaration to that effect. *See Trinity*, 872 F.3d at 664 (holding that district court erred in concluding alleged falsity was material to agency despite agency memorandum stating that there was "an unbroken chain of eligibility for Federal reimbursement" for the allegedly defective product at issue).

Sixth, although a motion to dismiss under section 3730(c)(2)(A) will often be filed at or near the time of declination, there may be cases where dismissal is warranted at a later stage, particularly when there has been a significant intervening change in the law or evidentiary record. However, if one waits until the close of discovery or trial, there is a risk that the court may be less receptive to the request given the expenditure of resources by the court and parties. The court may also be less receptive to a motion filed at a later stage when doing so undercuts a claimed desire to avoid or reduce costs associated with discovery or safeguard information in discovery. Attorneys considering dismissal should therefore allow for sufficient time to consult with the affected agency and, in delegated cases, to provide appropriate notice to the Fraud Section

Finally, attorneys planning to recommend declination or dismissal should, to the extent possible, consider advising relators of perceived deficiencies in their cases as well as the prospect of dismissal so that relators may make an informed decision regarding whether to proceed with the action. In many cases, relators may choose to voluntarily dismiss their actions, particularly if the government has advised the relator that it is considering seeking dismissal under section 3730(c)(2)(A).[5]

---

[5]   Since January 1, 2012, more than 700 *qui tam* actions have been dismissed by relators after the government elected not to intervene. The frequency with which relators voluntarily dismiss declined *qui tam* actions has significantly reduced the number of cases where the government might otherwise have considered seeking dismissal pursuant to section 3730(c)(2)(A).

# Exhibit H

**From:** "Barrett, David (USACAC)" <David.Barrett@usdoj.gov>
**Date:** January 14, 2019 at 10:29:06 AM PST
**To:** Gloria Juarez <tootsieglo@sbcglobal.net>
**Subject: RE: Roe vs Stanford**

Please see the attached instructions.  You have to create your own password.  If, after following the attached instructions, you still cannot open the encrypted message, please let me know.

---

**From:** Gloria Juarez <tootsieglo@sbcglobal.net>
**Sent:** Saturday, January 12, 2019 11:55 AM
**To:** Barrett, David (USACAC) <DBarrett@usa.doj.gov>
**Subject:** Re: Roe vs Stanford

What is password to open courts sealed order?

Sent from my iPhone

On Jan 11, 2019, at 7:17 PM, Barrett, David (USACAC) <David.Barrett@usdoj.gov> wrote:

Gloria,

As a result of the federal government shutdown, AUSA Frank Kortum has been furloughed and is not permitted to do any work on this case (or any other) while he is on furlough status. We have only a skeleton crew on hand (of which I am one), but none of us is able to undertake any work on this case, given our other responsibilities during the shutdown.

However, I have reviewed our file and determined that, on December 27, 2018, the Court continued the hearing on the United States' motion for change of venue to March 4, 2019. (For security reasons, I will forward a copy of the Court's sealed order by separate encrypted e-mail.)  This means that your client's opposition is not due until February 11, 2019 (21 days before the March 4 hearing date).

032

Under these circumstances, we would appreciate your patience in receiving a substantive reply to your e-mail below until AUSA Kortum's furlough ends and he returns to work.  If the government shutdown continues to the point where you need to start preparing your opposition to the change-of-venue motion, please let me know so that we can seek a further continuance of the hearing date to preserve the status quo in light of the government shutdown.


David K. Barrett

Assistant U.S. Attorney

Chief, Civil Fraud Section

Central District of California

Phone:  (213) 894-0522

Fax:       (213) 894-7819

E-mail address:   David.Barrett@usdoj.gov

Mailing address:  Federal Building, Suite 7516

                            300 North Los Angeles Street

                            Los Angeles, California 90012


CONFIDENTIALITY NOTICE:

This e-mail is confidential and may contain information that is privileged, attorney work product, or otherwise exempt from disclosure under applicable law.  It is intended only for the use of the individual(s) to whom it is addressed.  If you are not an intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachments, is strictly prohibited.  If you have received this message in error, please notify me immediately by telephone at (213) 894-0522 or by reply e-mail, and please delete this message, along with any attachments, from your computer. Thank you.

---

**From:** Kortum, Frank (USACAC) <FKortum@usa.doj.gov>
**Sent:** Friday, January 11, 2019 10:54 AM
**To:** Barrett, David (USACAC) <DBarrett@usa.doj.gov>
**Subject:** Fwd: Roe vs Stanford


Begin forwarded message:


**From:** Gloria Juarez <tootsieglo@sbcglobal.net>
**Date:** January 11, 2019 at 9:41:15 AM PST
**To:** Frank.Kortum@usdoj.gov
**Subject: Roe vs Stanford**

Counsel please find the attached declaration of Ms. Gaines.

We contend that it is more likely than not that the court will grant our motion on the lack of standing of DOJ, as well as that our opposition would prematurely reveal witnesses to Defendants should we be forced to file at this juncture.

Therefore please take your venue motion off calendar.

 ProofPoint Encryption - Secure Messaging for External Recipients.pdf
222.3kB

034

# Exhibit  I

RE: STANFORD Fw: service of process United States of America, et al. vs. Stanford

Sheeder, Frank <Frank.Sheeder@alston.com>
Thu 12/26/2019 4:29 PM
To: GLORIA JUAREZ, ESQ. <gloria@thegjlaw.com>
Cc: Gloria Juarez <tootsieglo@sbcglobal.net>; Smyer, Brad <Brad.Smyer@alston.com>; jd 121212 <jd121212@hotmail.com>

Gloria,

Thank you for your response.  We reiterate our offer to proceed with the Waivers of Service of Summons as set forth in our December 18, 2019, letter to you.  We could provide them by tomorrow.  It seems as though we agree as to the potential benefits of such an approach:

- We would have the opportunity to meet in person about this case during the week of January 6, 2020, in Los Angeles.  If you don't agree to the Waivers of Service, we will not be in a position to meet because we will be compelled to complete and file a Motion to Dismiss by January 7, 2020.  It seems preferable for all of us to have an opportunity to address the various matters in the case instead of commencing Motions, responses, replies, etc.
- The issues relating to deficiencies in service of process could be mooted.
- We have not yet moved to unseal the Exhibits, and assuming you agree to proceed with the Waivers of Service, we would agree to hold off on such a motion pending our meeting.

Please confirm whether you agree to go forward with the Waivers of Service of Summons as proposed in our December 18, 2019, letter and we will proceed accordingly.  Specifically, the agreement will be to accept and file those Waivers of Service and Summons, ███ not to file the returns for the service you have already attempted.

I will look forward to hearing back from you promptly.

Regards,
Frank

---

From: GLORIA JUAREZ, ESQ. <gloria@thegjlaw.com>
Sent: Thursday, December 26, 2019 5:36 PM
To: Sheeder, Frank <Frank.Sheeder@alston.com>
Cc: Gloria Juarez <tootsieglo@sbcglobal.net>; Smyer, Brad <Brad.Smyer@alston.com>; jd 121212 <jd121212@hotmail.com>
Subject: STANFORD Fw: service of process United States of America, et al. vs. Stanford

December 26, 2019

Mr. Frank Sheeder
Attorney for Stanford Defendants

Dear Frank,

In follow up to my office's earlier correspondence addressed to you and Brad which is incorporated by reference herein, we did not receive or review any further dispositive written correspondence from you.
We thus *intended* to email you on December 20, 2019 (*inset below for transparency*) as to the service matter. I apologize for any inadvertence in light of the holidays and limited end of year staffing in forwarding this correspondence as intended last week.

As you recall, Judge Hon. Fisher had an OSC set in this matter for December 6, 2019 for Plaintiffs to proceed with prosecuting the case. We were therefore under court order by Dec. 6th.
Therefore,  Stanford service of process was ordered before you contacted our office.

As you may know, our third party service process emailed us only late on December 19, 2019 moments before the close of business that certain Stanford Defendants were successfully served on 12/17/19.
We therefore drafted an email to you shortly thereafter on December 20th to meet and confer on the service issue. Our intended discussion was in the spirit of cooperation that Plaintiffs could agree to *not* file the proof of service in anticipation of discussion with your office as to the proposed waiver. However, we had not at that time received written correspondence from you on that issue.

Accordingly, in good faith, we have not yet filed the 12/17/2019 proof of service of the First Amended Complaint with the court, and have the opportunity to withhold the same pending furtherance of the meet and confer. Although we incurred significant costs and fees in effectuating service, and there were additional costs incurred because of lack of cooperation by several of your clients, we would have no obligation to file those effectuated  POS with the court.

Please find attached hereto a *courtesy* electronic copy of the FAC and Exhibits thereto.  While we can certainly stipulate to procedurally unseal the exhibits publicly now, we humbly propose that it may be in your clients' favor to not unseal the Exhibits should parties effectively reach a favorable case settlement before active litigation begins.  Accordingly, as set forth in our December 6, 2019 Statement to the Court, we had proposed seeking leave of court to re-seal the FAC should the action be dismissed by all parties.  As we proposed previously and you've agreed to for the week of January 6th, we would agree to thrust meaningful discussion as to the allegations in the FAC, as well as your clients' past and future billing compliance obligations. Unless we receive timely written communication from you stating otherwise, we will need to file the 12/17/2019 POS with the court before the end of the year.

Please let us know how we should proceed.  Thank you in advance for your anticipated cooperation.

Best Wishes and Happy Holidays!

## GJ

Gloria Juarez
LAW OFFICES OF GLORIA JUAREZ

ORANGE COUNTY OFFICE
26081 Merit Circle , Suite 112

036

Laguna Hills, CA 92653
Tel. 213-598-4439
Facsimile 714-919-0254

---------- Forwarded message ---------
From:
Date: Fri, Dec 20, 2019 at 2:02 PM

We just received this email from Onelegal that personal service was successfully effectuated on the Stanford Defendants.
Thank you

----- Forwarded Message -----
**From:** noreply@
**Sent:** Thursday, December 19, 2019, 04:45:27 PM PST
**Subject:** Successful service of process The United States of America, et al. vs. Stanford Healthcare

We have successfully served your documents for   The United States of America, et al. vs. Stanford Healthcare Billing Department, et al.   :

| Attempt Date | Attempt Time | Address | Status | Manner of Service | Desc |
|---|---|---|---|---|---|
| 12/17/2019 | 12:14 PM | Bldg. 170, 3rd Floor | | Individual Substitute Service | |

**What happens next**

We are processing your proof of service. When it's available, you'll receive it by email. This typically takes 3-5 business days.

If you have questions, please email us.

Thank you. We appreciate your business.

Sincerely,

----- Forwarded Message -----
Status of Orders placed - 14171340, 14171360, 14166162, 14171432

Good morning,

I wanted to update you on the status of the above orders placed for service. Orders # 14171340, 1417
were all served. The following orders below were not served as service was refused by the agent/cou
was because they told the server the entities in these orders were not titled correctly. No other direct
to the server on specifically what the issue was.

I have placed these four orders on hold at this point to allow you time to provide further instruction c
nature of these orders, if you decide to not move ahead with the orders below then please advise me
prepare and send out the non-service report to the agent, per your instructions. I have also prepared
to the agent for those orders which were served – again, per your instructions.

Please let me know how you wish to proceed with the orders below by Thursday, December 26th, othe
these out as non-served. Thank you!

Orders #14171306, (Stanford Healthcare Billing Department),

#14171478, (The Board of Trustees of Stanford University),

#14171417 (The Board of Directors of the Lucile Salter Packard Children's Hospital at Stanford)

#14171388 (The Board of Directors of the Stanford Health Care)

--

**GJ**

Gloria Juarez
LAW OFFICES OF GLORIA JUAREZ

ORANGE COUNTY OFFICE
26081 Merit Circle , Suite 112
Laguna Hills, CA 92653
Tel. 213-598-4439
Facsimile 714-919-0254

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

# Exhibit  J

# ALSTON & BIRD

Chase Tower
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
214-922-3400 | Fax: 214-922-3899

December 18, 2019

Ms. Gloria Juarez, Esq.
Law Offices of Gloria Juarez
*VIA email to tootsieglo@sbcglobal.net*

Re:     *U.S. ex rel. Roe, et al. v. Stanford Healthcare Billing Department, et al.*, 2:12-cv-08726-DSF-
AFM

Dear Ms. Juarez,

We understand that yesterday, you attempted to effect Service of Process upon Stanford Health
Care, Stanford Health Care Advantage, Debra Zumwalt, and "The Leland Junior University" but failed
to serve a complete copy of your client's First Amended Complaint (the "FAC") as required by Rule 4
and the Court's previous Orders on any of them. The copies of the FAC supplied by the process
server did not include even one of the at least 52 exhibits to the FAC, none of which are sufficiently
described in the FAC and all of which remain inaccessible through the Court's docket as sealed
documents. *See* FAC ¶ 108 (refencing exhibits up to AAA).

Your attempted service is ineffective under the Rules and may be rejected by the Court in
accordance with Rule 12(b)(5). However, we can offer to execute Waivers of Service of Summons on
behalf of Stanford Health Care, Stanford Health Care Advantage, Debra Zumwalt, and The Leland
Stanford Junior University (which we believe is the entity you are trying to name as a Defendant) if
you agree to file those with the Court instead of the ineffective returns of service. This allows you to
accomplish service via waiver before the end of the month as you previously represented to the
Court and allows for both sides to avoid further disagreements about the sufficiency of service of
process.

We make this offer in a good faith attempt to exhaust our conference obligations under the Local
Rules and to allow ample time for us to have substantive discussions about this case before the
commencement of litigation. As I mentioned when we spoke on Monday, the proper service of any
defendant in this matter, as opposed to a Waiver of Service of Summons, will initiate immediate
litigation and prevent the defendants from engaging in meaningful and collaborative discussions
without Court intervention.

Alston & Bird LLP                                                                                          www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.
040

Ms. Gloria Juarez
December 18, 2019
Page 2


Kindly let me know in writing by noon tomorrow whether you are amenable to proceeding with the Waivers of Service we have offered herein instead of filing returns of service in connection with yesterday's service attempt.  If you respond affirmatively, we will provide such Waivers as indicated.

Sincerely,

Frank E. Sheeder

# Exhibit  K

1/12/2020    Case 2:17-cv-08726-DSF-AFM    Document 49-1    Filed 01/18/20    Page 43 of 98    Page ID
#:1202
Mail - jl 121212@outlook

## United States of America, et al. vs. Stanford

### Sheeder, Frank <Frank.Sheeder@alston.com>

Mon 12/30/2019 4:26 PM

**To:** gloria <gloria@thegjlaw.com>
**Cc:** Gloria Juarez <tootsieglo@sbcglobal.net>; Smyer, Brad <Brad.Smyer@alston.com>; jd 121212 <jd121212@hotmail.com>

Gloria,

I am following up on my attempts to reach you today by telephone.

We have already conferred at length about the various reasons for dismissal of this matter under Rules 8(a), 9(b), and 12(b)(6), including by telephone on December 11 and 16, 2019, and you were not able to agree to our dismissal requests. However, you have not yet responded to my December 26th request for a call to confer about dismissal for insufficient service of process under Rule 12(b)(5). We also need to discuss the grounds for dismissal for failure to comply with Ninth Circuit standards governing litigation of cases under a pseudonym, including Rule 10(a).

We are both obligated by L.R. 7-3 to confer about these matters today or tomorrow. Please let me know when you can make yourself available.

Thanks,

Frank

_____

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

043

Exhibit  L

1/12/2020          Case 2:17-cv-08726-DSF-AFM   Document 19-1   Filed 01/18/20   Page 45 of 98   Page ID
[ Action Requested] Stanford M&C UNITED STATES et. al ex. relator Roe vs. STANFORD et. al. CV 17-08726-DSF
                              #:1204



                                          **GLORIA JUAREZ, ESQ. <gloria@thegjlaw.com>**

---

## [ Action Requested] Stanford M&C UNITED STATES et. al ex. relator Roe vs. STANFORD et. al. CV 17-08726-DSF

1 message

---

**GLORIA JUAREZ, ESQ.** <gloria@thegjlaw.com>                    Thu, Jan 2, 2020 at 11:49 AM
To: Frank.Sheeder@alston.com, Brad.Smyer@alston.com
Cc: Gloria Juarez <tootsieglo@sbcglobal.net>, jd 121212 <jd121212@hotmail.com>

*2nd Request*

Counsel,
Please find attached hereto for your review and response.
Also kindly notify as to representation of Dr. Fred Dirbas as
he appears to have been left out of your earlier email.
Thank you

---------- Forwarded message ---------
From: **GLORIA JUAREZ, ESQ.** <gloria@thegjlaw.com>
Date: Tue, Dec 31, 2019 at 12:23 PM
Subject: Stanford M&C UNITED STATES et. al ex. relator Roe vs. STANFORD et. al. CV 17-08726-DSF
To: <Frank.Sheeder@alston.com>, <Brad.Smyer@alston.com>
Cc: jd 121212 <jd121212@hotmail.com>, Gloria Juarez <tootsieglo@sbcglobal.net>


Counsel,
Please see correspondence attached hereto.
Thank you
--
GJ
Gloria Juarez
LAW OFFICES OF GLORIA JUAREZ
ORANGE COUNTY OFFICE
26081 Merit Circle , Suite 112
Laguna Hills, CA 92653
Tel. 213-598-4439
Facsimile 714-919-0254


--

# GJ
### Gloria Juarez
## LAW OFFICES OF GLORIA JUAREZ
## ORANGE COUNTY OFFICE
### 26081 Merit Circle , Suite 112
### Laguna Hills, CA 92653
### Tel. 213-598-4439
Facsimile 714-919-0254

---

 **19-12-31 lttr to Stanford Waiver Summons.pdf**
185K

# Exhibit  M

# ALSTON & BIRD

Chase Tower
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
214-922-3400 | Fax: 214-922-3899

January 3, 2020

Ms. Gloria Juarez, Esq.
Law Offices of Gloria Juarez
*VIA email to tootsieglo@sbcglobal.net and gloria@thegjlaw.com*

Re:     *U.S. ex rel. Roe, et al. v. Stanford Healthcare Billing Department, et al.*, 2:17-cv-08726-DSF-AFM

Dear Ms. Juarez,

As you know from our previous communications, we represent Stanford Health Care, Stanford Health Care Advantage, The Leland Stanford Junior University, and Ms. Debra Zumwalt (collectively, the "Moving Defendants"). I am writing in response to your December 31, 2019, letter (the "Letter").

We have reached out to you several times in good faith, both before and after your attempted service of process on the Moving Defendants, to allow ample time for us to work collaboratively regarding this case.  We have discussed in detail the various reasons for dismissal under Rules 8(a), 9(b), and 12(b)(6), and even offered to execute waivers of service for the Moving Defendants to allow us more time to work together before the commencement of litigation.  You have not accepted our offers or narrowed the issues, instead choosing to initiate litigation that will now be subject to the motion to dismiss we are about to file under those rules.

While we disagree as to whether your attempted service complied with the Rules, your actions have nevertheless commenced litigation and compelled us to work over multiple holidays to meet the Moving Defendants' responsive deadlines. Your tardy and inappropriately conditioned proposal for the stipulation referenced in your Letter has been mooted by your position that the attempted service of process on the Moving Defendants was proper.

Unfortunately, your Letter also contains numerous misstatements and contradictions that we need to correct.

- You state that your Letter is a follow up to your "office's telephonic outreach attempt to [me] last evening." We assume this statement was included by mistake. We have no record of any messages or missed calls from you, and you informed me by text that evening that you were not available to discuss the matter.  Your letter dated December 16, 2019, makes a similar reference to "telephonic correspondences" in September 2019 to which neither I nor anyone in our firm was a party.  Kindly provide the names, phone numbers, and email addresses for all persons with your firm who may contact us on your behalf, so we can endeavor to devote timely attention to any communications.

Alston & Bird LLP

www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

Ms. Gloria Juarez
January 3, 2020
Page 2

- No one from our firm has ever stated that we represent all the defendants you have listed in this matter. To the contrary, we have informed you more than once that most of the defendants you have listed in the suit do not exist as legal entities capable of being sued.

- We have never suggested that any defendant has been "personally served," but have instead explained how your attempted service of process on the Moving Defendants was insufficient because it failed to comply with the Rules and the Court's previous orders. Your cryptic accusations about other defendants evading service are incorrect and unfounded. There is no obligation for anyone to accept service for listed defendants that do not exist.

- You are not awaiting any response from us about your letter dated December 16, 2019. We spoke about your letter that same day, and we informed you that we would not be available for your proposed "mediation" the week of January 6, 2020, if you chose to initiate litigation before then. You did not accept our offer to execute waivers of service. Instead, your process server attempted service of process on the Moving Defendants the next day. We will not be meeting with you at this time to "mediate."

Sincerely,

Frank E. Sheeder

048

Exhibit  W

FILED

2017 DEC -4  PM 1:42

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1    Emily Roe
2    28241 Crown Valley Pkwy, Suite F228
     Laguna Niguel, CA 92677
3    Telephone (949)542-6354
     Email Orange20202@hotmail.com
4    Attorneys for Relator

5

6

7

8                        UNITED STATES DISTRICT COURT

9            FOR THE DISTRICT OF SOUTHERN CALIFORNIA

10

11   UNITED STATES OF AMERICA *ex. rel.*     CASE NO **CV17-08726**-DSF(AFMx)
     Emily Roe, an  individual,

12                                           **FILED *IN CAMERA* UNDER SEAL**
     THE STATE OF CALIFORNIA *ex. rel.* Emily
13   Roe., an individual,

14            Plaintiffs,                     **JURY TRIAL DEMANDED**
                vs.
15   STANFORD    HEALTHCARE    BILLING       **COMPLAINT    FOR    DAMAGE**
     OFFICE,  STANFORD  HEALTH  CARE         **PURSUANT TO CIVIL FALSE CLAIM**
16   (FORMERLY  KNOWN  AS  STANFORD          **ACT, 31 U.S.C. §§ 3729-33 ("FCA"); "QU**
     HOSPITALS    AND    CLINICS),  DR.      **TAM ACTION."**
17   FREDERICK  DIRBAS,  THE  BOARD  OF
     DIRECTORS OF THE STANFORD HEALTH
18   CARE, THE BOARD OF DIRECTORS OF
     THE    LUCILE    SALTER    PACKARD      Complaint Filed: November 27, 2017
19   CHILDREN'S HOSPITAL AT STANFORD,
     THE LELAND JUNIOR UNIVERSITY, THE
20   BOARD  OF  TRUSTEES  OF  STANFORD
     UNIVERSITY, AND DOES 1-10.                    PAID
21            Defendants.

22                                               DEC - 4 2017

23
                                            Clerk, US District Court
24                                              COURT 4612   SM

25         **INTRODUCTION AND FACTS COMMON TO CAUSES OF ACTION AND**

26                                **PLAINTIFFS**

27
     ────────────────────────────────────────────────────
                                    - 2 -
28   COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC § 3729(a))

1.  This is an action brought on behalf of Plaintiffs, the United States of America and the State of California, (herein" Plaintiffs")  against Defendants pursuant to the Qui Tam provisions of the Civil  False  Claims  Act,  31  U.S.C.§§  3729-33  ("FCA")  and  California  Insurance  Frauds Prevention Act ( Section 1871.4 of the Insurance Code, jointly referred to herein as the "Qui Tam Action."

2.  Plaintiff-Relator Emily Roe  by and through its undersigned, on behalf of the United States of America, alleges as follows for its Complaint against Defendants collectively "STANFORD" which comprise of STANFORD HEALTH CARE  (HEREIN "STANFORD" OR " SHC" ),  THE BOARD  OF  DIRECTORS  OF  THE  STANFORD  HEALTH  CARE,  DR.  FREDERICK DIRBAS,  MD  (  HEREIN  "DIRBAS"),  THE  BOARD  OF  DIRECTORS  OF  THE  LUCILE SALTER  PACKARD  CHILDREN'S  HOSPITAL  AT  STANFORD,  AND  THE  BOARD  OF TRUSTEES  OF  LELAND  JUNIOR  UNIVERSITY,  and  Does  1-50   based  upon  personal knowledge and relevant documents.  As a direct, proximate and foreseeable result of Defendants' fraudulent course of conduct set forth herein, and conducted as standard operating practice on a large  scale,  STANFORD    knowingly  submitted,  and  Defendants  caused  to  be  submitted, thousands  of  false  or  fraudulent  statements,  records,  and  Claims  to  Medicare  seeking reimbursement for health care services from at least 2010 through the present.

3.  The practices complained of herein are continuing. As detailed below, the Defendants' actions and omissions have caused many years of improper and false billings to the United States through the Medicare program, and the State of California through non-Medicare programs.

4.  As of 2016 STANFORD has **nearly doubled** its Medicare net revenue from 2012.  Whereas in 2012 STANFORD received $460.4 million in Federal funds from the Medicare Program, in the most recent year (2016), STANFORD received $755.7 million in Federal funds from the Medicare Program accounting for a remarkable 39% four year increase.

5.  Although STANFORD has nearly doubled its Medicare revenues in the four year period from 2012 to 2016, STANFORD has not doubled its staff, bed count, facilities, or services in that time period to substantiate this increase in enrichment.

6.  STANFORD executives and department managers are known to push aggressive billing and maintain a culture of pushing profits at any cost. STANFORD general counsel and Vice

President Ms. Debra Zumalt is known to harbor a general proclivity to turn a blind eye and suppress reports of improper billing allegations, as was done in this case.

7. STANFORD Hospital and Clinics located in Santa Clara County is one of the top three most profitable hospitals in the U.S. by patient-service surplus. In 2013, patient care surplus at STANFORD was $224,661,648, and surplus per adjusted discharge was $1,339.49.

8. In the most recent year (2016), STANFORD received a total of net patient service revenue of $3,893,005,000 and $3,393,413,000 in the prior year (2015). On average STANFORD receives 1/3 of its Gross Patient Service revenue from Medicare.

9. Of the total $3,893,005,000 funds collected by STANFORD in 2016, 34% of funds were from Medicare, 4% are from Medi-Cal, 55% from Managed care- " Discount Fee for Services", and 7% Self-Pay or Indemnity.

10. At the end of the fiscal year in August 31 STANFORD has account receivables of 12% from Medicare, 18% from Blue cross, and 11% from Blue Shield. SHC did not believe significant credit risks exist with these three payers.

11. STANFORD reported that SHC's Medicare cost reports have been audited by the Medicare administrative contractor through August 31, 2006.

12. More significantly, the STANFORD schemes that have resulted in false billings to Medicare and the State that began in at least 2010, and most likely earlier, as alleged more specifically *infra,* include but are not limited to the following:

•        upcoding patients' office visits to artificially inflate the base Medicare reimbursement paid for professional medical services by STANFORD physicians and health care providers;

•        artificially unbundling the pre-operative visit and inflating the global fees paid through surgical services rendered to patients to qualify for high adjustment payments of 10-20% greater funds per surgical procedure;

•        fraudulent and false patient pre-operative evaluations scheduled on the day or days before surgery and unbundled to reflect a distinct and separate evaluation and management service; and

•    failing to mitigate or cease the conduct once put on notice and demanded to cease unlawful billing.

13. Further, Defendants STANFORD conspired to violate the False Claims Act by causing the submissions of false or fraudulent claims, conspired to make and use, or cause to be made or used, false records material to false or fraudulent claims, and once put on notice of the unlawful billing,

- 4 -

COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC § 3729(a))

052

conspired to not return Medicare and non-Medicare overpayments from being returned to the government, and respective carriers.

14. As a result, Medicare overbillings by STANFORD revealed in an audit certification conducted by Plaintiffs was covered up and the billing schemes in place at STANFORD that resulted in the false billings identified by Plaintiffs continued unabated, resulting in additional false or fraudulent claims to Medicare.

15. By these actions and the other actions detailed herein, the Defendants have violated several laws, including without limitation, the Federal and State False Claim Statutes.

16. Defendants' fraudulent conduct has had a dramatic negative financial impact on Medicare and the government. According to the company's own public filings, STANFORD holds itself as a U.S. "Non-Profit" or not-for profit ("NFP") Foundation.

## DEFENDANTS

17. STANFORD Health Care ("SHC") is a non-profit, California corporation. It is a tax-exempt institution under section 501(c)(3) of the Internal Revenue Code. Its governing board is The Board of Directors of STANFORD Health Care.

18. The Centers for Medicare (herein "CMS") and Federal health care programs utilize the National Provider Identifier (herein "NPI"). NPI's are assigned to institutions as well as individual health care providers. Billing CMS requires utilization of both the institution's NPI and the individual rendering providers.

19. NPI 1437292927  is registered to STANFORD HEALTH CARE located at 300 Pasteur Drive STANFORD, California 94305.

20. NPI Number 1437292927 has the "Organization" type of ownership and has been registered to the following primary business legal name (which is a provider name or healthcare organization name) - STANFORD HEALTH CARE . The enumeration date of this NPI Number is 02/14/2007. NPI Number information was last updated at 03/07/2017.

21. Provider's other registered legal business name is STANFORD HOSPITAL AND CLINICS.

22.  Defendants' main business address where it receives payments for medical services is in Los Angeles, California. Stanford Billing Office receives all by mail payments and checks at the Address of P.O. Box 740715 Los Angeles, CA 90074-0715. The insurance carrier as well as

1  Relator also submitted payments to the main billing company address in the Central District. (

2  Exh. N accessed Nov. 26, 2017 at

3  https://stanfordhealthcare.org/content/dam/SHC/patientsandvisitors/billing/images/shc-billing-

4  statement-summary-2016.jpg)

23. STANFORD as a registered medical service provider is registered as physically located (Business

5  Practice Location) at:  300 PASTEUR DRIVE  STANFORD , CA  94305. The provider can be

6  reached at his practice location using the following numbers: Phone 650-723-4000  and Fax 650-

7  498-5840.

8  24. The provider's official mailing address is:  1804 EMBARCADERO ROAD , SUITE  100

9  STANFORD , CA  94305-3341 US The contact numbers associated with the mailing address are:

10  Phone  650-723-4000    Fax  650-498-5840  The  authorized  official  registered  with  the

11  "1437292927" NPI Number is MR. DAVID J. CONNOR.  The authorized official title (position)

12  is CHIEF FINANCIAL OFFICER. He can be reached as the authorized official at the following

   phone number 650-497-0391.

13  25.    NPI 1154457091 is registered to Dr.  FREDERICK DIRBAS MD  located at located at 300

14  Pasteur Drive STANFORD,  California  94305.

15  26.    CMS also uses a PTAN number for provider billing. A PTAN is a Medicare-only number

16  issued  to  providers  by  Medicare  Administrative  Contractors  (MACs)  upon  enrollment  to

   Medicare.

17  27. Lucile Salter Packard Children's Hospital ("LPCH") at STANFORD is a nonprofit, California

18  corporation. It is a tax-exempt institution under section 501(c)(3) of the Internal Revenue Code.

19  Its governing board is The Board of Directors of the Lucile Salter Packard Children's Hospital at

20  STANFORD.

21  28. The two hospitals are legal corporations separate from the University and from each other.

22  STANFORD also owns and operates multiple other satellite hospitals and facilities including

   STANFORD Outpatient Clinics and Surgery at Redwood City.

23  29. STANFORD Medicine is a term that encompasses all of the healthcare entities, including both

24  hospitals and their foundations and the School of Medicine. It replaces the term "STANFORD

25  University Medical Center." STANFORD Medicine and STANFORD University Medical Center

26  are not legal entities.

27

28  COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC § 3729(a))

30. Professional services are reimbursed based on a fee schedule in Federal funds from the Medicare Program. Medicare payments accounted for a significant percentage of STANFORD'S net service revenues, second only to Blue Cross.

31. STANFORD recognized additional fees for its hospital services. SHC recognized $55,195,000 and $103,667,000 in net patient service revenue under these programs and $45,809,000 and $73,585,000 in other expense for California Hospital Quality Assurance Fee Program ( herein "HQAF") to the California Department of Health Care Services for the years ended August 31, 2016 and 2015, respectively.

32. The State of California enacted legislation in 2009 which established a Hospital Quality Assurance Fee ("HQAF") Program and a Hospital Fee Program. These programs imposed a provider fee on certain California general acute care hospitals that, combined with federal matching funds, would be used to provide supplemental payments to certain hospitals and support the State's effort to maintain health care coverage for children. The effective period of this Hospital Fee Program was April 1, 2009 through December 31, 2010.

33. In the most recent year (2016), STANFORD received $755,658,000 in Federal funds from the Medicare Program. This Net Patient Service Revenue is a net of contractual allowances (but before provision for doubtful accounts), by major payor for the years ended August 31, 2016.

34. In the prior year (2015), STANFORD received $732,377,000 in Federal funds from the Medicare Program. Medicare payments accounted for a large percentage  of STANFORD'S net service revenues.  In the prior years (2013), STANFORD received $519,403,000 in Federal funds from the Medicare Program. Medicare payments accounted for a large percentage  of STANFORD'S net service revenues.

35. In the preceding year (2012) STANFORD received $460,442,000 in Federal funds from the Medicare Program.

36. Plaintiffs estimate that damages caused to the Medicare program by Defendants' violations of the FCA exceed half a billion dollars cumulatively as of the date the original complaint was filed.

37. STANFORD is a  California Entity, and venue is proper  under the Central  District Court.

38. STANFORD receives some walk-in payments at its BILLING OFFICE LOCATION, 4700 BOHANNON DRIVE, 2nd floor  MENLO PARK CA 94025.

39. STANFORD conducts business and receives significant  enrichment through its billing entity address at P.O. box 743447 in LOS ANGELES, CA 90074-3447.

40. STANFORD has numerous satellite offices and hospitals including

- Patient Financial Services, Valley Memorial Center 1111 E. Stanley Blvd. Livermore, CA 94550, Telephone 925.264.6500, Email: billing_ValleyCare@STANFORDhealthcare.org
- STANFORD Medicine Outpatient Center and STANFORD Medicine Redwood City; 450 Broadway, Redwood City, CA 94063. Phone: (650) 721-7332
- Stanford Health Care Advantage which received Federal Medicare funds and administrates a Medicare Advantage plan - PO Box 72530, Oakland, CA 94612-8730

## JURISDICTION AND VENUE

41. This District Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. §3730(e)(4)(A), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this Complaint.

42. Even to the extent there has been any such public disclosure, Plaintiff meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B). Specifically, Plaintiff voluntarily disclosed to the Government the information upon which allegations or transactions at issue in this complaint are based prior to any purported public disclosure under 31 U.S.C. §§ 3730(e)(4)(A).

43. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and, Relator voluntarily provided the information to the Government before filing its complaint. Relator therefore qualifies as an "original source" of the allegations in this Complaint such that the so-called public disclosure bar set forth at 31 U.S.C. § 3730(e)(4) is inapplicable.

44. Relator concurrently served upon the Attorney General of the United States, the United States Attorney for the District of California, and the State of California the original complaint and a written disclosure summarizing the known material evidence and information in the possession of Plaintiff related to the original Complaint, in accordance with the provisions of 31 U.S.C. §3730(b)(2). The disclosure statement is supported by material evidence, and documentary evidence has been produced with the disclosure. The documents referenced in the disclosure

statement, and those produced in connection therewith or subsequently, are incorporated herein by reference.

45. Plaintiff shall serve upon the Attorney General of the United States, United States Attorney for the District of California, the Attorney General for the State of California, and the California Insurance Commissioner a copy of this Complaint and any amended complaints.

46. This Court has personal jurisdiction and venue over the Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because each Defendant has minimum contacts with the United States. Moreover, Defendants can be found in, reside, and/or transact business in this District.

47. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants collect a significant portion of their enrichment at the billing address in Los Angeles. Thus, each Defendant transacts business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this District. Therefore, venue is proper within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. § 3732(a).

**PARTIES**

48. The real parties in interest( "Plaintiffs") to the False Claim Act ( herein " FCA") Qui Tam claims herein are the United States of America and the State of California. Accordingly, at this time, Relator is pursuing its cause of action on behalf of the United States on the FCA Qui Tam claims set forth herein. See, e.g., 31 U.S.C. § 3730(b)(1), and the State of California pursuant to the California Insurance Frauds Prevention Act and Section 1871.4 of the Insurance Code.

49. Relator Emily Roe  is an individual. Relator brings this Qui Tam action based upon direct and unique information obtained about Defendants, or those with whom the Defendants conduct business. The identity of these individuals has been provided in the pre-filing Disclosure Statement(s) produced to the United States pursuant to the Federal FCA, and to the State.

50. Defendant STANFORD is a U.S. Internal Revenue Code designated Non-Profit Foundation  based in California. STANFORD currently provides healthcare services to patients in California, and does so to patients locally as well as nationwide from the United States.

51. STANFORD provides and bills for health services throughout Southern California through its telemedicine portals. For example, according to advisory.com STANFORD Medicine Clinic provided in 2015  60% of its visits as "virtual visits", 23% of which were video visits and 37%

- 9 -

COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

057

were video visits. Only 40% of STANFORD's 2015 visits of more than 6500 visits were " in-person visits". Thus STANFORD  renders medical services through California as well as other states, making venue of Southern California proper.

52. As of 2016 STANFORD has **nearly doubled** its Medicare net revenue from 2012.  Whereas in 2012 STANFORD received $460.4 million in Federal funds from the Medicare Program, in the most recent year (2016), STANFORD received $755.7 million in Federal funds from the Medicare Program accounting for a remarkable 39 % increase over four year.

53. Of this tremendous increase in enrichment through Medicare payments,  several tens of millions of dollars are likely profited as a result of what is believed with certainty be a wide spread practice institution-wide at STANFORD of over-billing via the schemes described earlier.

54. STANFORD executives and department managers are known to push aggressive billing and maintain a culture of pushing profits at any cost.

55. Although STANFORD has nearly doubled its Medicare revenues in the four year period from 2012 to 2016, STANFORD has not doubled its staff, bed count, facilities, or services in that time period to substantiate this increase in enrichment.

56. STANFORD executives with knowledge of the fraudulent billing activities alleged herein include General Counsel and Vice president Ms. Debra Zumwalt, STANFORD retained counsel Ms. Carolyn Northrup and Ms. Daniella Stoutenburg, and STANFORD University faculty and professor Dr. Frederick Dirbas.

### RELATOR

57. Relator  is a trained and certified professional medical coder and biller, as certified  by the American Academy of Professional Coders (herein "AAPC"). As such, Relator has specialized training and expertise in coding guidelines and an auditor for insurance billing.

58. Relator is a U.S. Board certified physician and surgeon, licensed by the Medical Board of California  in excellent standing. Relator is an appointed expert for the California Department of Consumer Affairs, and is a current and thrice appointed expert for the California Board of Medical Quality Assurance.  In the capacity as a designated expert, Relator has been retained as an expert and testified on behalf of the State and the California Department of Consumer Affairs in matters involving medical coding.

59. In December 2012 Relator underwent a major surgery at STANFORD Hospitals and Clinics with Dr. Frederick Dirbas of the Department of Surgery.

60. In November of 2016 while auditing the chart and billing records for that service, Relator learned that on the date of service 12/11/12 STANFORD unbundled and  billed for a pre-operative visit although it should have been not chargeable. As a result if its unbundled billing, STANFORD received unjust enrichment for CPT code "99215", "comprehensive patient exam" as part of the pre-operative fee before a double mastectomy CPT code "19304".

61. On the day before the surgery (pre-op) was unbundled as an "unrelated" high comprehensive office visit and essentially up-coded for $494. STANFORD codes the visit as a " 99215" . STANFORD collected unjust enrichment of $341 in combination from the Relator and her insurance carrier.

62. A Physician Assistant ("PA-C") named Candice Schultz, PA  NPI Number: 1881725638 provided the entirety of the pre-operative office visit service to Relator on 12/11/12. Not only was the unbundled billing fraudulent on its own basis, but also the PA did not bill the service under her own NPI number. Had the PA billed the service correctly under her own NPI, the reimbursement was reduced by 15-20% for a "mid level provider".

63. According to the site  https://data.cms.gov/utilization-and-payment-explorer, Physician Assistant ("PA-C") named Candice Schultz, PA  NPI Number: 1881725638 billed a total of only 12 services to CMS for a grand total of $195.

The screenshot below accessed in October 2017 reflects the billings of Ms. Schults on behalf of STANFORD.

- 11 -
COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

059



64. Had STANFORD billed correctly, the correct coding for a "global surgery fee" with the global codes would <u>not</u> have resulted in any extra enrichment for the pre-op visit.

65. On information and belief that STANFORD's Department of Surgery had a custom and practice of similar unbundled billing of pre-operative visits, for federally funded patients, Relator obtained billing and payment data for multiple surgery providers in the STANFORD Department of Surgery. The reports reflected dates of service from 2010 through 2016.

66. Relator requested the reports in November 2016 but did not receive all of the full reports until on or about June 2017.

67. On or about March 9, 2017 Relator contacted STANFORD billing managers to discuss billing noncompliance issues.

68. On March 14, 2017 Relator emailed Dr. Dirbas the list of improper codes and billings.

69. On March 15, 2017 Relator notified STANFORD counsel Ms. Stoutenburg and Ms. Northrup, as well as Defendant Dr. Dirbas of the Medicare and non-Medicare billing noncompliance.

70. On September 8, 2017 Relator directly notified  Ms. Debra Zumwalt, General Counsel to STANFORD vis-à-vis electronic communication at zumwalt@STANFORD.edu of her institutions'  non-Medicare and Medicare billing claims non-compliance.  Ms. Zumwalt

COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

1   confirmed receipt of Relator's communication but declined to intervene or respond to the billing

2   discrepancies.

3   71. On September 10, 2017 Relator again notified  Ms. Debra Zumwalt, General Counsel to

4   STANFORD      at zumwalt@STANFORD.edu as well as Dr. Frederic Dirbas of the billing

5   noncompliance and asked to begin discussions with STANFORD on new billing processes to

    ensure compliance.

6   72. To date, Defendants and their representatives have failed to acknowledge or to take steps to

7   mitigate their unjust enrichment.

8   73. Whilst the over billing records of Dr. Dirbas and the relevant exhibits in this brief speak for

9   themselves, it is believed that this type of fraudulent billing is a wide spread practice throughout

10  STANFORD.

11

12              **DEFENDANTS VIOLATED CODING AND SEPCIAL FEDERAL LAW**

13           **PROTECTIONS FOR WOMEN UNDERGOING MASTECTOMY AND BREAST**

14                                  **SURGERY**

15  74. Defendants' upcoding and unbundling affected and currently affects many patients who

16      underwent  breast services at STANFORD.

17  75. Of particular interest in this action, are the upcoding in women's health care and breast care.

    76. About 1 in 8 U.S. women (about 12%) will develop invasive breast cancer over the course of

18      her lifetime. In 2017, an estimated **252,710** new cases of invasive breast cancer are expected

19      to be diagnosed in women in the U.S., along with **63,410** new cases of non-invasive (in situ)

20      breast cancer.  (Ref. https://seer.cancer.gov/statfacts/html/breast.html)

21  77. Data released by the Agency for Healthcare Research and Quality (AHRQ) show that while

22      breast cancer rates have remained constant, the rate of women undergoing mastectomies

23      increased 36 percent between 2005 and 2013, including a more than tripling of double

        mastectomies.                 (Ref.         https://www.ahrq.gov/news/newsroom/press-

24      releases/2016/mastectomy-sb.html)

25  78. Medicare is the expected primary payer for 44.5% of all hospital-based ambulatory surgery

26      center unilateral mastecotmies, and 14.7% of all bilateral mastectomies.

27

28

79. Therefore, the upcoding and unbundling in this action affect are of public interest and impact a large portion of healthcare spending.

80. Thus, these coding issues identified through this action demonstrate institutional areas for change. The system errors and similar coding discrepancies demonstrated in CMS records appeared to be of a larger magnitude than expected.

81. For instance, under information and belief, a query with OSHPD showed that the upcoding claims involved potentially some STANFORD discharges of 224 mastectomy patients in 2012, and 217 patients in 2013.

82. For example, based on Dr. Dirbas's NPI CMS billing of $1,618,328.50 plus larger non-CMS billings  and  Dr. Gordon Lee's  similar billings, STANFORD was asked to reply with institutional  timely compliance with correct coding initiatives. STANFORD failed to reply.

83. As STANFORD billed and received more than 700 million dollars in Federal funds from Medicare, corrective action as a result of this Action will result in immense benefit to beneficiaries, and save federal and state healthcare dollars.

84. This suit is also grounds for institutional awareness and improved coding through STANFORD's awareness of the foregoing CMS and Federal guidelines for correct coding.

85. Attached hereto as "Exhibit A" is a true and correct copy with minor redaction of the authenticated Records Request for Medicare CMS billing and enrichment data  of Dr. Frederick  Dirbas's and Dr. Gordon Lee's  revenue production at STANFORD through November 2016.

86. Attached hereto as "Exhibit B" is a true and correct copy of the CMS billing and enrichment data as a PDF of Dr. Frederick Dirbas's revenue production from 2010 through 2016.

87. Attached hereto as "Exhibit C" is a true and correct copy of the CMS guidelines for global surgical codes. CMS guidelines require that healthcare providers  may not charge for a separate evaluation and management code ("E&M") the day before a major surgery.

88. Attached hereto as "Exhibit D" is a true and correct copy of the STANFORD Annual Disclosure report of Stanford Healthcare For the Fiscal Year Ended August 31, 2016, dated January 25, 2017."

89. In 2017, informational copies of the aforementioned records were made available to STANFORD executives, STANFORD Counsel, Dr. Dirbas, and Ms. Zumwalt Vice President of STANFORD University and the  STANFORD Office of the General Counsel for the

- 14 -

COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC § 3729(a))

062

purpose of helping STANFORD and the department of Surgery to urgently correct the unbundling of any preoperative visits moving forward, and to also timely institute a billing compliance plan, which STANFORD declined to do.

**STANDARD MEDICARE AND "CMS" GLOBAL SURGERY FEE PRINCIPLES**

90. "CPT" is Correct Procedural Terminology and is the set of codes that standardize and codify standard medical services and surgeries. CPT designates separate codes for visits and separate codes for procedures. Office visits are coded as five digit codes beginning with " 992_ _"

91. CPT code 9920_ codes specify a new patient visit, or one not seen by the provider in three years.

92. CPT code 9921_ codes designate a return patient visit.

93. CPT's 5th digit for office visits designates the level of complexity, from 1 (the lowest complexity and least priced service) to 5 (the highest complexity and most expensive service). For example, Defendants in this action coded nearly all visits as 99205 or 99215, which demanded the highest payments. From 2010 to 2016, Defendants billed Medicare from $379 to $653 for a new patient CPT code 99205 visit . They billed Medicare $263 to $458 for a return patient, CPT code 99215 visit.

94. In comparison, from 2010-2016 Defendant DIRBAS billed Medicare CPT code 99211 ( the lowest service) *only once*. The charge for CPT 99211 was $23.

95. The "global surgical package", also called global surgery fee , includes all the necessary services normally furnished by a surgeon before, during, and after a procedure. CMS assigns a fixed total or " global" fee for a codified surgery. The global fee payment for a code encompasses the work required to perform the surgery as well as the before and after-care for the surgery.

96. Physicians who furnish the surgery and furnish all of the usual pre-and post-operative care may bill for the global package by entering the appropriate CPT code for the surgical procedure only. Separate billing is not allowed for visits or other services that are included in the global package. Thus, a surgeon cannot unbundle and bill separately for the pre-operative visit the day before surgery.

97. Office visits or "Evaluation and Management" services (herein "E/M" or " visits) the day before surgery are *included* in the surgical fee package, and not separately billable.

98. The national global surgery policy became effective for surgeries performed on and after January 1, 1992. A national definition of a *"global surgical package"* has been established to ensure that payment is made consistently for the same services across all A/B MAC (B) jurisdictions, thus preventing Medicare payments for services that are more or less comprehensive than intended. (Reference https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/GlobalSurgery-ICN907166.pdf)

99. Medicare established a national definition of a "global surgical package" to ensure that Medicare Administrative Contractors (MACs) make payments for the same services consistently across all jurisdictions.

100.   Medicare payment for a surgical procedure includes the pre-operative, intra-operative, and post-operative services routinely performed by the surgeon or by members of the same group with the same specialty. Physicians in the same group practice who are in the same specialty must bill and be paid as though they were a single physician.

101.   Medicare includes the following services in the global surgery payment when provided in addition to the surgery:  Pre-operative visits after the decision is made to operate. For major procedures, this includes preoperative visits the day before the day of surgery.

102.   The Medicare approved amount for these procedures *includes* payment for the following services related to the surgery when furnished by the physician who performs the surgery. Therefore, a global fee paid for performing a mastectomy (a major surgery) already includes in that total fee an amount for pre-operative and post-operative visits. Thus, the surgeon is not entitled to unbundle and bill separately for pre-operative visits.

103.   These services are not billable for payment:

- For minor procedures, this includes pre-operative visits the day of surgery.
- Intra-operative services that are normally a usual and necessary part of a surgical procedure
- All additional medical or surgical services required of the surgeon during the post-operative period of the surgery because of complications, which do not require additional trips to the operating room.
- Follow-up visits during the post-operative period of the surgery that are related to recovery from the surgery

- Post-surgical pain management by the surgeon.

104.   Global surgery applies in any setting, including an inpatient hospital, outpatient hospital, Ambulatory Surgical Center (ASC), and physician's office. When a surgeon visits a patient in an intensive care or critical care unit, Medicare includes these visits in the global surgical package.

105.   Major procedures have a 90-day post-operative Period which by definition includes one day pre-operative.  Also the day of the procedure is generally not payable as a separate service. Thus the total global period is 92 days,  counting 1 day before the day of the surgery, the day of surgery, and the 90 days immediately following the day of surgery.

106.   Pursuant to CMS, codes with "090" are major surgeries (90-day post-operative period).

107.   Medicare  has multiple national contractors that administrate its plans. Palmetto GBA is one such carrier.  Palmetto provides a simple tool for providers to lookup CMS global days.  (Ref. https://www.palmettogba.com/palmetto/global90.nsf/Front?OpenForm#step1)

108.   For example, entering the CPT code "19302" into this search tool reflects that this is a major surgery code for mastectomy with a 90 day global period. Thus the pre-operative visit before this surgery must not be unbundled and is not separately chargeable. (Screenshot inset below.)

Code: **19302**
Description: **P-mastectomy w/ln removal**
Modifier:
Global Days: **90 days**

109.   For example, entering the CPT code "19125" into this search tool reflects that this is a major surgery code for mastectomy with a 90 day global period. Thus, the pre-operative visit before this surgery must not be unbundled, and is not separately chargeable. (Screenshot inset below.)

Code: **19125**
Description: **Excision breast lesion**
Modifier:
Global Days: **90 days**

110.   Similarly, the following major surgery codes used by Defendants also have a 90 day global code which precludes Defendants from unbundling and billing separately for *any* pre-operative or post-operative visits:  19125, 19342, 19340, 19120.

## FEW EXCEPTIONS TO GLOBAL SURGICAL SERVICE FEES

- 17 -
COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

065

111.    In this action, Defendants routinely and freely upcoded, unbundled, and billed for pre-operative visits which were included in the payment for the global surgery fees. There is no evidence here that any exceptions applied to any cases. All cases were unbundled pre-operative visits which were charged after the decision for surgery was made. Some visits were billed for *post-operative* visits which were also included in the global surgery fee.

112.    However, it is noted that the following services are *not* included in the global surgical payment. These services may be billed and paid for separately: • Initial consultation or evaluation of the problem by the surgeon to determine the need for major surgeries. This is billed separately using the modifier "-57" (Decision for Surgery). This visit may be billed separately only for major surgical procedures.

113.    Evaluation and Management services (herein "E/M" or "visit") on the day before major surgery, or on the day of major surgery that result in the *initial decision to perform* the surgery are *not included* in the global surgery payment for the major surgery. Therefore, these services may be billed and paid separately.

## DEFENDANTS FREELY VIOLATED GLOBAL SURGERY FEE RULES

114.    Defendants performed major surgery services codes with "090" which qualify as global fees with a 90 day  post-operative period.

115.    Defendants unlawfully and knowingly unbundled and separately coded for pre-operative visits which they knew or should have known were part of the global surgery fee for major surgeries.

116.    Defendants  unlawfully and willfully unbundled and coded for  pre-operative visits done the day before major surgery. This unbundling practice yielded Defendants upwards of 20-50% greater and unjust enrichment from the surgery.

117.    For example, a mastectomy surgery is coded as "19301" and reimbursed approximately $900. Rather than accept $900 for the surgery, the surgeon deliberately upcoded the service to receive enrichment of $1200 for the same surgery. This increased revenue was obtained when the surgeon unlawfully unbundled and charged a separate fee for an extensive or comprehensive pre-operative office visit, which lawfully would have not been separately reimbursable. Had the surgeon billed and coded correctly, CMS would have paid him only $900 in total for the surgery and the pre-and postoperative visits.

118.   Here, the surgeons upcoded and billed for unbundled services, causing CMS to pay Defendants a total of $1200. Thus, Defendants obtained unjust enrichment through submitting false claims.

**REPRESENTATIVE STANFORD UNBUNDLED GLOBAL FEE CASES :  DR. DIRBAS**

119.   Representative cases of STANFORD's improper and unbundled billings are inset below.

- 99205 and 99214 are evaluation and management ("EM") or "office visit" codes.
- 19301 is a mastectomy code, a major surgery under CMS rules which has a 90 day "global" period.
- Here, STANFORD unlawfully unbundled and billed for a pre-operative visit on the day before surgery, which was actually part of the global surgery fee.

| 1/24/2012 | 1/24/2012 | 22 | 1 | 99205 |    |    |    | 2330 |
|-----------|-----------|----|---|-------|----|----|----|------|
| 2/21/2012 | 2/21/2012 | 22 | 1 | 99214 |    |    |    | 2330 |
| 2/22/2012 | 2/22/2012 | 22 | 2 | 19301 | LT | GC |    | 2330 |
| 4/4/2012  | 4/4/2012  | 22 | 2 | 19301 | 58 | RT | GC | 2330 |

120.   In the aforementioned case, on 2/22/12 CMS beneficiary underwent a major surgery coded as CPT 19301.

Code 19301 includes the day before and 90 days afterwards as a global surgical code. On 1/24/12 CMS was billed and paid for a comprehensive, high level, new patient E&M code as CPT 99205. The decision for surgery was made at that first visit.

On 2/21/12 CMS was wrongly billed and *paid* STANFORD for a separate extended evaluation and management "E&M" service as 99214. This was one day before surgery. Therefore, the professional services on 2/21/12 were included in the global fee paid to STANFORD for the surgery code.

121.   According to CMS, is it improper for a surgeon to have charged a visit the day pre-op for major surgery when he already did the "pre-op", made a decision for surgery, and scheduled surgery less than 30 days prior. If a surgeon prefers to meet with the patient the day or two before surgery to touch base and answer questions before surgery, that encounter is not separately chargeable and is encompassed in the global code and fee assigned for the surgery.

122.    As another representative example, Defendant Dr. Frederick  Dirbas unlawfully billed and received payment from CMS for a *pre-operative visit* the day before he performed a major surgery on the same beneficiary.

123.    Pursuant to CMS guidelines, the visit on 9/1/15 was included in the global surgery fee paid to the surgeon for the surgery performed on 9/2/15. Thus, the unjust enrichment from unbundling the pre-operative visit on 9/1/15 was unlawful and must be reimbursed to CMS. CPT codes 19120 and 19125 are used for excision of breast lesions, where attention to surgical margins and assurance of complete tumor resection is unnecessary.

124.    CPT code 99214 is an extended evaluation and management service, or office visit.

| 9/1/2015 | 9/1/2015 | 22 | 1 | 99214 |    |    |
|----------|----------|----|---|-------|----|----|
| 9/2/2015 | 9/2/2015 | 22 | 2 | 19125 | RT | GC |
|          |          |    |   |       |    |    |

125.    As an example, Defendant Dr. Frederick  Dirbas unlawfully billed and received payment from CMS for a pre-operative visit the day before he performed a major surgery on the same beneficiary.  Pursuant to CMS guidelines, the visit on 6/28/16 was included in the global surgery fee paid for the surgery performed on 6/29/16.  Thus the unjust enrichment from unbundling the pre-operative visit on 6/28/16  was unlawful and must be reimbursed to CMS.

126.    CPT code 99215 is the highest reimbursed return patient visit, a comprehensive evaluation and management code. It is unlawful to separately bill this code for a pre-operative visit.  CPT 19302 is a major surgery code with a 90 day global fee basis.

| Date of Service | CPT code | Modifier |    |
|-----------------|----------|----------|----|
| 6/9/2016        | 99205    |          |    |
| 6/28/2016       | 99215    |          |    |
| 6/29/2016       | 19302    | LT       |    |

127.    As another example, Defendants Dr. Dirbas and STANFORD billed a new patient visit on 5/19/16. On that date a decision for mastectomy was made. He then unbundled and unlawfully billed a pre-operative visit on 6/2/16.  On 6/6/16 he performed a modified radical mastectomy surgery.

Per CMS, the visit on 6/2/16 was included in the global fee paid to Dr. Dirbas for the mastectomy.

- 20 -
COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

068

Thus, Dr. Dirbas was not entitled to "double dip" and collect unjust enrichment for a visit which was calculated and included in CMS global surgery fee to him.

| Date of Service | CPT code | Description |
| --- | --- | --- |
| 5/19/2016 | 99205 | New patient comprehensive exam on May 19, 2016 and decision for surgery was made. Surgery scheduled on 6/6/16. |
| 6/2/2016 | 99215 | Medicare was unlawfully charged for a high level comprehensive return visit. By CME rules, this visit 4 days before surgery is not separately chargeable. |
| 6/6/2016 | 19307 | Surgery date where Global surgery code for modified radical mastectomy including removal of under arm lymph nodes has a 90 day global period and includes the pre-op visit. |

128.   As another example, Defendants Dr. Dirbas and STANFORD unlawfully billed and received reimbursement for a pre-operative visit on 6/21/16. CPT code 99215 is the highest paying office visit code for a return patient. This illegal unbundling practice resulted in unjust enrichment of approximately $200 to Defendants Had it not been for Defendants' unlawful upcoding and unconscionable billing, CMS would have paid at least 20% less for the total care of this beneficiary.

| Date of Service | CPT code | Description |
| --- | --- | --- |
| 6/7/2016 | 99205 | New patient comprehensive exam charged on June 7, 2016 and decision for surgery was made. Surgery scheduled for 6/22/16. |
| 6/21/2016 | 99215 | Medicare was unlawfully charged for a pre-operative visit as a high level comprehensive return visit. By CME rules, this visit 1 day before surgery is *not* separately chargeable. |
| 6/22/2016 | 19301 | Global surgery code for Partial mastectomy or lumpectomy of breast is a major surgery code with a 90 day global fee and includes the pre-operative and post-op care. |

129.   As another example, Defendants Dr. Dirbas and STANFORD unlawfully charged and received CMS payment for a pre-operative visit on 11/29/12. CPT code 99214 is the 2nd highest paying office visit code for a return patient.

This illegal unbundling practice resulted in unjust enrichment of approximately $130 to Defendants. Had it not been for Defendants' unlawful upcoding and unconscionable billing, CMS would have paid at least 20% less for the global care of this beneficiary.

| Date of Service | CPT code | Description |
|---|---|---|
| 11/20/2012 | 99205 | Defendants charged a new patient visit code for the highest level and highest paying code. The decision to proceed with surgery was made and was scheduled for 12/17/12. |
| 11/29/2012 | 99214 | Defendants unlawfully unbundled and billed for a pre-operative visit  before surgery. |
| 12/17/2012 | 19301 | This mastectomy  code is a major surgery  with a 90 day global service.  The global fee reimbursement includes the pre-operative and postoperative care . |

130.    As another example, Defendants Dr. Dirbas and STANFORD unlawfully charged a pre-operative visit on 8/14/12.

| Date of Service | CPT code | Modifier | Description |
|---|---|---|---|
| 8/2/2012 | 99205 | GC | New patient comprehensive visit charged and decision for surgery made. Surgery scheduled for 8/22/12. |
| 8/14/2012 | 99215 | | Defendants unlawfully billed for a pre-operative visit. They coded it as the highest paying comprehensive visit. |
| 8/22/2012 | 19301 | LT | Patient underwent surgery (mastectomy), a major surgery code with a 90 day global. |
| 8/22/2012 | 38525 | 51 | Open excision of lymph nodes is also a 90 day global code. Thus the pre-operative visit was included in this fee. |

131.    As another example,  Defendants unlawfully billed a pre-operative visit on 2/7/2013.  CPT code 99215 is the highest paying office visit code for a return patient. This illegal unbundling practice resulted in unjust enrichment of approximately $200 to Defendants. Had it not been for Defendants' unlawful upcoding and unconscionable billing, CMS would have paid at least 20% less for the care of this beneficiary.

(Inset from Exhibit "B":  CMS production of billing and payment records to Defendants)

| Date of Service | CPT code | Description |
|---|---|---|
| 1/24/2013 | 99205 | New patient comprehensive code billed. Decision for surgery made and mastectomy scheduled for 2/20/13. |
| 2/7/2013 | 99215 | Unlawfully billed a pre-operative visit. Used the highest paying code. |
| 2/20/2013 | 38525 | Lymph node Dissection with a 90 day global fee service. |
| 2/20/2013 | 19303 | Mastectomy major surgery code with a 90 day global fee service |

132.    As another example, Defendants unlawfully billed a pre-operative visit on 9/1/2015.  CPT code 99215 is the highest paying office visit code for a return patient. This illegal unbundling

- 22 -

COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

practice resulted in unjust enrichment of approximately $200 to Defendants Had it not been for Defendants' unlawful upcoding and unconscionable billing, CMS would have paid at least 20% less for the care of this beneficiary.

| 217 | | | | | I6820 8 | 104331574 0 | 6/30/2015 | 1 | 99205 | | |
|-----|---|---|---|---|--------|-------------|-----------|---|-------|---|---|
| 217 | | | | | I6820 8 | 104331574 0 | 9/1/2015 | 1 | 99214 | | |
| 217 | V438 2 | | | | | | 9/2/2015 | 2 | 19125 | R T | GC |

62. As an example, Defendants unlawfully billed an office visit for 9/28/10 in the global post-operative period. Per CMS, the major surgery codes including CPT 19125 and 19126 have a 90 day global period. Thus, the charge on 9/28/10 was only 10 days after surgery and should not have been billed.

Inset from Exhibit B:

| Date of Service | | | CPT code | Modifier | | | | Diagnosis | Provider UPIN |
|-----------------|---|---|----------|----------|---|---|---|-----------|---------------|
| 9/9/2010 | | 1 | 99204 | | | | | 2330 | 00G589351 |
| 9/20/2010 | | 2 | 19125 | RT | | | | 2330 | 00G589351 |
| 9/20/2010 | | 2 | 19126 | 59 | | | | 2330 | 00G589351 |
| 9/28/2010 | | 1 | 99213 | | | | | 79380 | 00G589351 |

133.   In these cases, the surgeon always coded maximum fees and high level codes as a 99205 for new patients, and 99215 or 99214 for return patients. CPT code 99205 is the highest paying office visit code for a new patient. CPT codes 99215 is the highest paying office visit code for a return patient.

134.   Defendants' illegal unbundling practice resulted in unjust enrichment of approximately $200 per patient to Defendants. Had it not been for Defendants' unlawful upcoding and unconscionable billing, CMS would have paid at least 15-20% *less* for the care of each beneficiary.

### DEFENDANTS UPCODED AND BILLED UNDER THE PHYSICIAN NPI WHEN A MID LEVEL PROVIDER RENDERED SERVICES.

135.   Defendant surgeon Dr. Dirbas used a mid level provider (physician assistant) to provide for much of the initial, pre-operative, and post operative services for patients. He nearly exclusively charged all services under his own NPI regardless of if the mid level provider rendered the services, especially the pre-operative charges.

136.   Defendant surgeon Dr. Dirbas regularly charged for the highest level of office visit for new patients as CPT "99205".  By time requirements alone are this level code is a very lengthy 60 minute visit.  Therefore, the surgeon's billed fees for E&M code  "99205" in one day would amount to 1 hour per patient. If his charges were to be believed, he would, on a 7-hour work day, have only an ability to see and bill 7 patients in this type of exam, and would not have time to see other lower level patients or do any operation.

137.   Defendant surgeon Dr. Dirbas unlawfully billed a pre-operative visit in violation of CMS global surgery fee rules. In addition, Defendants would illegally bill for these services provided by his physician assistant.


## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**CIVIL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-33 ("FCA"); "QUI TAM ACTION."**

**By Plaintiff United States of America**

**Against all of the STANFORD Defendants and DOES 1 through 50**

138.   Plaintiffs incorporate by reference and reallege the preceding paragraphs.

139.   This is a claim for damages and penalties under the Civil False Claims Act, codified at 31 U.S.C. §§ 3729-33 brought by the United States of America.

140.   It is illegal to:

(1)    Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.

(2)    Knowingly present multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud.

(3)     Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(4)     Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

141.    It is illegal to "knowingly assist or conspire with any person" to do any of the following:

(1)     Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

142.    Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA") or "Qui Tam" actions  provide that every person who violates this code section is subject to civil penalties of tens of thousands of dollars of penalties per act.

143.    By virtue of the acts described above, STANFORD Defendants violated the FCA.

144.    STANFORD  Defendants submitted false, fraudulent or misleading bills to payors by regularly and freely unbundling and separately charging for pre-operative visits which were part of a global fee schedule, and thus not eligible for separate billing.

145.    STANFORD Defendants submitted false, fraudulent, or misleading bills to payors by unbundling and charging for pre-operative and sometimes post-operative visits that are already captured in other revenue codes or in the surgeon's separate bills.

146.    The STANFORD Defendants submitted false, fraudulent, or misleading bills to CMS through use of time-based or complex level billing of  the highest level paying codes designating comprehensive visits for pre-operative services.  These separate pre-operative charges for visits implied that the patient is being billed separately for "free" visits before or after surgery when in fact all such services are captured in other codes or in the surgeon's separate bill.

147.    The STANFORD Defendants submitted false, fraudulent or misleading bills to payors by inflating the bills through unjustified pre-operative visit , thereby rendering illusory any global surgery fees that  CMS set or the insurers had negotiated with the STANFORD Defendants, either on their own or through national correct coding guidelines.

148.    As a result of the above-described conduct, Plaintiffs are entitled to damages as provided for by 31 U.S.C. §§ 3729-33.

### SECOND CAUSE OF ACTION

**California Insurance Frauds Prevention Act, Ins. Code Section 1871.7**

**By Plaintiff the State of California**

**Against all of the STANFORD Defendants and DOES 1 through 50**

149.    Plaintiffs incorporate by reference and reallege the preceding paragraphs.

150.    This is a claim for damages and penalties under the Insurance Frauds Prevention Act, codified at Cal. Ins. Code section 1871.7, brought by the State of California.

151.    Penal Code section 550(a) makes it illegal to:

(1)    Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.

(2)    Knowingly present multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud.

(3)    Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(4)    Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

(5)    Knowingly submit a claim for a health care benefit that was not used by, or on behalf of, the claimant.

152.    Penal Code section 550(b) makes it illegal to "knowingly assist or conspire with any person" to do any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or

1    payment or other benefit pursuant to an insurance policy, knowing that the statement contains any

2    false or misleading information concerning any material fact.

3    153.    Insurance Code section 1871.7(b) provides that every person who violates Penal Code section

550 is subject to civil penalties of between $5,000 and $10,000, plus an assessment of not more

4    than three times the amount of each claim for compensation.

5    154.    By virtue of the acts described above, STANFORD Defendants violated the IFPA.

6    155.    STANFORD  submitted false, fraudulent or misleading bills to

7    payors by regularly and freely unbundling and separately charging for pre-operative visits

8    which were part of a global fee schedule, and thus not eligible for separate billing.

9    156.    STANFORD submitted false, fraudulent, or misleading bills to payors by unbundling and

10    charging for pre-operative and sometimes post-operative visits that are already captured in other

revenue codes or in the surgeon's separate bills.

11    157.    STANFORD submitted false, fraudulent, or misleading bills to payors through use of time-

12    based or complex level billing of the highest level paying codes designating comprehensive visits

13    for pre-operative services.  These separate pre-operative charges for visits implied that the patient

14    is being billed separately for "free" visits before or after surgery

15    when in fact all such services are captured in other codes or in the surgeon's separate bill.

16    158.    STANFORD submitted false, fraudulent or misleading bills to payors by inflating the bills

17    through unjustified pre-operative visit , thereby rendering illusory any global surgery fees that

CMS set or the insurers had negotiated with the STANFORD Defendants, either on their own or

18    through national correct coding guidelines.

19    159.    As a result of the above-described conduct, Plaintiffs are entitled to damages as provided for

20    by Insurance Code section 1871.7.

21

22

### THIRD CAUSE OF ACTION

23

**Declaratory and Injunctive Relief, Ins. Code Sections 1871.7(b)**

24

**By Plaintiff the State of California Against All Defendants and DOES 1-50**

25

26    160.    Plaintiffs incorporate by reference and reallege the preceding paragraphs.

27

28    COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

1   Insurance Code Section 1871.7(b) empowers the Court "to grant other equitable relief, including
2   temporary injunctive relief: as is necessary to prevent the transfer, concealment, or dissipation of
3   illegal proceeds, or to protect the public."

4   161.   The Commissioner seeks equitable relief pursuant to Ins. Code section 1871.7(b), because
5   unless equitable relief is granted, Defendants are likely to continue their unlawful conduct after
    the conclusion of this litigation. The State of California will continue to suffer damage if
6   Defendants continue their fraudulent activities, as health insurance rates will continue to increase
7   more than they otherwise would or should.

8   162.   As described above, Defendants use contractual provisions to prevent challenges to fraudulent
9   billings. These contractual provisions are contrary to the Insurance Code and public policy, and
10  should therefore be declared unenforceable pursuant to Civil Code section 1667.

11
12                                        **PRAYER**

13            **ON BEHALF OF PLAINTIFF UNITED STATES OF AMERICA**

14  WHEREFORE, the United States prays for judgment against Defendants as

15      a.   Judgment in an amount equal to three times the amount of each
16           claim for compensation submitted by the Defendants from the commencement of the statutory
           period through the time of trial;

17      b.   Liability to the United States Government for a civil penalty of not less than $5,000 and not
18           more than $10,000, as adjusted by the Federal  Civil Penalties Inflation Adjustment Act of
19           1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages
20           which the Government sustains because of the act of that person from the commencement of
21           the statutory period through the time of trial;

22      c.   Disgorgement of profits unlawfully acquired by Defendants;

23      d.   An award to Relator of the maximum amount allowed pursuant to Civil False Claims Act, 31
24           U.S.C. §§ 3729-33 ; Attorneys' fees, expenses and costs of suit herein incurred, pursuant to
             Civil False Claims Act, 31 U.S.C. §§ 3729-33.

25      e.   An injunction against each of the defendants for any continuing conduct violating the Civil
26           False Claims Act, 31 U.S.C. §§ 3729-33.

27

28   COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

f.   An order directing Defendants to cease and desist from violating Civil False Claims Act, 31 U.S.C. §§ 3729-33.

g.   An order and findings declaring that any contractual provisions used by Defendants to prevent challenges to fraudulent billings are against the public policy of the United States of America and therefore unenforceable.

Such other and further relief as the Court deems just and proper.

## FOR PLAINTIFF THE STATE OF CALIFORNIA

WHEREFORE, the State of California prays for judgment against Defendants as

a.   Judgment in an amount equal to three times the amount of each claim for compensation submitted by the Defendants from the commencement of the statutory period through the time of trial;

b.   A civil penalty of $10,000 for each violation of Insurance Code section 1871.7 from the commencement of the statutory period through the time of trial;

c.   Disgorgement of profits unlawfully acquired by Defendants;

d.   An award to Relator of the maximum amount allowed pursuant to Insurance Code section 1871.7; Attorneys' fees, expenses and costs of suit herein incurred, pursuant to Insurance Code section 1871.7;

e.   An injunction against each of the defendants for any continuing conduct violating Insurance Code section 1871. 7;

f.   An order directing Defendants to cease and desist from violating California Insurance Code section 1871.7;

g.   An order and findings declaring that the contractual provisions used by Defendants to prevent challenges to fraudulent billings are against the public policy of the State of California and therefore unenforceable.

Any such other and further relief as the Court deems just and proper.

1   JURY TRIAL DEMANDED. Damages Sought Will be In An Amount To Be Proven At Trial.

2

3                  Respectfully Submitted,                    Dated: November 26, 2017

4

5          Plaintiffs the United States of America , and the State of California.

6   ex.  relator EMILY ROE,   on behalf of Plaintiffs.

7

8    Date:  November 26, 2017        s/ EMILY ROE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am over the age of 18 years. I have personal knowledge of the facts upon which I make this declaration, and if called upon to testify, under oath, I could and would competently testify thereto. On the date below I caused to be served the accompanying correspondence and within Complaint on the required parties and filed with the court in this action, as follows:

☑ (service by personal service ) By uploading a true and correct copy thereof for personal service to the attached service list.
☑ ( Correspondence by mail)  By placing a true and correct copy of the correspondence to the attached  service list in a sealed envelope, addressed as indicated on the service list, with postage thereon fully paid, and depositing in the U.S. Mail.

United States Attorney General for the District of California
Ms. Dorothy Schouten, Chief, Civil Division
Office of the United States Attorney
300 N. Los Angeles Street, 7th Floor, Suite 1200
Los Angeles, CA 90012
(213) 894-2879 (Phone)/ (213) 894-7819 (Fax)

Attorney General of the State of California
The Attorney General's Office
California Department of Justice   Attn: False Claims Unit
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Chief Counsel, California Department of Insurance
Adam M. Cole, State Bar No. 145344
Richard Krenz, State Bar No. 59619
Antonio A. Celaya, State Bar No. 133075
**45 Fremont Street, 21 Floor**
**San Francisco, CA 94105**
Telephone: (415) 538-4117/ Facsimile:(415) 904-5490
Attorneys for Mr. Dave Jones, Insurance Commissioner of the State of California and the California Department  of Insurance

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 27 th day of November 2017, at Orange, California.

s/ EMILY ROE A.
EMILY ROE A.
Declarant/ Relator

- 31 -
COMPLAINT United States ex. relator Emily Roe. vs. Stanford et al. 376 Qui Tam (31 USC  § 3729(a))

079

# Exhibit  X

1  XAVIER BECERRA
   Attorney General of California
2  KATHLEEN FOOTE
   Senior Assistant Attorney General
3  MICHAEL JORGENSON
   Supervising Deputy Attorney General
4  CHERYL LEE JOHNSON (SBN 66321)
   ESTHER LA (SBN 160706)
5  EMILIO VARANINI (SBN 163952)
6  Deputy Attorneys General
    455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
    Telephone: 415-510-3541
8    Fax: 415-703-5480
    E-mail: Emilio.Varanini@doj.ca.gov
9  *Attorneys for Plaintiff, People of the State of*
10 *California*

   Exempt from Filing Fees
   (Govt. Code §6103)

   ENDORSED
   FILED
   San Francisco County Superior Court

   MAR 29 2018

   CLERK OF THE COURT
   BY: ROSSALY DE LA VEGA
          Deputy Clerk

11

12

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14           **FOR THE CITY AND COUNTY OF SAN FRANCISCO**

15                              CGC-18-565398

16 | **PEOPLE OF THE STATE OF** | **COMPLAINT FOR VIOLATIONS OF**
   | **CALIFORNIA EX REL. XAVIER BECERRA,** | **THE CARTWRIGHT ACT (BUS. &**
17 | | **PROF. CODE § 16720** *et seq.***)**
   |                        **Plaintiff,**
18 |
   |           **v.**
19 |
   | **SUTTER HEALTH,**
20 |
   |                        **Defendant.**
21

22      California Attorney General Xavier Becerra brings this civil antitrust action on behalf

23 of the People of the State of California, in his law enforcement capacity, to enjoin defendant

24 Sutter Health and its affiliates (**"Sutter"**) from unlawful conduct in violation of California's

25 Cartwright Act, for disgorgement of overcharges, and to restore competition in healthcare

26 markets in California. The People of the State of California, ex rel. Xavier Becerra, Attorney

27 General (**"the People"**) allege the following:

28

## I.      **INTRODUCTION**

1.      Healthcare costs in California have rapidly increased, far outstripping population growth or inflation.  For example, hospital revenue in California over the ten-year period from 1999-2009 increased 111% while population increased some 15% during the same time period and utilization of hospitals only increased from 4% to 9%.

2.      Healthcare costs in Northern California are higher than in other areas of the state. This is a trend that has long existed.  For example, a March 2011 analysis from *The Los Angeles Times* concluded that "[o]n average, hospitals in Northern California's six most populous counties collect **56% more revenue** per patient per day from insurance companies and patients than hospitals in Southern California's six largest counties . . . ."

3.      A July 2012 CALPIRG Education Fund report focused on the significant geographic variation in hospital charges in California for common, elective, inpatient surgeries performed at hospitals across the state—and created an index set forth below that can be used to compare charges for the 12 most common surgeries by regions:

Charge Index for 12 Common Surgeries by Region



4.      These increased healthcare costs in Northern California endure today.  For example, a 2015 study found that insurance premiums offered through Covered California,

2

082

the state-run health insurance Exchange established by the Affordable Care Act, are 16 to 48 percent more expensive in San Francisco than in Southern California.

5.    In turn, these increased healthcare costs have adverse consequences for the general economy of Northern California and thus for the state as a whole.  Most employer-sponsored insurance requires cost-sharing, through contributions towards premiums, deductibles, coinsurance and other out of pocket costs for employees. Higher prices from health care providers can thus be passed on to employees through each of these cost-sharing arrangements.

6.    Moreover, economists have shown that when health insurance premiums increase, workers' wages fall or rise more slowly. Thus, higher prices from health care providers further harm workers by increasing premiums and thus placing downward pressure on wages. This implies that every excess dollar that health care providers charge insurers for treating enrollees in employer-sponsored plans comes, to a large extent, directly out of workers' pockets.  Rising premiums may affect workers in other ways with one Harvard University study estimating that, on average, the effects of a 10% economy-wide increase in health insurance premiums include the following:

- A 1.2 percentage point reduction in the aggregate probability of employment;
- Among the employed population, a 1.9 percentage point reduction in the probability of working full time instead of part time;
- A 2.4% reduction in hours worked; and
- Among workers who have insurance coverage, a 2-3% decrease in wages.

7.    Economic studies have found that the increased costs in providing healthcare services that arise from increased market concentration do not lead to improvements in the quality of healthcare.

8.    That these increased costs are due to increased market concentration in healthcare provider markets in Northern California, and no other factors, has been observed by studies and public analysis.  For example, a 2018 study found unadjusted inpatient procedure prices are 70% higher in Northern California than Southern California corresponding to hospital market

3

083

1    concentration being 110% higher in Northern California than Southern California, while input

2    cost adjusted inpatient procedure prices are 32% higher in Northern California than Southern

3    California.

4        9.    Much of the increased cost of healthcare in Northern California is attributable to

5    Sutter and its anticompetitive contractual practices which it has imposed as a result of its

6    market power. Specifically, Sutter embarked on an intentional, and successful, strategy of

7    securing market power in certain local markets in Northern California.

8        10.    Sutter's market power in certain markets has enabled it to increase prices, and

9    thus costs, for its healthcare services.  A 2008 U.S. Federal Trade Commission retrospective

10   study of the merger of Alta Bates, owned by Sutter, and Summit Medical Center found that

11   the contracted price increases for Summit following the merger ranged from approximately

12   29% to 72% depending on the insurer, compared to approximately 10% to 21% at Alta

13   Bates, and that the Summit post-merger price increases were among the highest in California.

14       11.    Even though Sutter intentionally embarked on its strategy of acquiring market

15   power at the time of that merger, the district court reviewing the Attorney General's legal

16   challenge to that merger found that Sutter would be unable to use its market power to raise

17   prices because insurers could employ steering and tiering practices to incentivize patients to

18   use lower-cost alternatives to Alta Bates or Summit for medical care.  As the district court

19   explained in relying on Sutter documents and Sutter expert testimony:

20       When faced with price increases, there are numerous mechanisms through

21       which health plans can discipline hospitals. (Defs.' Ex. 1021; Defs.' Ex. 1012,
Decl. of Jay M. Gellert at 14–15; Hr'g Tr. at 716:18–718:17.) The simplest, but

22       rarely used, is to exclude hospitals from the plans' provider networks. (Defs.'

23       Ex. 1026, Dep. of John Sweeney at 17–21.) The primary mechanism by which
MCOs and IPAs keep prices low is through the "steering" of patients. In

24       managing their patients' illnesses, physicians are often responsible for deciding

25       the components to be used in providing treatment, including the hospitals to
which their patients are admitted. In steering, MCOs or IPAs provide incentives

26       to or direct physicians to refer their patients to certain hospitals. Such incentives

27       may include direct financial incentives as well as more general risk-sharing

28       arrangements that reward physicians for providing care in the most cost-

4

effective environment. When faced with rising prices, MCOs can attempt to steer patients to lower cost health care providers and away from the hospital imposing a price increase, thereby pressuring the hospital to eliminate the price increase. (Defs.' Ex. 1013, Pugh Report ¶ 57.) As one witness who has been on both sides of the table explained, "there is a discipline going both ways" because "we need them, but simultaneously they need us." (Defs.' Ex. 1012, Gellert Decl. at 18, 40.)

Hospitals, in general, have high fixed costs, both in terms of the physical plant and equipment as well as the high cost of maintaining a highly skilled staff. At the same time, their profit margins are thin. (Hr'g Tr. at 508:3–12; 706:21 – 707:17; Defs.' Ex. 1013, Pugh Report ¶ 59; Defs.' Ex. 1001, Guerin–Calvert Report ¶ 63.) Steering has been quite effective in disciplining prices because hospitals are sensitive to declines in volume. (Defs.' Ex. 1001, Guerin–Calvert Report ¶¶ 63–64; Defs.' Ex. 1013, Pugh Report ¶¶ 59–61; Defs.' Ex. 1012, Gellert Decl. at 14.)

12.   Thus, Sutter understood and argued to that court that steering and tiering by insurers are important tactics by which insurers can provide access to competitively priced healthcare services and provide insurers with bargaining leverage against healthcare providers with dominant positions in local markets.

13.   But through its anticompetitive conduct, Sutter leveraged and maximized its market power in certain local healthcare markets across all markets and prevented insurers from using steering and tiering to counter its excessive pricing. And it cloaked its conduct to prevent awareness by employers, enrollees, and the public.  Sutter is not merely a provider with a few hospitals or one whose dominance is limited to a county or part of a county with geographical impediments preventing easy access to alternatives.  Rather, Sutter became a large multi-market healthcare system with at least 24 state-licensed hospitals throughout Northern California. Sutter reports that within its network are 24 separately-licensed hospitals and 4,311 acute care beds; 35 outpatient centers; physicians' organizations with 5,500 members and 12,000 other physicians who partner with Sutter; medical research facilities; region-wide home health, hospice, and occupational health services; and long-term care centers.

both)  as the effects of Sutter's anticompetitive conduct are the same as to Self-Funded Payors as well as Commercial Insurance Plans and as any equitable relief imposed should not penalize the victims of Sutter's anticompetitive conduct by forcing them to become Self-Funded Payors to avail themselves of the benefits of these proposed affirmative acts.

F.  Sutter be ordered, under Section 16754.5 of the Cartwright Act so as to restore competition, to disgorge overcharges to Self-Funded Payors arising from its anticompetitive acts.

G.  The People recover their costs of suit, including reasonable attorneys' fees, as provided by law.

H.  The People receive such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated:  March 29, 2018

XAVIER BECERRA
Attorney General of the State of California

By:

Emilio E. Varanini (#163952)
Deputy Attorney General

Complaint of the People of the State of California

## ATTORNEY GENERAL XAVIER BECERRA
## TAKES ACTION AGAINST SUTTER HEALTH

*Attorney General Becerra filed an antitrust action against Sutter Health for illegal, anti-competitive conduct. Today's enforcement action seeks to restore competition in California's healthcare markets and stop this behavior.*

Attorney General Becerra's lawsuit follows an investigation into the practices of the state's healthcare systems due to the **wide disparities between Northern and Southern California healthcare cost**s. A *Los Angeles Times* analysis found that, on average, hospitals in Northern California's six most populous counties collect 56% more revenue per patient per day from insurance companies and patients than hospitals in Southern California's six largest counties.  A recent University of California, Berkeley report found further evidence that the consolidated market in Northern California has led to higher prices for consumers, finding that the average hospital inpatient procedure the cost $131,586 in Southern California and $223,278 in Northern California.

The complaint alleges that **Sutter engaged in anticompetitive behavior**. These illegal practices resulted in **higher prices for health care in Northern California** by:
- Establishing, increasing and maintaining Sutter's power to control prices and exclude competition;
- Foreclosing price competition by Sutter's competitors; and
- Enabling Sutter to impose prices for hospital healthcare services and ancillary products that far exceed the prices it would have been able to charge in an unconstrained, competitive market.

The complaint alleges that Sutter did this by:
- **Preventing insurance companies from negotiating with it on anything other than "all or nothing" system-wide basis**. This means that health insurers are required under the terms of contract with Sutter Health to negotiate with all the Sutter Health system or face termination of their contract, which can be very disruptive for patients;

- **Preventing insurance companies from giving consumers more low-cost health plan options**. For example, an insurance company might charge a $200 out-of-pocket cost for an outpatient surgery performed by a facility outside of the preferred group and $100 for outpatient surgery performed by a facility inside the preferred group.

- **Setting excessively high out-of-network rates** for patients who must seek care outside of their provider network.  These rates exceed those of Sutter's competitors and Medicare rates;

- **Restricting publication of provider cost information and rates**.  Transparency is a critical tool to help patients to choose quality, cost-effective care.

These business practices violate the **Cartwright Act.**

087

# Exhibit  Y

## DECLARATION OF TOMIYA O. GAINES

I, Tomiya Gaines, make the following declaration based on my personal knowledge of these facts.

1. I am a certified professional coder with the designation of Certified Professional Coder ("CPC"), Certified Professional Medical Auditor (CPMA) and a member in good standing of the American Academy of Professional Coders (AAPC), the highest certifying institution for healthcare billing in the U.S.

2. I make the following statements and would be able to competently testify to these same facts. I would be able testify to these matters, and could do so in the Los Angeles district.

3. As a professional and certified medical coder, I have written a book on the subject entitled "*2012 Surgery Global Reference Guide*." I personally have over 15 years of combined claims reimbursement and coding experience and expertise.

4. On April 20, 2015 I was hired by Stanford Health Care ("SHC")  and University Healthcare Alliance ("UHA") as a " Coding Quality Coordinator", where I was employed to April 15, 2016. On April 29, 2015 shortly after employment, SHC and UHA promoted me to "Coding and Charge Capture Supervisor."

5. University Healthcare Alliance is a medical foundation proudly owned by Stanford Health Care and Stanford University. Stanford University's Healthcare Alliance logo was present on nearly all manuals and documents University Healthcare Alliance. Prior to my employment, I went to Stanford Hospitals and University campus in Stanford to obtain employment clearances and the like. For University Healthcare Alliance. Based on information and belief, I understand that University Healthcare Alliance and Stanford are one and the same. University Healthcare Alliance is proudly owned by Stanford Health Care and Stanford Medical Center.

6. Stanford Healthcare's University Healthcare Alliance institutional,  and billing and coding department wide written manuals  and directives mandated and  instructed coders and billers to code high, and maximal in *every* healthcare care claim regardless of controverting  medical documentation,  lack of medical necessity, and  failure to comply with Current Procedural Terminology ("CPT"), Correct Coding Initiatives (CCI) and, American Medical Association ("AMA") Guidelines.

7. Many times during my employment with Stanford Healthcare's University Healthcare Alliance and specifically early in my employment on April 28, 2015 I notified Stanford Healthcare's University Healthcare Alliance Executive Management, Directors & Supervisors including Terri Fischer that Stanford Healthcare's University Healthcare Alliance was upcoding for stress echograms resulting in unjust enrichment per claim. I specifically notified Stanford Healthcare's University Healthcare Alliance that their willful misrepresentation of the facts; and willful disregard for coding

conventions was in violation of American Academy of Professional ("AAPC") Code of Ethics and such practices violated Centers for Medicare & Medicaid Services ("CMS") Electronic Media Claims ("EMC"), Electronic Data Interchange ("EDI") Agreement, the Dodd Frank Act and Federal False Claims Act.

8. Stanford Healthcare's University Healthcare Alliance failed to correct in any manner their identified upcoding billing schemes. In July 2015 SHC management issued verbal reprimands to me for identifying the improper billing schemes and refused to correct or re-process  prior improper claims. Stanford Healthcare's University Healthcare Alliance management also refused to correct their institutional wide upcoding schemes or instructions to the coding department.

9. During my employment as a coder at Stanford Healthcare's University Healthcare Alliance, Stanford willfully and freely employed "schemes" intended to defraud Medicare, Medicaid, and other commercial payers.

10. Also during my year long term at Stanford Healthcare's University Healthcare Alliance, my supervisors regularly issued directives to coders that includes but is not limited to intentionally unbundling and upcoding healthcare claims.  Many of Stanford Healthcare's University Healthcare Alliance billing schemes directly targeted  many cardiac (heart) procedure codes with Stanford Healthcare's University Healthcare Alliance stated intent to  obtain maximal reimbursement regardless of lack of medical documentation or coding compliance . I was regularly instructed by supervisors to process healthcare claims using proprietary Stanford Healthcare's University Healthcare Alliance "cheat sheets" which were intended to result in fraudulently gained revenue.

11. Stanford's University Healthcare Alliance fraudulently billed at least four (4) healthcare services in reckless disregard for the truth.

12. Stanford Healthcare's University Healthcare Alliance routinely submitted false and/or fraudulent healthcare claims to CMS under the penalty of perjury for several high frequency services including but not limited to, (1) complete stress echocardiograms, (2) critical care services, and (3) cardiac monitoring. Stanford Healthcare's University Healthcare Alliance would bill CPT code for "Complete stress echocardiogram", with documentation at best for "limited echo" which resulted in a $14.00 overpayment capture per adjudicated claim.

13. There were over 82,000 billings for stress echocardiogram(s) during a 9-month period, over 9,111 stress echocardiograms billed per month. The margin between complete stress echo vs limited stress echo was (-$14.00). If 50% of facts of complete stress echocardiograms billed were intentionally misstated, the sum of Stanford Healthcare's University Healthcare Alliance recklessness would result in approximately $800,000 fraudulently captured revenue to SHC per year; and up to **$200,000,000 ($200M) in missed revenue**. *(See Illustration Below)*

False Claims Act (FCA)(31 U.S.C. 3729)
$800,000 Fraudulently Captured Revenue +
$2,400,000 (3x Overpayment) +
9,111 x $21,916 per fraud claim= $199,676,676
**$202,876,676 Missed Revenue**

*This illustration depicts (1) type of service billed within a nine (9) month period.*

14. Stanford Healthcare's University Healthcare Alliance medical documentation for services rendered lacked the Center for Medicare and Medicare ("CMS") standard to qualify as a billable event.

15. It is my belief that Stanford Healthcare's University Healthcare Alliance blatant disregard and willful negligence of CPT, CCI, and proper policies and procedures set forth by the Office of Inspector General ("OIG") was and is willful, and intended to capture greater revenue that Stanford Healthcare's University Healthcare Alliance know they would not otherwise be entitled to had they truthfully adjudicated claims.

I swear under penalty of perjury that the foregoing is true and correct and that this declaration was signed on January 9, 2019 in the State of California.

TOMIYA GAINES

Exhibit  Z

# STANFORD
### UNIVERSITY



**OFFICE OF THE GENERAL COUNSEL**
Debra L. Zumwalt
Vice President and General Counsel

Telephone (650) 723-6397
Facsimile (650) 723-4323
zumwalt@stanford.edu

June 6, 2018

Molly Stump
City Attorney
Office of the City Attorney
City Hall, 8th Floor
250 Hamilton Avenue
Palo Alto, CA 94301

Re:     **"Palo Alto Accountable and Affordable Health Care Initiative"**

Dear Ms. Stump:

   I write on behalf of Stanford Health Care ("Stanford") to express concerns regarding the "Palo Alto Accountable and Affordable Health Care Initiative" (the "Initiative") recently submitted to the city clerk for certification by individuals affiliated with the Service Employees International Union – United Healthcare Workers West ("SEIU-UHW"). We believe that the Initiative is facially invalid and unconstitutional. Moreover, because the proposed measure "exceed[s] the initiative power," pre-election review is "eminently appropriate." *City & County of San Francisco v. Patterson*, 202 Cal. App. 3d 95, 100 (1988). In fact, the city attorney in Emeryville, where SEIU-UHW is funding a substantively identical initiative, already filed suit to prevent the initiative from proceeding in that city. The electorate has no more power than the City Council to enact laws that are preempted by state and federal law. Here, the Initiative would place Stanford and other Palo Alto health care providers in the impossible situation of having to choose between complying with either a local ordinance or state and federal laws that govern the charging and payment of health care. It also intrudes in numerous phases of the health care field that are fully occupied by state and federal law. On its face, the Initiative would also violate due process by impairing Stanford's ability to provide technologically-advanced, high-quality care to all patient populations, including charity care to uninsured patients, and undermine the policy determinations that California and the federal government have already made in this area. And, it would create an impermissible burden on the City of Palo Alto by requiring the Administrative Services Department (the "Department") to act as a *de facto* court while attempting to enforce an ordinance that would be unconstitutionally vague. For these reasons, set forth in more detail below, we respectfully request that the City refrain from placing the Initiative on the ballot if the city clerk certifies that sufficient signatures have been collected.

   The stated purpose of the Initiative is "to impose reasonable limits on prices that hospitals and other health facilities may charge." Sec. 5.40.010. To do so, the Initiative would require Palo Alto hospitals, medical clinics, and certain "other providers" to calculate the "reasonable cost of direct patient care" and the pro-rata "health care quality improvement costs"

Molly Stump
June 6, 2018
Page 2

for each patient, and would cap the amount a provider can recover in reimbursement for care provided to that patient at 115% of the sum of those amounts, which the Initiative defines as the "acceptable payment amount." Secs. 5.40.020, 5.40.030(a). If a provider collects from or bills the "person or persons who paid or are financially responsible for payments for services provided to a particular patient" an amount greater than the acceptable payment amount over the course of a fiscal year, the provider must issue that "payer" a rebate (plus interest) or reduction in the amount collected or billed "in excess of the acceptable payment amount" and pay fines of up to $1,000 per rebate or reduction, with those fines continuing to accrue if they are not timely paid. Secs. 5.40.030(a)(2)-(4), (6)-(7). While the Initiative allows providers to petition the City to obtain relief from the 115% cap, such a variance may be granted only when the Department—a city agency that has no experience or expertise as a health care payer or with health care costs or reimbursement—decides that the Initiative's application would be "confiscatory or otherwise unlawful." Sec. 5.40.030(d)(2).

The Initiative defines "health care quality improvement costs" and the "reasonable cost of direct patient care" narrowly, and excludes categories of costs that are critical to the care Stanford provides to the public, including but not limited to administrative, management, and technology costs, and salary and benefit costs for positions associated with those functions. Secs. 5.40.020(c), 5.40.030(b)(1). The Initiative even excludes costs that Stanford is required by state law to incur, including for various managerial staff critical to the provision of care. *See, e.g.*, Cal. Code of Regs., tit. 22, §§ 70211(b) (nursing service administrator), 70225(c) (surgical service manager), 70425(e) (burn center manager), 70465(b) (coronary care service manager), 70485(b) (intensive care newborn nursery service oversight), 70243(f) (director of clinical laboratory service). Nor do the permissible costs account for the emergency care that providers are legally required to provide uninsured patients regardless of their ability to pay. The Initiative allows providers to petition for costs "not specified" in section 5.40.030(b)(1) to be designated as health care quality improvement costs or reasonable costs of direct patient care, but the costs eligible for such a variance are limited to costs "spent on services offered at the hospital, medical clinic, or other provider," which is impermissibly narrow, particularly when read in light of the express restrictions in section 5.40.030(b)(1). *See* Sec. 5.40.030(c)(2)(iii), (3)(iii). And the procedures for petitioning for relief from the 115% cap are poorly defined and would impose significant costs on both providers and the city government. *See* Sec. 5.40.030(d).

Under preemption principles, a city's authority to enact and enforce local laws like the Initiative is limited by state and federal law. A city can neither invade an area already occupied by state or federal laws nor pass legislation that conflicts with state or federal law. Cal. Const. Art. XI, § 7 ("A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."); U.S. Const. Art. VI, cl. 2 (Supremacy Clause); *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) ("[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws."). The Initiative raises both state and federal preemption concerns.

Molly Stump
June 6, 2018
Page 3

First, contrary to the proposed initiative's assertion that "neither the State nor federal governments have" imposed limits on the prices charged by hospitals and health facilities, Sec. 5.40.010, extensive federal and state regulations aimed at protecting insurance beneficiaries and patient access to low-cost and high-quality care are already in place, including pricing and payment regulations that determine the reasonable costs for particular health care services. *See, e.g.*, *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151, 167 (2001) (describing California's "highly-regulated health care finance and delivery schemes"); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 729 (1985) (recognizing "extensive" regulation of group health insurance contracts). Together, these regulations leave no room for individual municipalities to insert their own regulatory schemes restricting health care pricing and payment.

Second, by setting artificial pricing limitations without regard to pre-existing contracts between providers and insurers or the applicable "reasonable cost" determinations set forth in state and federal regulations, the Initiative would make it impossible for providers and insurers to comply with state and federal regulations while also complying with the initiative's proposed pricing cap. More broadly, the pricing limitations would also interfere with state and federal policy determinations that have already been made about how best to balance concerns about excessive prices against the costs of providing high-quality medical care to insured and uninsured patients alike.

The body of state and federal health care and insurance laws is vast, but we include several illustrative examples here:

At the state level, California enacted the Knox-Keene Act to "promote the delivery and the quality of health and medical care" for people enrolled or subscribed in health care plans by "[h]elping to ensure the best possible health care for the public at the lowest possible cost." Cal. Health & Safety Code § 1342. In implementing this legislation, the State determined that the best way to pursue the legislature's goals was to define the compensation paid by a health plan to a provider as either the "agreed upon contract rate," the "amount set forth in [a PPO or POS] enrollee's Evidence of Coverage," or, for non-contracted emergency services, the "reasonable and customary value for health care services." Cal. Code Regs. tit. 28, § 1300.71(a)(3). These reimbursement levels are necessary to "'ensure[] the continued financial viability of California's health care delivery system.'" *Bell v. Blue Cross of Cal.*, 131 Cal. App. 4th 211, 218 (2005) (citation omitted). For example, "[g]iven that the law elsewhere requires that emergency services and care be provided without regard to a patient's insurance or ability to pay, the Knox-Keene Act imposes a requirement that health care service plans must reimburse a provider who has provided emergency services or care to a health care service plan's enrollee" based on "reasonable and customary" rates. *YDM Mgmt. Co. v. Sharp Cmty. Med. Group, Inc.*, 16 Cal. App. 5th 613, 624-25 (2017). And providers are "entitled to reimbursement from a health care service plan" at those same rates. *Id.* at 627. Moreover, by requiring reimbursement at "reasonable and customary" rates by reference to specific factors, one of which includes the prices usually charged for such services, the State "established the minimum criteria for reimbursement." *Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260,

Molly Stump
June 6, 2018
Page 4

1273 (2014); *see also Bell*, 131 Cal. App. 4th at 217-18.[1]  In contrast, the Initiative would
disregard contracted rates entirely, and impose its own rate calculation based on a distinct
determination of what costs are reasonable and what criteria should be considered.

Local efforts such as these that deviate from statewide law are preempted.  *See
Am. Fin. Servs. Ass'n v. City of Oakland*, 34 Cal. 4th 1239, 1254-56 (2005) (holding city could
not pass more restrictive measure that would ban practice allowed under state law); *N. Cal.
Psychiatric Soc'y v. City of Berkeley*, 178 Cal. App. 3d 90, 105-06 (1986) (holding that where
state placed detailed regulations on when and how controversial psychiatric treatment could be
offered, city could not ban such treatment entirely).  In fact, because "regulation of statewide
commercial activities" like health care "command statewide uniformity," courts are particularly
wary of individual cities setting their own standards in "matters of health and medicine," which
"are of statewide concern." *N. Cal. Psychiatric Soc'y*, 178 Cal. App. 3d at 101, 108.  Moreover,
to the extent the proposed initiative prevents health plans and insurers from paying contracted
rates and reasonable and customary value for non-contracted emergency care, it forbids what
state law permits and even requires, and thus would be subject to conflict preemption.  *See
Coyne v. City & County of S.F.*, 9 Cal. App. 5th 1215, 1229-30 (2017) (local ordinance requiring
relocation subsidies when a landlord chooses to go out of the rental business subject to conflict
preemption because it prohibited landlords from "exercis[ing] their rights under [California's]
Ellis Act").

At the federal level, the ACA retains a role for "State law"—not local law—in the
oversight of the provider-plan relationship, while preempting all laws that "prevent application
of the" ACA's provisions. 42 U.S.C. § 18041(d).  On that front, regulations implemented as part
of the Affordable Care Act have set forth detailed methods to determine appropriate prices for
certain categories of medical care, which are similarly reliant on regularly charged and
negotiated prices as well as the federal government's own determination of what costs and other
considerations should be taken into account.  For example, Public Welfare regulations require
group and individual health plans to provide benefits for out-of-network emergency services in
an amount "at least equal to the greatest of three amounts," which in turn are based on contracted
prices for such services when they are provided in-network, the "usual, customary and
reasonable" amount paid for such services, or the amount that would be paid under Medicare.  45
C.F.R. § 147.138(b); *see also* 42 U.S.C. § 300gg-19a(b)(1)(C)(ii)(I).

Courts have also recognized that ERISA preempts all state or local laws that
"govern[] the payment of benefits" by an ERISA plan, including laws that "directly conflict[]
with ERISA's requirement that plans be administered, and benefits be paid, in accordance with
plan documents." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001).  Here, by
limiting the prices that hospitals can charge and that health plans and insurers can pay, the
proposed initiative would conflict with employee benefit plans' ability to pay benefits as
required by plan documents.  Notably, ERISA preemption is so broad with respect to the plans

---

[1] Similarly, California Insurance Code section 10112.82 applies minimum reimbursement criteria to an insurer's
payment for provision of non-contracted care to a beneficiary of a plan not regulated by the Knox-Keene Act.  See
also Cal. Ins. Code § 10133.65(c) (setting forth provider rights including limitations on the circumstances in which
rates of payment may be changed from those set forth in contracts between plans and providers).

Molly Stump
June 6, 2018
Page 5

within its scope, such as self-funded payer plans, that it has been found to displace some of the
same California statutes and regulations that would preempt the Initiative in its application to
others, such as Knox-Keene health plans, were it enacted. *See, e.g., Lodi Mem'l Hosp. Ass'n v.
Tiger Lines, LLC*, No. 2:15-CV-00319-MCE, 2015 WL 5009093, at *7 (E.D. Cal. Aug. 20,
2015) (concluding that Knox-Keene Act reimbursement requirement did "not extend to a self-
funded ERISA plan"). Thus, to the extent that state law does not preempt the Initiative in some
applications, that is only because federal law preempts those applications of the Initiative. *See
Atay v. County of Maui*, 842 F.3d 688, 705 (9th Cir. 2016) (finding local regulations preempted
by a mix of state and federal law).

Apart from preemption concerns, we believe the Initiative and its pricing
restrictions would violate due process in at least two respects. First, the Initiative's narrow
definition of costs that can be factored into hospital prices—which excludes, among other things,
the cost of free emergency care hospitals are legally required to provide—would leave hospitals
and other providers unable to subsidize the services they are required to provide without
payment. *See Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal. 4th 761, 771 (1997) (a statute
imposing pricing controls violates due process where it would "deprive investors of a 'fair
return' and thereby become 'confiscatory'"). Second, due process requires that a regulated party
must be able to petition for variances from pricing restrictions, and that the procedural
mechanism to obtain such variances "must not be prohibitively burdensome." *Id.* at 772. Here,
however, to obtain relief from the 115% limit, providers must demonstrate that application of the
limit would be "unlawful" and provide sufficient information to demonstrate what a "lowest
acceptable payment" for a particular patient would be, without regard to the fluctuating costs
incurred by a provider for the entirety of its patient base over the fiscal year. These procedures
are too burdensome to allow for meaningful relief. *See Birkenfeld v. City of Berkeley*, 17 Cal. 3d
129, 172-73 (1976) (striking down rent control law because its procedures were so cumbersome
and time-consuming that landlords could not in reality obtain relief from confiscatory rates).

Finally, the Initiative's variance procedures also raise concerns beyond due
process limits on price controls. First, the Initiative would require the Department to sit as a *de
facto* court, evaluating the strength of a provider's legal and factual showing for a variance and
determining whether application of the 115% cap would be "confiscatory or otherwise
unlawful." Sec. 85.40.030(d)(2), (3), (4). Asking City officials to make these determinations
would violate bedrock principles of separation of powers by usurping the courts' proper role and
shifting controversial decisions onto an executive body. *See Kasler v. Lockyer*, 23 Cal. 4th 472,
493 (2000) (cautioning that the "separation of powers doctrine prevents any delegation of power
that would result in the 'aggrandizement' or 'encroachment' of one branch of power" and that an
"unconstitutional delegation of authority" occurs when the executive or judicial branch is called
on to resolve "fundamental policy issues"). In fact, "a local administrative agency has *no*
authority under the California Constitution to exercise judicial power." *Lockyer v. City &
County of San Francisco*, 33 Cal. 4th 1055, 1094 (2004). Second, the Initiative's variance
procedures and definitions lack essential details, rendering them unconstitutionally vague. For
example, it fails to identify the market to be used for comparison in determining whether
additional costs are "reasonable in light of market rates for similar goods or services." It also
fails to identify what burden of proof health care providers would bear in "prov[ing]" application

097

Molly Stump
June 6, 2018
Page 6

of the cap would be unlawful, or how "necessary information" provided to the Department would be presented. Moreover, the Initiative lacks sufficient specificity in its definition of "other providers" to put Palo Alto health care providers on notice of whether they are covered by the Initiative. *See, e.g.*, Sec. 5.40.020(f) (incorporating Health & Safety Code § 1375.4(f), which extends to any entity that "delivers, furnishes, or otherwise arranges for or provides health care services," without accounting for the essential limitations of that definition within that statutory scheme). Together, these flaws and the burdens imposed on the City will have the effect of interfering with essential government functions already allocated to the Department.

For all these reasons, the Initiative is facially invalid. Because it is preempted by state and federal law, the Initiative "exceed[s] the initiative power," making pre-election review "eminently appropriate." *Patterson*, 202 Cal. App. 3d at 102 (affirming removal of initiative from San Francisco ballot where proposed ordinance was preempted and thus "unmistakably beyond the power of the people to enact"); *see also Wiltshire v. Superior Court*, 172 Cal. App. 3d 296, 305 (1985) (affirming order precluding initiative from proceeding where it was "beyond the power of the voters to adopt" because, in part, it ran "aground on the shoals of preemption"). And, because pre-election review on preemption grounds is appropriate, a court would be authorized to address all of the Initiative's defects. *See Citizens for Responsible Behavior v. Superior Court*, 1 Cal. App. 4th 1013, 1024 n.5 (1991) (explaining that if a court is "permitted" to conduct a pre-election review of one issue, "there is no logical reason why [it] should be prohibited from reaching all the challenges raised to the measure"). As Emeryville recognized in filing suit to prevent a substantively identical initiative from proceeding in that city, placing the Initiative on the ballot notwithstanding the these clear legal deficiencies would only waste public resources, create divisions in the community, and mislead the public. *See also id.* at 1023.

Thank you for the opportunity to express Stanford's concerns, and for your attention to this important matter. Please let me know if you believe that any further information would be of assistance.

Very truly yours,

Debra L. Zumwalt / KM

Debra Zumwalt